**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PHILLIP WOOLGAR, Individually and On Behalf of All Others Similarly Situated, | Case No. 19-cv-05500 |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| KINGSTONE COMPANIES, INC., BARRY GOLDSTEIN, DALE A. THATCHER, and VICTOR J. BRODSKY, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Phillip Woolgar ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Kingstone Companies, Inc. ("Kingstone" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Kingstone; and (c) review of other publicly available information concerning Kingstone.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired Kingstone securities between March 14, 2018 and April 29, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Kingstone offers property and casualty insurance products through its wholly-owned subsidiary, Kingstone Insurance Company ("KICO").

3. On April 29, 2019, the Company disclosed a $2.5 million charge to its claims case reserves and a $2.5 million charge to its IBNR reserves, based on a "comprehensive review of [the Company's] claims operations." As a result of the charges, the Company "expects to end the full year with a combined ratio excluding catastrophe losses of 88% to 91% and catastrophe losses of 4 to 5 points."

4. On this news, the Company's share price fell $2.07, or over 15%, to close at $11.61 per share on April 30, 2019, on unusually heavy trading volume.

5. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company did not adequately follow industry best practices related to claims handling; (2) that, as a result, the Company did not record sufficient claims reserves; (3) that the Company lacked

adequate internal control over financial reporting; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

10.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.      Plaintiff Phillip Woolgar, as set forth in the accompanying certification, incorporated by reference herein, purchased Kingstone securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.      Defendant Kingstone is incorporated under the laws of Delaware with its principal executive offices located in Kingston, New York.  Kingstone's common stock trades on

the NASDAQ exchange under the symbol "KINS."

13.    Defendant Barry Goldstein ("Goldstein") was the Chief Executive Officer ("CEO") of the Company from March 2001 to January 1, 2019.

14.    Defendant Dale A. Thatcher ("Thatcher") has been the CEO since January 1, 2019

15.    Defendant Victor J. Brodsky ("Brodsky") was the Chief Financial Officer of the Company at all relevant times.

16.    Defendants Goldstein, Thatcher, and Brodsky, (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

### SUBSTANTIVE ALLEGATIONS

### Background

17.    Kingstone offers property and casualty insurance products through its wholly-owned subsidiary, Kingstone Insurance Company ("KICO").

### Materially False and Misleading
### Statements Issued During the Class Period

18.    The Class Period begins on March 14, 2018. On that day, the Company announced its fourth quarter and full year 2017 financial results in a press release, reporting $10.0 million net income and net combined ratio of 80.6%. The Company further stated in

relevant part:

> Kingstone's EVP and Chief Actuary, Ben Walden, provided details on the underwriting results for the quarter.
>
> Mr. Walden stated, "Underwriting results for the quarter were dampened by the impact of large claims and by an early onset of severe cold weather. Two large claims, one in personal lines and one in commercial lines, reached the per risk reinsurance retentions during the quarter, and these had a 5.8 point impact on the loss ratio. An unusual spell of very cold weather during the last week of December resulted in pipe freeze claims that affected the quarterly loss ratio by another 2.7 points. Combined, the two large claims and those from late December had a 2.5 point impact on the full year loss ratio. Fire claim activity this quarter was more in line with long term averages than was observed in Q4 2016, which had an unusually low impact from such claims. Despite the impacts noted above, the quarterly combined ratio again came in under 90% and the full year ended with a combined ratio just over 80%.

19.    On March 15, 2018, the Company filed its annual report on Form 10-K with the

SEC, affirming the previously reported financial results for the period ended December 31, 2017

(the "2017 10-K"). As to loss reserves, the 2017 10-K stated, in relevant part:

> We are required to establish reserves for incurred losses that are unpaid, including reserves for claims and loss adjustment expenses ("LAE"), which represent the expenses of settling and adjusting those claims. These reserves are balance sheet liabilities representing estimates of future amounts required to pay losses and loss expenses for claims that have occurred at or before the balance sheet date, whether already known to us or not yet reported. We establish these reserves after considering all information known to us as of the date they are recorded.
>
> Loss reserves fall into two categories: case reserves for reported losses and LAE associated with specific reported claims, and reserves for losses and LAE that are incurred but not reported ("IBNR"). We establish these two categories of loss reserves as follows:
>
> *Reserves for reported losses* - When a claim is received, we establish a case reserve for the estimated amount of its ultimate settlement and its estimated loss expenses. We establish case reserves based upon the known facts about each claim at the time the claim is reported and we may subsequently increase or reduce the case reserves as additional facts and information about each claim develops.
>
> *IBNR reserves* - We also estimate and establish reserves for loss and LAE amounts incurred but not yet reported ("IBNR"). IBNR reserves are calculated in bulk as an estimate of ultimate losses and LAE less reported losses and LAE. There are two types of IBNR; the first is a provision for claims that have occurred but are not yet reported or known. We refer to this as 'Pure' IBNR, and due to the fact that we write primarily quickly reported property lines of business, this type

of IBNR does not make up a large portion of KICO's total IBNR. The second type of IBNR is a provision for expected future development on known claims, from the evaluation date until the time claims are settled and closed. We refer to this as 'Case Development' IBNR and it makes up the majority of the IBNR that KICO records. Ultimate losses driving the determination of appropriate IBNR levels are projected by using generally accepted actuarial techniques.

20.     Regarding the reserving process, the 2017 10-K stated, in relevant part:

The reserving process for loss and LAE reserves provides for the Company's best estimate at a particular point in time of the ultimate unpaid cost of all losses and LAE incurred, including settlement and administration of losses, and is based on facts and circumstances then known including losses that have occurred but that have not yet been reported. The process relies on standard actuarial reserving methodologies, judgments relative to estimates of ultimate claims severity and frequency, the length of time before losses will develop to their ultimate level ('tail' factors), and the likelihood of changes in the law or other external factors that are beyond the Company's control. Several actuarial reserving methodologies are used to estimate required loss reserves. The process produces carried reserves set by management based upon the actuaries' best estimate and is the cumulative combination of the best estimates made by line of business, accident year, and loss and LAE. The amount of loss and LAE reserves for individual reported claims (the "case reserve") is determined by the claims department and changes over time as new information is gathered. Such information includes a review of coverage applicability, comparative liability on the part of the insured, injury severity, property damage, replacement cost estimates, and any other information considered pertinent to estimating the exposure presented by the claim. The amounts of loss and LAE reserves for unreported claims and development on known claims (IBNR reserves) are determined using historical information aggregated by line of insurance as adjusted to current conditions. Since this process produces loss reserves set by management based upon the actuaries' best estimate, there is no explicit or implicit provision for uncertainty in the carried loss reserves.

21.     Regarding risks related to reserves, the 2017 10-K stated, in relevant part:

***Actual claims incurred may exceed current reserves established for claims, which may adversely affect our operating results and financial condition***.

Recorded claim reserves for our business are based on our best estimates of losses after considering known facts and interpretations of circumstances. Internal and external factors are considered. Internal factors include, but are not limited to, actual claims paid, pending levels of unpaid claims, product mix and contractual terms. External factors include, but are not limited to, changes in the law, court decisions, changes in regulatory requirements and economic conditions. Because reserves are estimates of the unpaid portion of losses that have occurred, the establishment of appropriate reserves, including reserves for catastrophes, is an inherently uncertain and complex process. The ultimate cost of losses may vary

materially from recorded reserves, and such variance may adversely affect our operating results and financial condition.

22.    The 2017 10-K stated that the Company's internal control over financial reporting was effective as of December 31, 2017.

23.    On May 9, 2018, the Company announced its first quarter 2018 financial results in a press release, stating in relevant part:

**2018 First Quarter**

*(All results are compared to prior year period unless otherwise noted)*

- Direct written premiums[1] increased 20.7%; Personal lines grew by 27.6%.

- Net premiums earned increased 39.5% to $22.8 million.

- Net investment income increased 61.3% to $1.4 million.

- First quarter net catastrophe losses, including associated loss adjustment expenses and decrease in contingent ceding commissions, are now estimated at $4.6 million after taxes.

- Net loss ratio of 75.6% compared to 50.7%. Net loss ratio, <u>excluding Q1 2018 catastrophe losses</u>[1], of 51.3% compared to 50.7%.

- Net operating income[1] decreased to a loss of ($2.3 million) or ($0.22) per diluted share from a gain of $1.5 million or $0.15 per diluted share.

- Net income decreased to a loss of ($2.7 million) or ($0.25) per diluted share from a gain of $1.5 million or $0.15 per diluted share.

- Net combined ratio of 114.3% compared to 85.2%. Net combined ratio, <u>excluding Q1 2018 catastrophe losses</u>[1], of 88.7% compared to 85.2%.

- Book value per share of $8.27, down $.02 from March 31, 2017 and down $.63 from December 31, 2017.

\* \* \*

Ben Walden, Kingstone's EVP and Chief Actuary, commented, "***Beginning this year, Kingstone has changed its definition of a catastrophe event to more closely align with the definition used by other major carriers.*** Going forward, Kingstone will define catastrophe losses as those associated with an event that is assigned a catastrophe number by the Property Claim Services (PCS) unit of ISO (Insurance Services Office). Kingstone experienced three such events in the first quarter that were first disclosed in mid-March.

Kingstone's initial estimate of the net after-tax impact from the three winter catastrophe events was conservatively stated at between $5 million and $7 million. ***Since the initial disclosure, the impact from the two March storms has emerged to be less than originally anticipated. At present, the expected total pre-tax net impact from the three events is $5.9 million, or $4.6 million after tax.***

Apart from the winter catastrophe events, underlying results remained solid. Kingstone continued to observe favorable prior year claim emergence with 0.4 points of favorable loss development recorded during the quarter."

(Emphases added.)

24.    On May 10, 2018, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2018, affirming the previously reported financial results. The report stated: "There was no change in our internal control over financial reporting during our most recently completed fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

25.    On August 8, 2018, the Company announced its second quarter 2018 financial results in a press release, stating in relevant part:

**2018 Second Quarter**

*(All results are compared to prior year period unless otherwise noted)*

- Net income increased 9.8% to $2.8 million or $0.25 per diluted share

- Net operating income[1] increased 17.1% to $2.8 million or $0.26 per diluted share

- Net premiums earned increased 42.2% to $24.1 million

- Direct written premiums increased 21.0%; Personal lines grew by 28.1%

- Net combined ratio of 84.2% compared to 77.6%

- Return on average common equity (annualized) of 12.5% up from 11.3%

- Operating return on average common equity (annualized)[1] of 12.9% up from 10.9%

26.    On August 9, 2018, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2018, affirming the previously reported financial results. The report stated: "There was no change in our internal control over financial reporting during our most recently completed fiscal quarter that has materially affected, or is reasonably likely to

materially affect, our internal control over financial reporting."

27.    On November 7, 2018, the Company announced its third quarter 2018 financial results in a press release, stating in relevant part:

**2018 Third Quarter**

*(All results are compared to prior year period unless otherwise noted)*

- Net income decreased 3.4% to $3.9 million or $0.36 per diluted share

- Net operating income[1] decreased 9.9% to $3.7 million or $0.34 per diluted share

- Net premiums earned increased 28.0% to $27.5 million

- Direct written premiums increased 18.1%; Personal lines grew by 21.8%

- Net combined ratio of 86.0% compared to 69.8%

- Return on average common equity (annualized) of 17.5%

- Operating return on average common equity (annualized)[1] of 16.2% down from 17.6%

\* \* \*

Dale Thatcher, Kingstone's Chief Operating Officer, commented, ". . . Although the combined ratio is substantially higher for third quarter 2018, that is more a story of how low the combined ratio was last year at 69.8%. This year we recorded a more normal 86.0% combined ratio and an operating ROE for the quarter of 16%. Both metrics demonstrate our continued high performance.

In addition, our expense ratio this quarter inched upward reflecting our continued investment in growth. As we look at the cost of core operations exclusive of the new states, we continue to work hard on maintaining expense efficiencies, and we see the ratio of other underwriting expenses to direct written premium holding steady at 13.4%. We are working hard to build an exemplary Northeast Regional carrier on our platform of historic profitability. ***For the full year, we still expect to achieve a combined ratio, excluding catastrophe losses, of between an 84% and 86% and catastrophe losses of between 6 points and 7 points on the combined ratio.***

(Emphasis added.)

28.    On November 8, 2018, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2018, affirming the previously reported financial results. The report stated: "There was no change in our internal control over financial reporting

during our most recently completed fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

29.    On March 13, 2019, the Company announced its fourth quarter and full year 2018 financial results in a press release, stating in relevant part:

**2018 Full Year**

(All results are compared to prior year)

- Direct written premiums increased 20.7%; Personal lines grew by 25.0%

- Net premiums earned increased 33.7% to $103.4 million

- Net investment income increased 49.7% to $6.2 million

- 2018 net catastrophe losses, including associated loss adjustment expenses and impact on contingent ceding commissions, are estimated at $5.8 million

- Net loss ratio of 56.4% compared to 44.2%. Net loss ratio, excluding Q4 2018 catastrophe losses, of 50.4% compared to 44.2%

- Net income of $3.1 million or $0.29 per diluted share including an unrealized decline in value of equity securities of $1.8 million or $.17 per diluted share, net of tax

- Net operating income decreased 49.0% to $5.1 million or $0.47 per diluted share

- Net combined ratio of 94.8% compared to 80.6%

- Return on average common equity of 3.4%

- Operating return on average common equity of 5.5% down from 13.1%

  For 2019 we expect a combined ratio excluding catastrophes between 82% and 84%, and catastrophe losses of approximately 4 points.

30.    On March 18, 2019, the Company filed its annual report on Form 10-K with the SEC, affirming the previously reported financial results for the period ended December 31, 2018. The 2018 10-K stated that the Company's internal control over financial reporting was effective as of December 31, 2018.

31.    The above statements identified in ¶¶18-30 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the

Company did not adequately follow industry best practices related to claims handling; (2) that, as a result, the Company did not record sufficient claims reserves; (3) that the Company lacked adequate internal control over financial reporting; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

32.    On April 29, 2019, the Company reduced its full year 2019 guidance due to a $2.5 million charge to its claims case reserves and a $2.5 million charge to its IBNR reserves, based on a "comprehensive review of [the Company's] claims operations." In a press release, the Company stated, in relevant part:

> **Catastrophe Losses in Q1**- KICO estimates ultimate net losses from multiple winter catastrophe events of approximately $5 million pre-tax, resulting in a 17 point impact on the quarterly combined ratio. No catastrophe reinsurance recovery is expected as no single event reached the KICO retention of $5 million. The catastrophe events are estimated to have a $0.37 after-tax impact on net income per share for the quarter. Relative to the prior year, net losses from winter cat events are higher than those recorded in 2018 due to the reduction in the quota share rate from 20% to 10% in July 2018.

> **Claims Department Reorganization-** "Following multiple quarters of disappointing results from our Claims Department, KICO engaged a consultant to do a comprehensive review of our claims operations," said Dale Thatcher, Kingstone CEO. "The final report concluded that there was much room for improvement in claims handling through adopting and implementing a number of industry best practices including the need to acquire more skilled and experienced staff. The process began with our hiring of a former colleague of mine, Bill O'Brien, as our new Chief Claims Officer as announced earlier this month. The result of the review gives rise for the need to strengthen our claims case reserves by approximately $2.5 million and our IBNR reserves by an additional $2.5 million for a total reserve charge of $5.0 million. The overall impact of this reserve strengthening is 17 points on the quarterly combined ratio. Although this will reduce our quarterly earnings and book value per share by approximately $0.37, it will substantially strengthen our balance sheet and position us well for the future."

> **Updated Guidance**

> As a result of the two charges noted above, Kingstone now expects to end the full year with a combined ratio excluding catastrophe losses of 88% to 91% and catastrophe losses of 4 to 5 points.

33.     On this news, the Company's share price fell $2.07, or over 15%, to close at $11.61 per share on April 30, 2019, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

34.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Kingstone securities between March 14, 2018 and April 29, 2019, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

35.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Kingstone's common shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Kingstone common stock were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Kingstone or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

36.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

37.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

38.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Kingstone; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

39.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

40.    The market for Kingstone's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Kingstone's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Kingstone's securities relying upon the integrity of the market price of the Company's securities and market information relating to Kingstone, and have been damaged thereby.

41.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Kingstone's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Kingstone's business, operations, and prospects as alleged herein.

42.    At all relevant times, the material misrepresentations and omissions particularized

in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Kingstone's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

43.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

44.     During the Class Period, Plaintiff and the Class purchased Kingstone's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

45.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Kingstone, their control over, and/or receipt and/or modification of Kingstone's allegedly materially misleading

misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Kingstone, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

46.    The market for Kingstone's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Kingstone's securities traded at artificially inflated prices during the Class Period.  On March 14, 2018, the Company's share price closed at a Class Period high of $21.05 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Kingstone's securities and market information relating to Kingstone, and have been damaged thereby.

47.    During the Class Period, the artificial inflation of Kingstone's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Kingstone's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Kingstone and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

48.    At all relevant times, the market for Kingstone's securities was an efficient market for the following reasons, among others:

(a)    Kingstone shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Kingstone filed periodic public reports with the SEC and/or

the NASDAQ;

(c)     Kingstone regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Kingstone was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

49.     As a result of the foregoing, the market for Kingstone's securities promptly digested current information regarding Kingstone from all publicly available sources and reflected such information in Kingstone's share price. Under these circumstances, all purchasers of Kingstone's securities during the Class Period suffered similar injury through their purchase of Kingstone's securities at artificially inflated prices and a presumption of reliance applies.

50.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

51.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Kingstone who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

52.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

53.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Kingstone's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

54.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Kingstone's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

55. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Kingstone's financial well-being and prospects, as specified herein.

56. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Kingstone's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Kingstone and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

57. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

58. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Kingstone's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

59.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Kingstone's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Kingstone's securities during the Class Period at artificially high prices and were damaged thereby.

60.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Kingstone was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Kingstone securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

61.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

62.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

63.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

64.     Individual Defendants acted as controlling persons of Kingstone within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

65.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

66.     As set forth above, Kingstone and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the

Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 12, 2019

**GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Lesley F. Portnoy*
Lesly F. Portnoy (LP-1941)
230 Park Ave., Suite 530
New York, New York 10169
Telephone: (212)682-5340
Facsimile: (212) 884-0988
Email: lportnoy@glancylaw.com

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160
Email: info@glancylaw.com

*Attorneys for Plaintiff Phillip Woolgar*

**SWORN CERTIFICATION OF PLAINTIFF**

**KINGSTONE COMPANIES, INC. SECURITIES LITIGATION**

I, Phillip J. Woolgar, individually, and/or in my capacity as trustee and/or principal for accounts listed on Schedule A, certify that:

1.  I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.  I did not purchase the Kingstone Companies, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in Kingstone Companies, Inc. securities during the Class Period set forth in the Complaint are as follows:

    (See attached transactions)

5.  I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

6/11/2019

_____
Date

DocuSigned by:

*Phillip J. Woolgar*

EEE8495F0EDC437...
_____
Phillip J. Woolgar

**Phillip J. Woolgar's Transactions in Kingstone Companies, Inc. (KINS)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 12/20/2018 | Bought | 646 | $15.4780 |