**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

PHILLIP WOOLGAR, Individually and On Behalf of All Others Similarly Situated,

Plaintiff,

v.

KINGSTONE COMPANIES, INC., BARRY GOLDSTEIN, DALE A. THATCHER, VICTOR J. BRODSKY, and BENJAMIN WALDEN,

Defendants.

Case No.: 1:19-cv-05500-RA

**AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS


I. INTRODUCTION .......... 2

II. JURISDICTION AND VENUE .......... 6

III. THE PARTIES .......... 6

A. Lead Plaintiff .......... 6

B. Defendants .......... 7

IV. BACKGROUND AND NATURE OF THE FRAUD .......... 9

A. The Company and its Business .......... 9

B. Kingstone's Key Financial Metrics .......... 12

C. Defendants Create a Misleading Impression of Financial Health .......... 14

D. Contrary to Defendants' Misrepresentations, Kingstone's Loss Reserves Were Materially Understated .......... 15

E. Kingstone Was Required to Report Financial Results in Accordance with GAAP and SEC Regulations .......... 20

V. THE TRUTH EMERGES .......... 23

VI. ADDITIONAL SCIENTER ALLEGATIONS .......... 31

VII. MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD .......... 38

A. Defendants Materially Misstated Kingstone's Financial Results .......... 39

B. Misstatements Regarding Kingstone's Underwriting, Risk Management, and Reserves Practices .......... 41

C. Additional Misstatements During the Class Period .......... 46

D. False Statements Regarding Internal Controls .......... 53

VIII. LOSS CAUSATION .......... 55

IX. NO SAFE HARBOR .......... 56

X. PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET .......... 57

XI. CLASS ACTION ALLEGATIONS ..... 58

XII. CAUSES OF ACTION ..... 60

Lead Plaintiff Donald Fitzherbert ("Fitzherbert" or "Lead Plaintiff"), individually and on behalf of a class of similarly situated persons, by his undersigned attorneys, alleges the following against Kingstone Companies, Inc. ("Kingstone" or the "Company") and the Individual Defendants (defined below), upon personal knowledge as to himself and his own acts and upon information and belief as to all other matters.

Lead Plaintiff's information and belief is based upon the investigation conducted by and through Lead Plaintiff's counsel, which included, among other things, a review and analysis of: (i) Kingstone's public filings with the U.S. Securities and Exchange Commission (the "SEC"); (ii) press releases, news articles, and other public statements issued by or concerning Kingstone and the Individual Defendants; (iii) transcripts of investor calls with Kingstone senior management; (iv) analysts' reports and advisories about the Company; (v) interviews with former employees of the Company; and (vi) other publicly available information. Counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting those allegations are known only to the Defendants (defined below) and are exclusively within their custody or control. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Lead Plaintiff brings this federal securities action on behalf of himself and a class consisting of all persons that purchased or otherwise acquired Kingstone securities between March 14, 2018 and April 29, 2019, inclusive (the "Class Period"), subject to certain exclusions as described in paragraph 164 below (the "Class"). The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder, and are brought against: Kingstone; Kingstone's Chief Executive Officer ("CEO"), Barry Goldstein ("Goldstein"); the Company's former CEO, Dale A. Thatcher

("Thatcher"); Kingstone's Chief Financial Officer ("CFO"), Victor J. Brodsky ("Brodsky"); and Kingstone's Chief Actuary, Benjamin Walden ("Walden") (collectively, "Defendants").

## I. INTRODUCTION

1. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities when the truth finally emerged, Lead Plaintiff and the Class have suffered significant damages.

2. Kingstone is a holding company for its wholly owned subsidiary Kingstone Insurance Company ("KICO"), both headquartered in New York. KICO is a property and casualty insurance company providing insurance products for individuals and small to mid-sized businesses in the northeast, with most of its business in New York. The Company claims to be the "15th largest writer of homeowners and dwelling fire insurance in the State of New York." Kingstone formed a second subsidiary, the Cosi Agency, Inc. ("COSI") in 2019. COSI is a multi-state general agency giving the Company access to lead and nationwide insurance agencies, whereas KICO distributes its insurance products through an independent agent and broker network.

3. Insurance companies like Kingstone are required to maintain loss reserves. The loss reserve is an estimate of the value of claims not yet paid and directly impacts the company's net income as it is recorded as a balance sheet liability. There are two types of loss reserves: (i) case reserves, which are for known but unpaid claims; and (ii) "incurred but not reported" loss reserves ("IBNR"), which are for unknown policy claims. Under settled norms in the insurance industry, a company's case reserves must accurately reflect the cost of known but unpaid claims, and a company's IBNR reserves must reflect, as reasonably as possible based on established procedures, the estimated costs of unknown claims.

4. Kingstone's loss reserves during the Class Period were materially lower than they should have been, as Defendants intentionally under-reserved, or were at minimum grossly

reckless in doing so, because—as Defendants now admit—the Company flouted industry best practices for claims handling.

5. Defendants were motivated to understate Kingstone's loss reserves to inflate the Company's net income and overall financial strength, especially in light of the Company's recent A.M. Best rating upgrade which was bringing in more business. Indeed, in the years leading up to the Class Period, Kingstone saw its net premiums, revenues, and net income continually increase. Despite this knowledge, Kingstone did not adequately increase the loss reserves. The under reporting came to light at the end of the Class Period when Defendants were forced to take a reserve charge in the amount of $5 million. Shortly thereafter, defendant Thatcher purportedly "resigned." Since the end of the Class Period, the Company has taken additional reserve charges for a total charge of over $11 million and operating results have suffered with a reported $7.4 million loss for the first nine months of 2019 (compared to nearly $4 million in income for the same period in 2018).

6. Kingstone's loss reserves were also inadequate due to the culture created by the Individual Defendants who disallowed communications between the underwriting and claims departments and enabled increased underwriting risk to appease agents and brokers. Confidential Witnesses ("CWs") describe how exceptions were granted to lead agents and decisions overridden after complaints to management, including defendant Goldstein. CWs also recount widespread and significant under-valuation of properties—an issue the Individual Defendants knew about but blatantly ignored. Because the Individual Defendants had caused the Company to lower its underwriting standards, Kingstone should have increased its loss reserves.

7. Despite these and other known issues, Defendants represented to investors that the Company's loss reserves were "adequate," "strong," and "solid," and that the Company considered

all relevant information in setting and continually updating the reserves. In addition, Defendants purported to accurately report Kingstone's related key financial metrics—the loss ratio and the net combined ratio. Defendants also falsely portrayed Kingstone's financial reporting and internal controls as accurate and adequate.

8. On April 29, 2019, Kingstone shocked the market by announcing a $5 million loss reserve charge—$2.5 million to case reserves and $2.5 million to IBNR. The press release stated that the Company had "engaged a consultant to do a comprehensive review of [its] claims operations" with the report concluding that Kingstone should adopt and implement "a number of industry best industry practices including the need to acquire more skilled and experienced staff." The press release also stated that the charge would reduce the Company's earnings and book value per share by $0.37.

9. On this news, Kingstone's stock price dropped $2.02 per share, or 15.2%, on unusually heavy trading volume.

10. While investors suffered losses due to Defendants' fraudulent scheme, the Individual Defendants have reaped significant salaries and were motivated to conceal underwriting weaknesses and under-reserve for losses in order to maintain the Company's recent A.M. Best rating upgrade and their annual performance bonuses and profit sharing plan income which were tied to Kingstone's income and combined ratio, respectively. Defendant Goldstein was further motivated to inflate the Company's stock price in order to maximize his individual profits, ***reaping over $1.3 million in stock sale proceeds during the Class Period***.

11. Further facts have come to light since the Company's admission that it was not following industry best practices requiring the initial $5 million loss reserve charge. On May 8, 2019, the Company revealed that it was tightening its underwriting guidelines and was placing a

moratorium on its commercial lines in order to "***re-underwrite the entire book***."[1] Defendants claimed that the case reserve charge related primarily to commercial lines and accidents from 2014, 2016, and 2017. Defendants attempted to downplay the seriousness of the charge and the breadth of issues with the Company's reserves on a May 9, 2019 conference call, but defendant Thatcher recognized that the need for it was readily apparent, stating "even I, a nonclaims professional said wow, that needs to be reserved at a higher number than that."

12. Suspiciously, defendant Thatcher "resigned" just two months later after serving a mere seven months of his lucrative three-year employment agreement as President and CEO of Kingstone. Shortly thereafter, on July 23, 2019, Kingstone announced that it would no longer underwrite commercial liability risks.

13. The loss reserve charge increased by another $1.6 million as reported with the Company's second quarter 2019 financial results. The Company's quarterly report revealed that while commercial lines represented only 12% of Kingstone's net premiums, those lines represented 43% of the loss and loss adjustment expenses ("LAE") reserves net of reinsurance recoverables. Kingstone also withdrew its combined ratio guidance.

14. As reported on November 11, 2019, for the third quarter of 2019, Kingstone took yet another loss reserve charge, this time for $5.1 million of which $4.4 million was related to the commercial lines. It was emphasized that the Company was tightening underwriting standards.

15. The Company's quarterly financial report for the quarter ended September 30, 2019 stated that the Company's disclosure controls and procedures were not effective as a result of the material weakness in oversight of the process of setting appropriate liability case reserves.

[1] Unless otherwise noted, all emphasis is added.

16. In total to date, since the end of the Class Period, Kingstone has taken over $11 million in loss reserve charges with the likely possibility of more to follow.

## II. JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

19. Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Many of the acts and omissions that constitute the alleged violations of law, including the dissemination to the public of untrue statements of material facts, occurred in this District. Kingstone's shares are traded on the NASDAQ exchange, which is based in this District.

20. In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. THE PARTIES

### A. Lead Plaintiff

21. Fitzherbert acquired Kingstone securities at artificially inflated prices during the Class Period as set forth in the certification previously filed with the Court, and he suffered damages as a result of the violations of the federal securities laws alleged herein.

**B. Defendants**

22. Kingstone is the parent company of KICO, a provider of insurance products for individuals and small to mid-sized businesses in the northeast with the majority of its business in New York.[2] The Company is incorporated under the laws of the state of Delaware and headquartered in Kingston, New York. Kingstone trades on the NASDAQ under the ticker symbol "KINS."

23. Goldstein currently serves as Kingstone's CEO and President, a position he has held since July 19, 2019, and previously from March 2001 until December 31, 2018. Goldstein has also served as Kingstone's Executive Chairman of the Board of Directors (the "Board") since January 1, 2019, and as Chairman of the Board from March 2001 until December 31, 2018. He served as Kingstone's CFO from March 2001 to November 2007 and as Treasurer from May 2001 to August 2013. Goldstein served as President of AIA Acquisition Corp. from 1997 to 2004 which sold substantially all of its assets to Kingstone in 2003.

24. Goldstein also serves as KICO's President and CEO, a position he has held since July 19, 2019. He also served as KICO's CEO from January 2012 to December 31, 2018, as President from January 2012 to March 2018, and as Treasurer from March 2010 through September 2010. He has served as KICO's Chairman of the Board and Chairman of its Executive Committee since January 2006 and as Chief Investment Officer since August 2008. In addition, Goldstein has served as President of COSI since January 1, 2019.

25. Thatcher served as Kingstone's President and CEO from January 1, 2019 until his abrupt resignation on July 19, 2019. He also served as the Company's Chief Operating Officer ("COO") beginning in March 2018 and as a board member from August 2017 until July 19, 2019.

---

[2] References to Kingstone herein include KICO's operations.

Thatcher served as KICO's CEO from January 1, 2019 until July 19, 2019, and as President from March 2018 to July 19, 2019.

26. Brodsky has served as Kingstone's CFO since August 2009 and as Treasurer since August 2013. He previously served as the Company's Chief Accounting Officer from August 2007 through July 2009, as Principal Financial Officer for SEC reporting purposes from November 2007 through July 2009, and as Secretary from December 2008 to August 2013. Brodsky has also served as a director of KICO since February 2008, as CFO of KICO since September 2010, and as Executive Vice President of KICO since February 2017. He served as KICO's Senior Vice President from January 2012 to February 2017 and as KICO's Treasurer from September 2010 through December 2011.

27. Walden has served as Executive Vice President of KICO since February 2017 and as Chief Actuary of KICO since December 2013. He served as KICO's Senior Vice President from January 2015 to February 2017 and as KICO's Vice President from December 2013 to January 2015.

28. Goldstein, Thatcher, Brodsky, and Walden are sometimes referred to herein as the "Individual Defendants."

29. The Individual Defendants, because of their positions within the Company, possessed the power and authority to control the contents of Kingstone's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew that

the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

## IV. BACKGROUND AND NATURE OF THE FRAUD

### A. The Company and its Business

30. Kingstone was incorporated in 1961, assumed the name DCAP Group, Inc. in 1999, and changed its name to Kingstone on July 1, 2009. Kingstone offers property and casualty insurance products through its wholly owned subsidiary, KICO, and claims to be the "15th largest writer of homeowners and dwelling fire insurance in the State of New York." During the Class Period, Kingstone created a second subsidiary, COSI, which partners with name-brand carriers and nationwide insurance agencies receiving commission revenues from KICO for the policies it places.

31. KICO is licensed in New York, New Jersey, Connecticut, Massachusetts, Pennsylvania, Rhode Island, Maine, and New Hampshire, and as of May 9, 2019, offered products in each of those states with the exception of New Hampshire. During 2018, 93.7% of KICO's direct written premiums were in New York and for the nine months ended September 30, 2019, 86.8% of the direct written premiums were in New York.

32. The Company's entrance into states other than New York began in earnest in 2017. In addition to expanding into other states, in April 2017, KICO "achieved its long-standing goal of becoming an A-rated carrier [upgraded from its B++ rating to A-]." Kingstone claims that the rating upgrade "has resulted in increased growth from existing agents and new agents and in new markets." Indeed, defendant Goldstein repeatedly boasted the import of the "A-" rating on investor conference calls throughout the Class Period, stating, for example: "Earlier in 2017, we saw our

A.M. Best rating of 'A- Excellent.' 12 years ago we started without any A.M. Best rating, and since that initial rating of B (Fair), we've worked hard to improve our company grow its writing, strengthen its balance and reduce our reliance upon quota share reinsurance. I think you'll all agree with me that we've succeeded on all counts."

33. Kingstone's revenues are derived from KICO's insurance premiums, ceding commissions from quota share reinsurance, and a variety of fees related to insurance policies. In addition, the Company invests the insurance premium earnings in cash and cash equivalents, short-term investments, fixed-maturity and equity securities.

34. Kingstone conducted a public offering immediately prior to the Class Period, issuing $30 million of 5.50% Senior Unsecured Notes due December 30, 2022, with net proceeds of approximately $29.1 million. Kingstone used $25 million of the net proceeds "to contribute capital to KICO, to support additional growth."

35. The Company's primary source of revenue is the premiums paid to KICO for its property and casualty insurance policies, with net premiums earned totaling $77.4 million and $103.4 million for the years ended December 31, 2017 and December 31, 2018, respectively, and representing 83.4% and 91% of Kingstone's total revenue, respectively. The property policies generally cover accidental losses to home and personal property, or a business's building, inventory, and equipment. The casualty policies, or liability insurance, generally cover legal liability relating to negligent acts or omissions. In general, the property claims are settled in a short time period, while casualty claims can take years to settle. All of KICO's insurance policies are twelve-month policies and the Company recognizes revenue over the "period of time that coverage is provided (*i.e.*, ratably over the life of the policy)."

36. During the Class Period, KICO's product lines included personal, commercial liability, livery physical damage, and other. The personal line is KICO's largest line, accounting for 78.9% and 81.8% of its gross written premiums for the years ended December 31, 2017 and December 31, 2018, respectively, and consists of homeowners and dwelling fire multi-peril, cooperative/condominiums, renters, and personal umbrella policies.

37. The commercial liability line represented 12% and 11.4% of the Company's gross written premiums for the years ended December 31, 2017 and December 31, 2018, respectively, and consists primarily of small business retail, service, and office risks with limited residential exposure. The commercial liability line also includes liability policies for small independent contractors (seven or fewer employees) and special multi-peril policies for larger and more specialized risks, as well as umbrella policies for each of these.

38. The livery physical damage line covers vehicle physical damage for car service vehicles and taxicabs, primarily in New York City, and represented 8.8% and 6.7% of the Company's gross written premiums for the years ended December 31, 2017 and December 31, 2018, respectively. Other policies include canine legal liability policies and participation in the mandatory state joint underwriting associations, accounting for 0.3% and 0.1% of the gross written premiums earned for the years ended December 31, 2017 and December 31, 2018, respectively.

39. For at least four years preceding the start of the Class Period, including 2017 which was reported on during the Class Period, Kingstone saw ever increasing net premiums, revenues, and net income. Between 2014 and 2017, Kingstone's net premiums earned had more than doubled and total revenues had almost doubled. The trend of increasing net premiums earned and total revenues continued for 2018, although net income decreased, and similarly for 2019 with a net loss of $7.4 million for the nine months ended September 30, 2019.

| Period Ending | Net Premiums Earned | Total Revenue | Net Income (Loss) |
|---|---|---|---|
| December 31, 2014 | $32.6 million | $49.8 million | $6.2 million |
| December 31, 2015 | $48.6 million | $63.6 million | $7.6 million |
| December 31, 2016 | $61.4 million | $77.4 million | $8.9 million |
| December 31, 2017 | $77.4 million | $92.8 million | $10.0 million |
| December 31, 2018 | $103.4 million | $113.8 million | $3.1 million |
| September 30, 2019 | $95 million | $108.1 million | ($7.4 million) |

### B. Kingstone's Key Financial Metrics

40. Kingstone records loss reserves, a requirement for all insurance companies to ensure adequate liquidity to pay policy claims. Loss reserves are balance sheet liabilities and are meant to reflect the estimated cost of future amounts the company will be required to pay on claims for policies written at or before the balance sheet date. The loss reserves are for both known and unknown losses which have been incurred as of the financial reporting date on all previously written policies, both current and expired.

41. Loss reserves fall into two categories. The first category, known as case reserves, includes reserves for known losses that are unpaid, including reserves for the claims and LAE, expenses for settling and adjusting the claims. When Kingstone receives an insurance claim, the case reserve, or estimated amount of its ultimate settlement and its estimated loss expenses, is established based on the then-known facts about the claim. Each reported claim reserve may be subsequently increased or decreased based upon developing additional facts.

42. The second category of reserves consists of the IBNR losses, loss and LAE amounts incurred but not reported and expected future development on known claims. Kingstone's SEC filings state that the Company's IBNR reserves are calculated "in bulk as an estimate of ultimate losses and LAE less reported losses and LAE." Kingstone further states that the "determination of appropriate IBNR levels are projected by using generally accepted actuarial techniques."

43. The Company further represents that loss reserves are "estimated on an undiscounted basis, ***using individual case-basis valuations***, statistical analyses and various actuarial procedures" and that future claim payment projections and reporting is "***based on an analysis of [its] historical experience***, supplemented by analysis of industry loss data." The case reserve amount determinations include reviews of "***coverage applicability***, comparative liability on the part of the insured, injury severity, ***property damage, replacement cost estimates, and any other information considered pertinent to estimating the exposure presented by the claim***."

44. As stated above, loss reserves are a liability on Kingstone's balance sheet. The loss reserves directly impact income and are the largest expense on the Company's income statement.

45. In addition to loss reserves and net income, a key financial metric for insurance companies like Kingstone is the net loss ratio which measures the underwriting profitability of the insurance company's business. The net loss ratio is the ratio of net losses and LAE incurred to net premiums earned. For companies like Kingstone, loss ratios typically range from 40% to 60% showing that they are collecting more premiums than the amount being paid out in claims. Higher loss ratios can be an indication of financial trouble.

46. Another key measure for insurance companies is the net combined ratio which shows its relative underwriting performance. The net combined ratio is calculated by adding the loss ratio with the underwriting expense ratio which is the ratio of policy acquisition and other underwriting expenses to earned premiums. A net combined ratio of under 100% "indicates that an insurance company is generating an underwriting profit prior to the impact of investment income." A combined ratio of above 100% means the company is paying more in claims than it is receiving from premiums.

**C. Defendants Create a Misleading Impression of Financial Health**

47. During the Class Period, Kingstone's SEC filings represented, among other things, that the Company's loss reserve process used "standard actuarial reserving methodologies" considering "***all information known to us as of the date they are recorded***," that the loss reserves were "***closely monitored and [] recomputed periodically using the most recent information on reported claims and a variety of statistical techniques***."

48. The Individual Defendants stated on investor earnings calls that the loss reserves were "strong," "adequate," and "remained solid," among other things.

49. On the August 9, 2018 earnings call, defendant Walden stated: "As Barry [defendant Goldstein] noted, we strive to be transparent and proactive in all of our financial reporting. . . . As part of our proactive philosophy, ***we constantly monitor individual claims and make adjustments to reserve levels whenever needed***."

50. Defendants continually stressed the strength of Kingstone's net loss ratio and net combined ratio during the Class Period as well. For example, on the August 9, 2018 earnings call, defendant Thatcher stated: "And for only the second time in my 35-year insurance career, my company came in with a combined ratio in the 80s at 84.2%." On the same call, defendant Walden stated, "***our underlying loss ratio remains consistently profitable***." Defendant Thatcher stated on the November 8, 2018 earnings call that: "For the quarter, we recorded a combined ratio of 86%, an excellent combined ratio by anyone's standards . . . ."

51. Kingstone and the Individual Defendants also represented that the Company's underwriting policies and procedures minimized risks, stating in the Company's annual reports: "Our underwriting process evaluates and screens out certain risks based on property reports, individual insurance scoring, information collected from physical property inspections, and

driving records. We maintain certain policy exclusions that reduce our exposure to risks that can create severe losses."

52. Furthermore, throughout the Class Period, Defendants represented that Kingstone maintained effective internal controls that enabled the Company to accurately account for loss reserves, among other things. Defendants Goldstein, Thatcher, and Brodsky certified the effectiveness of Kingstone's internal controls such that the Company's financial statements were accurate, prepared in compliance with generally accepted accounting principles ("GAAP") and fairly presented the Company's financial condition in each of the financial reports issued during the Class Period.

### D. Contrary to Defendants' Misrepresentations, Kingstone's Loss Reserves Were Materially Understated

53. As discussed above, prior to the start of the Class Period, Kingstone achieved record growth and had achieved an A.M. Best rating upgrade to "A-." Unbeknownst to investors, Kingstone's record pre-Class Period growth came at an undisclosed cost and the effects would soon be too large to hide.

54. Defendants' manipulated Kingstone's loss reserves through intentional, or at the very least grossly reckless, undervaluation of properties at the underwriting phase and claims phase, and by failing to follow industry best practices in its claims department.

55. In order to increase the Company's business, Defendants permitted risky underwriting of policies and insufficient claims reserving for those poorly underwritten policies. As confirmed by former Kingstone employees, a culture of failing to accurately underwrite policies and set adequate loss reserves prevailed at the Company and was well-known, if not encouraged, by the Individual Defendants.

56. CW1, a Personal Lines Underwriter from March 2014 to March 2019, reported to Jim White, the Personal Lines Manager, who in turn reported to defendant Walden. CW1 detailed numerous issues plaguing Kingstone, from employee retention to underwriting and claims issues: "There were a lot of issues, not just in that department [the claims department]. I'll be surprised if [the Company] doesn't go belly-up."

57. As to employee retention, CW1 stated that the claims department "couldn't keep anybody in it. Their criteria were built upon who you knew, and not what you know." Although a company with merely 100 employees, CW1 said that issues arose due to the disconnect between the underwriting department and other departments, stating that the underwriters' files and documentation were not accessible to other departments, including the claims department, and that the underwriters did not have access to the claims department files. "They wouldn't read any of that stuff [conditions of a property and policy exclusions], and ignore my input." CW1 added, "[h]ow can they not talk to me about a claim if I have pertinent information and they don't have access to each other's files."

58. Within the underwriting department CW1 stated that the underwriters were not permitted to speak to the underwriting assistants who "were not allowed to get out of their seats, and I was not allowed to go see them." According to CW1, this lack of communication had an adverse effect on the underwriting process with certain signatures not being obtained on documents involving required maintenance or inspections resulting in additional liability because of improper coverages and perhaps failure to install certain safety features. Additionally, the underwriters were not allowed to speak with any auditors.

59. CW2, the Director of Sales for High Value Homes from September 2017 until October 2018, also described the lack of communication between departments at Kingstone,

stating that everything was "secretive" and that there was "no sharing of information, and no transparency. It was all very, very closed, with marketing and claims not sharing any information."

60. CW1 described a risky underwriting culture where management continually overrode underwriters and granted unwarranted exceptions leading to the undervaluation of properties. According to CW1, all certain agents had to do was complain to management, especially defendant Goldstein, when an underwriter would decline business and the decision was overridden. "They gave exceptions for things that they should not have been given exceptions on. I was an underwriter there, but anybody could do my job because I had no say. When I denied something, all they had to do was complain above my head and get their way."

61. With regards to underwriting, CW1 added: "They gave me a lot of crap and told me to write it. If you didn't do what they wanted, you were going to get fired. They were very controlling. The bottom line is that the top are going to have the final say in it. They will override you every step of the way."

62. CW1 also described ever-changing underwriting guidelines, stating: "They changed so often that there was no way to enforce anything." According to CW1 the changes occurred every three to four months.

63. CW1 summed up Kingstone's underwriting as an errors-and-omissions nightmare just waiting to happen due to the fact that documents were missing, policies were not properly reviewed, and inspections were not completed, resulting in the Company getting "stuck for a lot of money on certain policies."

64. CW2 confirmed CW1's accounts of underwriting at Kingstone, stating: "What I recognized right away was that they [Kingstone] were definitely undervaluing all their homes. ***They didn't have proper reserves***," adding that the Company would not fight appraisals because

their focus was on keeping the agents happy. "They didn't want to ruffle any feathers. It was like the agents owned the organization, not the shareholders."

65. CW2 explained that undervaluing properties means "[y]ou're not collecting the proper premium for the risk" and that becomes problematic when you are insuring homes for their full replacement value. "You were collecting premiums for $400,000, but in a total loss event you might pay up to $3 million dollars. It's uncapped." CW2 "brought up these concerns over and over and over about undervaluing [Kingstone's] books and putting [the Company] at risk," emphasizing that the under-valuations were "significant."

66. More specifically, CW2 submitted monthly reports discussing the under-valuations of the properties. The monthly reports were submitted to all management via e-mail, including defendants Goldstein and Thatcher. The reports were then further discussed in meetings with at least defendants Goldstein, Walden, and others at the Company's Valley Stream office. CW2 recalled discussing the book being undervalued multiple times with Goldstein and Walden, as well as with defendant Thatcher. "This was the topic of conversation for me, the undervaluation of the books, and how it would impact us if there was a catastrophic event. We would be completely underinsured. We weren't collecting the proper premium for the business that we had on the books." CW2 also stated that defendant Goldstein's response to the undervaluation concerns was that CW2 was making something of nothing, calling it a red herring, and eventually trying to avoid having conversations with CW2 altogether.

67. CW3 served as a Personal Lines Underwriter at Kingstone, leaving the Company in 2016. CW3 reported experiencing the same issues as CW1 and CW2, stating concessions were made to certain insurance agencies depending upon the volume of business they brought to the

Company. CW3 stated that the policies defied good underwriting guidelines and should not have been written.

68. CW4, an Underwriting Assistant at Kingstone for thirty years until July 2019, stated that over the last few years of CW4's tenure the focus became volume as opposed to quality, "[t]hey wanted me to wear blinders."

69. CW5, an Underwriting Assistant at the Company for approximately six years until July 2019, stated that something was definitely "off" with regards to underwriting and that a lot of business was written for both personal and commercial properties that should not have been. CW5 specified that Kingstone "took whatever they could get" recalling a specific instance on a high value home left unattended for the winter where the pipes burst causing millions of dollars of damage and ***where Kingstone had not properly reserved for the claim, or possibly had no reserve for it, and had to pay out millions***.

70. Kingstone's issues were not isolated to the underwriting department, according to CW1, Kingstone's claims department also had concerns, with at least five different claims managers during CW1's five-year tenure—"If you didn't play the game, they got rid of you."

71. CW1 added that with regards to the loss reserves, that defendant Walden, the Company's Chief Actuary "has no business being an actuary at an insurance company, because he doesn't understand insurance. He was constantly giving exceptions."

72. CW2, who had previously worked for larger agencies such as AIG, stated that Kingstone "***did not have proper reserves set*** and it was very hush-hush when there was a big loss."

73. CW6, who worked in the claims department during the Class Period, stated that "a lot of the [Company's] files were under reserved, particularly the larger accounts. Some of the claims I handled should have had reserves of $650,000, but they were only at $150,000 or

$200,000." It was CW6's job to calculate what the reserves should be, but CW6's recommendations were ignored by upper management at least 50% of the time on the larger accounts. When CW6 requested reserve increases, the requests were declined. CW6 recalled commercial claims being under-reserved as well, mentioning one case where an excess verdict was obtained and the amount awarded was in excess of the policy.

74. As Defendants have now admitted, Kingstone's claims department was not following industry best practices. As a result of the failure to follow best practices and the credit risk described above, the Company was required to take loss reserve charges totaling over $11 million between April 2019 and the filing of this Complaint. ***The loss reserve charges represent an understatement of the loss reserves reported for 2018 by approximately 20%.*** Further, Kingstone has admitted to a material internal control weakness relating "to the ineffective oversight over the establishment of case reserve levels."

**E. Kingstone Was Required to Report Financial Results in Accordance with GAAP and SEC Regulations**

75. To inflate the prices of Kingstone's securities and maintain its A.M. Best rating, Defendants caused the Company to falsify the reported financial results for the fourth quarter and year ended December 31, 2017, and all quarters and the year end results for 2018. Specifically, in violation of GAAP,[3] Defendants loss reserve expenses were materially understated on its income statement, resulting in an overstatement of the Company's net income during the Class Period.

76. Kingstone's financial reports issued during the Class Period falsely represented that the financial information was a fair statement of the Company's financial results and that the results were prepared in accordance with GAAP. However, the financial information was not

[3] GAAP are a set of principles recognized as the standards, rules, and procedures acceptable at a particular time to be followed when assessing accounting metrics and preparing financial statements.

prepared in accordance with GAAP because Kingstone failed to establish sufficient loss reserves as Defendants were not following industry best practices and had turned a blind eye to, if not induced, risky underwriting practices and claims practices.

77. Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading. Further, Regulation S-X requires that interim financial statements comply with GAAP, with the exception that interim financial statements need not include disclosures duplicative of disclosures in accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

78. Item 303 of Regulation S-K requires the disclosure of known trends that will affect a company's future revenue, "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Similarly, GAAP regulation ASC 275-10 requires a company disclose risks and uncertainties that could significantly affect the amounts reported in the financial statements in the near term, including significant concentrations in certain aspects of the company's operations.

79. The disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." *See SEC Interpretation: Management's Discussion and Analysis of Financial Condition and Results of Operations*, S.E.C. Release No. 6835. Thus, information "regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects" and "[c]ompanies should provide

quantitative as well as qualitative disclosure when quantitative information is reasonably available and will provide material information for investors." *See SEC Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, S.E.C. Release 8350.

80. Under Item 303, disclosure of known trends is required "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operations." *See SEC Interpretation: Management's Discussion and Analysis of Financial Condition and Results of Operations*, S.E.C. Release No. 6835.

81. Further, GAAP provides rules for how and when to set loss reserves. ASC Topic 944 requires that public insurance companies estimate losses for unpaid claims and that losses should be included in a reserve. Specifically, ASC 944-40-25-1 and 944-40-25-2 address the recognition of insurance claim costs and provide that:

> Both of the following shall be accrued when insured events occur:
>
> a. A liability for unpaid claims (including estimates of costs for claims relating to insured events that have occurred but have not been reported to the insurer);
>
> b. A liability for claim adjustment expense; that is a liability for all costs expected to be incurred in connection with the settlement of unpaid claims.
>
> The estimate liability for unpaid claims includes the amount of money that will be required for future payments on both of the following:
>
> a. Claims that been reported to the insurer;
>
> b. Claims related to insured events that have occurred but have not been reported to the insurer as of the date the liability is estimated.

82. ASC 944-40-30-1 ("Liability for Unpaid Claims") addresses a company's obligation to disclose loss and loss adjustment expense reserves and states:

> The liability for unpaid claims shall be based on the estimated ultimate cost of settling the claims (including the effects of inflation and other societal and economic factors), using past experience adjusted for current trends, *and any other factors that would modify past experience*.

83. Throughout the Class Period, Kingstone repeatedly violated GAAP by materially misrepresenting its loss reserves, risky underwriting trends, and failure to follow industry best practices for claims handling.

## V. THE TRUTH EMERGES

84. On April 29, 2019, just days after announcing the date of the upcoming first quarter 2019 earnings call, Defendants shocked investors with the announcement of reserve charge of $5 million, $2.5 million for the case reserves and $2.5 million for the IBNR reserves. The press release stated, in relevant part:

> **Claims Department Reorganization** – "Following multiple quarters of disappointing results from our Claims Department, KICO engaged a consultant to do a comprehensive review of our claims operations," said Dale Thatcher, Kingstone CEO. "The final report concluded that there was much room for improvement in claims handling through adopting and implementing a number of industry best practices including the need to acquire more skilled and experienced staff. The process began with our hiring of a former colleague of mine, Bill O'Brien, as our new Chief Claims Officer as announced earlier this month. The result of the review gives rise for the need to strengthen our claims case reserves by approximately $2.5 million and our IBNR reserves by an additional $2.5 million for a total reserve charge of $5.0 million. The overall impact of this reserve strengthening is 17 points on the quarterly combined ratio. Although this will reduce our quarterly earnings and book value per share by approximately $0.37, it will substantially strengthen our balance sheet and position us well for the future."
>
> **Updated Guidance** – As a result of the two charges noted above, Kingstone now expects to end the full year with a combined ratio excluding catastrophe losses of 88% to 91% and catastrophe losses of 4 to 5 points.

85. Following this news, Kingstone's stock price dropped from a closing price of $13.32 per share on April 29, 2019, to a closing price of $11.30 per share on April 30, 2019, a decline of $2.02, or 15.2%, on unusually heavy trading volume.

86. After the Class Period, further details on the Company's loss reserves came to light, including additional reserve charges. On May 8, 2019, Kingstone issued a press release announcing its financial results for the quarter ended March 31, 2019. The Company reported a net loss of $7.34 million, compared to a net loss of $2.72 million for the first quarter of 2018, ***a loss increase of 169.9%, even though net premiums earned increased by 29.6%***. The press release further expounded on the Company's reserve charge, as well as the tightening of underwriting guidelines, and placement of a moratorium on new business on commercial lines. In relevant part, the press release stated:

> Dale Thatcher, Kingstone's Chief Executive Officer, commented, "It is important to note that in spite of the difficult first quarter, we still expect to achieve a combined ratio excluding catastrophes between 88% and 91%, and catastrophe losses of 4 to 5 points.
>
> We had another tough weather quarter with extended sub-zero temperatures again this year. We are expanding our education efforts for our insureds regarding maintaining minimum heating temperatures when away, ***as well as tightening our underwriting guidelines*** on seasonal and secondary homes. Unfortunately, New York state regulations require us to stay on a risk for three years once written, ***so it will take some time to fully achieve the benefit of any underwriting changes. In addition, we took steps to dramatically improve our claims operations this quarter by hiring additional professional staff and strengthening our claims reserves***. I am very pleased with the quality of our claims reserves and the initial changes to our practices and procedures. I believe we are now well positioned to most effectively handle our expansion and growth. We are continuing our strong growth, especially in our expansion states, which will permit us to diversify our book and achieve more consistent results.
>
> ***As a further step to address emerging profitability issues on commercial lines, we are placing a moratorium on new business for the next six months on all commercial lines,*** excluding our Livery Auto Physical Damage business. ***This will allow us to re-underwrite the entire book*** and seek out ways to return the commercial liability lines to long term profitability. It is an increasingly more competitive environment, particularly for small business liability risks. Our obligation to our shareholders is to devote the Company's capital judiciously, and with an eye to long-term sustainable underwriting profits."

* * *

> For the quarter ended March 31, 2019, the Company's net loss ratio was 98.4%, compared to 75.6% in the prior period. The 22.8 point increase in the first quarter 2019 net loss ratio was due to: (1) unfavorable prior year loss development which in turn, impacted re-estimation of loss ratios for the current year, (2) higher average claim severity driven by property claims from fires and non-weather water damage, and (3) a reduced but still significant impact from winter catastrophe losses.
>
> Prior year unfavorable loss development for the first quarter of 2019 impacted the loss ratio by 15.1 points, compared to 0.4 points of favorable impact in the first quarter of 2018. ***During the first three months of 2019, we completed an outside review of our claims practices that revealed several areas of opportunity to improve claim outcomes. As a result, a change was made to our claims leadership and a more complete review of larger open liability claims from prior years was undertaken. It was then determined that significant case reserve strengthening was required for several older liability claims, primarily affecting the ultimate loss projections for commercial lines business in accident years 2014, 2016, and 2017.***
>
> The first quarter 2019 net loss ratio included 17.1 points from catastrophes, compared to 24.3 points in the first quarter of 2018.

87. The next day, May 9, 2019, Defendants held an earnings conference call for the first quarter 2019 financial results on which they further explained the reserve charge, downplaying the seriousness of the charge on the Company as whole by stating it related to just a few older cases in commercial lines. Defendant Walden described the reserve charge as follows:

> Turning to reserves. We took quick and decisive steps to address some emerging trends. Over the last several months, we've seen an increasing number of older liability claims settle for amounts greater than existing case reserves. At the same time, our average defense costs per case have shown outsized increases. These trends prompted us to engage a leading consulting firm to review our claims practices. As a result, several opportunities for improvement were identified. As Dale discussed, this led to the hiring of Bill O'Brien as our new Chief Claims Officer. A detailed review of open liability claims then resulted in large reserve increases on several older cases during the quarter dating back to accident year 2014. ***These adjustments required us to reestimate our ultimate losses for all years and to boost IBNR. We acted decisively and the result was total reserves strengthening of $4.5 million for prior years or 15.3 point impact on the quarterly combined ratio; across all years, reserves adjustment had a $0.37 impact per share. 80% of the reserves strengthening was for commercial lines, which now contributes only 12% of our total written premium.*** As a result, we quickly acted to reduce the amount of business we are writing in commercial lines as we review its ongoing profitability.

88. Defendant Thatcher added:

> Well, really it's literally a handful of claims. I mean that's one of the difficulties with – we have a very small reserve base and obviously, a small premium base. So for a handful of claims, that will be a rounding area at a larger company. But for us, it creates an event obviously. It's older commercial liability claims that in our estimation upon further review, as you're approaching litigation on an old claim from a 2014 time frame, you would expect to have a substantially higher level of reserve than what we had. And I'd say that we were – our claims folks were a bit too optimistic, given the age of the claim and given the venue of the claim. As soon as I have some details on some of those claims – ***even I, a nonclaims professional, said wow, that needs to be reserved at a higher number than that***. So we had Bill go through and look at all those older claims and assess them with his professional eye and give us, to me, a more realistic possibility for a claim. So it's – again, it's only a handful of claims, but it has an outsized impact on the quarter as a result of that. And also an impact on Ben's diagonals as we have to apply that through the triangle. Hopefully that helps a little bit without giving precise details on a claim.

89. Kingstone's Form 10-Q for the quarter ended March 30, 2019, filed with the SEC on May 10, 2019, including the following with regards to the loss reserve charge:

> During Three Months 2019, we completed an outside review of our claims practices that revealed several areas of opportunity to improve claim outcomes. As a result, it was determined that significant case reserve strengthening was required for older liability claims, primarily affecting the ultimate loss projections for commercial lines business in accident years 2014, 2016, and 2017.
>
> Finally, the underlying loss ratio excluding the impact of catastrophes and prior year development was 66.1% for Three Months 2019, an increase of 14.3 points from the 51.8% underlying loss ratio recorded for Three Months 2018. The underlying loss ratio increased compared to Three Months 2018 due to higher average claim severity driven by property claims from fires and non-weather water damage. In addition, the core loss ratio for Three Months 2019 was impacted by re-estimation of loss ratios for the current year as a result of increases in our prior year loss ratio estimates for commercial lines and other liability lines. See table below under "Additional Financial Information" summarizing net loss ratios by line of business.
>
> Beginning in March 2019, we took steps to dramatically improve our claims operations by hiring additional professional staff, strengthened claims reserves as described above and made changes to practices and procedures. These steps leave us well positioned to most effectively handle our expansion and growth.

90. On July 19, 2019, the Company announced that defendant Thatcher had resigned his positions as CEO and President of Kingstone and KICO and as director on the Boards of

Kingstone and KICO. Defendant Goldstein resumed the positions as President and CEO of Kingstone and KICO.

91. On July 23, 2019, Kingstone issued a press release announcing that KICO would no longer underwrite commercial liability risks.

92. On August 8, 2019, in the Company's press release announcing its second quarter 2019 financial results, it was revealed that the Company would be taking an additional reserve charge of $1.6 million resulting in a 10.2 point increase in the net loss ratio and net income of $1.64 million compared to $2.76 million the prior year period.

93. On August 12, 2019, the Company filed its quarterly report on Form 10-Q for the quarter ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q reiterated that the Company would no longer underwrite commercial liability risks, noting that the policies represented approximately 12% of Kingstone's net premiums earned and the claims from those commercial lines represented 43% of the loss and LAE reserves net of reinsurance recoverables. The 2Q19 10-Q also stated that, "[d]ue to uncertainties related to the run-off of our commercial lines business . . . we are withdrawing our combined ratio guidance."

94. On November 11, 2019, Kingstone issued a press release announcing its financial results for the quarter ended September 30, 2019. For the third quarter in a row, the Company took a reserve charge, this time by $5.1 million, with the charge including amounts attributable to both the commercial lines business and the personal lines business. The press release stated, in relevant part:

> Barry Goldstein, Kingstone's Chief Executive Officer, elaborated on the results for the quarter:
>
> "***Our third quarter financial outcome was disappointing, driven by a comprehensive internal and external reserve review process and making the necessary adjustments to address those reviews. During Q3, we announced our exit from commercial lines and the runoff is well underway***, with the last

commercial liability policies scheduled to come off our books by September 30, 2020.

We've added highly experienced professionals to our claims team and are reducing our reliance on outsourcing of key claims processes by instead bringing key functions in house. Bill O'Brien, our new VP of Claims, along with his team, has now reviewed every open claim and re-set all commercial liability case reserves as needed. We called in a leading outside actuarial consulting firm, to get an independent mid-year assessment of our reserve position. ***As a result, we raised our reserves***, primarily in commercial liability. Ben Walden, our in-house Chief Actuary, also raised his current year loss picks to take into account our exit from commercial lines and our re-stated view of ultimate liability claim severity.

* * *

***We've already begun to tighten our underwriting standards and to eliminate those types of risks that don't warrant deploying capital to support.*** We are expanding mandatory hurricane deductibles to all states where we offer coverage, and this will help to reduce our catastrophe reinsurance costs."

Ben Walden, EVP and Chief Actuary, detailed the reserving actions for the quarter:

"This quarter, our financial results were significantly affected by further adjustments to commercial liability claim reserves. During the quarter, an outside actuarial review of reserve levels and liability claims handling was completed. We have taken immediate actions as a direct result of that review. This review was the culmination of several quarters of detailed internal and external reviews that also affected results for the first two quarters of the year. ***In the third quarter, we increased ultimate loss projections for prior years by another $5 million, bringing the year-to-date prior year loss development to just over $11 million.*** Insurance loss reserving is an inherently judgmental process. It is dependent on individual opinions regarding specific information available at a given point in time. ***Recent reviews of our claims reserving process by multiple parties have led to the additional increase in reserves taken this quarter.*** As noted, we have taken several key actions to address the emerging claims issues. We are confident that the actions we've taken place us in a stronger position to move forward and focus on continued profitable growth. When viewed over a five year period, prior year loss development including the adjustments made this year averages less than 3 points annually. Excluding the commercial lines business now in runoff, prior year loss development over the last five years remains favorable, with no impact on the combined ratio over that period."

*Net Loss Ratio and Underlying Net Loss Ratio excluding Commercial Lines*:

For the quarter ended September 30, 2019, the Company's net loss ratio was 72.4%, compared to 48.3% in the prior period. The 24.1 point increase in the third quarter 2019 net loss ratio was primarily driven by additional prior year loss development

related to commercial liability claims as detailed below, as well as increased fire claim activity and higher overall claim severity for personal lines business.

Prior year loss development for the quarter impacted the loss ratio by 14.7 points, compared to 0.4 points of favorable impact in the prior period. During the quarter, a detailed actuarial review of reserve levels was completed by a leading outside actuarial consulting firm. ***This review included an analysis of individual case reserves for a sampling of liability claims open at June 2019, as well as a full review of overall loss development through that point. As a result of this review, it was determined that further adjustments to ultimate loss projections for prior accident years were required, particularly for commercial liability business. During the quarter, $5.1 million of additional prior year loss development was recorded, with $4.4 million of that amount attributable to commercial lines business.*** In July 2019, the Company announced that it will exit commercial lines, and all policies are expected to be off the books by the end of September 2020. Excluding commercial lines, the impact of prior year development for the quarter was 2.0 points. In addition, the overall impact from catastrophe losses during the third quarter was 1.3 points. Excluding the impact of prior year loss development and catastrophe losses, the underlying net loss ratio excluding commercial lines was 51.4%, compared to 45.9% for the prior period. The underlying net loss ratio increased due to the re-estimation of current accident year loss ratios for other liability lines, and due to increased fire claim activity and higher overall claim severity for personal lines business.

<u>*Net Combined Ratio:*</u>

Kingstone's net combined ratio was 109.9% for the three-month period ended September 30, 2019, compared to 86.0% for the prior year period. The increase was driven by the increase in loss ratio as outlined above.

95. In addition, the press release stated that the Company "***expects to report a material weakness in internal control. The weakness relates to the establishment of case reserve levels***."

96. Kingstone's quarterly report on Form 10-Q for the quarter ended September 30, 2019 (the "3Q19 10-Q") filed with the SEC on November 12, 2019, stated in relevant part:

During Three Months 2019, the net loss ratio increased by 24.1 points compared to Three Months 2018 for several reasons. First, a continued evaluation of case reserve levels resulted in an additional $5.0 million of prior year development for the quarter, impacting the quarterly loss ratio by 14.7 points. This compares to 0.4 points of favorable prior year loss development in Three Months 2018, or an increase in the impact of prior year loss development of 15.1 points. Prior year loss development for the quarter was primarily related to older liability claims, of which, $4.4 million were related to commercial lines liability claims. During the quarter, an external actuarial review was completed that was specific to those lines affected

by liability case reserve adjustments made earlier in the year. The external review analyzed the adequacy of a sampling of individual case reserves after the case reserve adjustments. Following this external review, it was determined that additional adjustments to IBNR and expected ultimate losses for prior years were needed. This resulted in the additional prior year loss development recorded during the Three Months 2019. Excluding commercial lines, the impact of prior year development in Three Months 2019 was 2.0 points, compared to 1.5 points of favorable prior year development in Three Months 2018, or an increase in the impact of prior year development of 3.5 points. The impact from catastrophe losses during the Three Months 2019 was 1.3 points, compared to a 1.4 point impact from catastrophes for the Three Months 2018, or a reduction in the impact of catastrophes of 0.1 point.

97. With regards to Kingstone's internal controls, the 3Q19 10-Q, stated that:

***Evaluation of Disclosure Controls and Procedures***

We maintain a system of disclosure controls and procedures as defined in Rule 13a-15(e) under the Exchange Act that are designed to assure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. ***Based on this evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of such period, our disclosure controls and procedures were: (i) not effective as of September 30, 2019 as a result of the material weakness identified in the quarter in recording, processing, summarizing, and reporting information on a timely basis that we are required to disclose in the reports that we file or submit under the Exchange Act, and (ii) not effective as of September 30, 2019 in ensuring that information that we are required to disclose in the reports that we file or submit under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.***

As required by Exchange Act Rule 13a-15(b), as of the end of the period covered by this Quarterly Report, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, we evaluated the effectiveness of our disclosure controls and procedures. ***Our management concluded that, as of September 30, 2019, our internal control over financial reporting was not effective. Management determined there was ineffective oversight over the process of setting appropriate liability case reserves, which has been assessed as a material weakness. Case reserve estimates are subject to individual judgment, and provide the primary information used as the basis for setting overall reserve levels including a provision for IBNR reserves.*** Notwithstanding the material weakness, management has concluded that the

accompanying condensed consolidated financial statements included in this Form 10-Q fairly present, in all material respects, the financial position, results of operations, and cash flows for the periods presented in accordance with U.S. generally accepted accounting principles.

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of an entity's financial statements will not be prevented or detected and corrected on a timely basis.

***Identification of the Material Weakness in Internal Control over Financial Reporting***

During our assessment we determined that the following material weaknesses existed as of September 30, 2019 in the principles associated with both the control and monitoring activity components of the COSO framework:

***The material weakness relates to the ineffective oversight over the establishment of case reserve levels***, as discussed above. As of the date of this report, there have been no misstatements identified. Insurance loss reserving is an inherently judgmental process. It is dependent on individual opinions regarding specific information available at a given point in time. Recent reviews of our claims reserving process by multiple parties have led to the additional increase in reserves taken this quarter.

***Remediation Plans***

Our management, with oversight from our Audit Committee, will initiate a plan to remediate the material weakness above. Management will work to ensure that all designed control activities are executed appropriately for the remainder of 2019. Management believes that such activities will allow the Company to select, develop, and perform ongoing and/or separate evaluations to ascertain whether our components of internal control are present and functioning. Because the reliability of the internal control process requires repeatable execution, the material weakness cannot be considered fully remediated until all remedial processes and procedures have been implemented, each applicable control has operated for a sufficient period of time, and management has concluded, through testing, that the controls are operating effectively. Until the material weakness is remediated, we will not be able to assert that our internal controls are effective.

## VI. ADDITIONAL SCIENTER ALLEGATIONS

98. As alleged herein, each of the Individual Defendants acted with scienter in that they knowingly or recklessly disregarded that the information disseminated to the public contained materially false and/or misleading information and omitted material information. Throughout the

Class Period, the Individual Defendants acted intentionally or in such a deliberately reckless manner as to constitute a fraud upon Lead Plaintiff and the Class. Such actions caused the price of Kingstone shares to be artificially inflated.

99. In their respective roles as senior officers of Kingstone, the Individual Defendants were able to, and did, control the information disseminated to the investing public in the Company's various SEC filings, press releases, and other public statements during the Class Period. As a result, each had the opportunity to falsify the information provided to the public regarding Kingstone's business and performance.

100. ***First***, each of the Individual Defendants themselves repeatedly made detailed statements based on purported personal knowledge as to the adequacy of Kingstone's loss reserves, among other things. In addition, defendants Goldstein, Thatcher, and Brodsky signed certifications attesting to the sufficiency of Kingstone's internal controls over its reserves. These statements reflect the Individual Defendants' knowledge of the Company's loss reserve process and involvement in loss reserve policies, supporting a strong inference of scienter.

101. ***Second***, Kingstone's corporate culture supports scienter. As described by multiple CWs, underwriters were not permitted to interact with other departments, or even the underwriting assistants. ¶¶ 57-59. Underwriting exceptions were commonplace, especially at the instance of large producing agents with defendants Goldstein and Walden specifically overriding the decisions of underwriters. ¶¶ 60-62, 64, 67. Further, Defendants encouraged or, at minimum, turned a blind eye to, substantial under-valuations of properties and under-reserving on claims. ¶¶ 64, 69, 70, 72-73. This was part of a scheme to increase net income, and conversely lower loss reserves, in order to portray a false picture of financial health to investors and the ratings agency.

102. ***Third***, Kingstone is an extremely small Company with only 101 employees as of December 31, 2018, all located in New York. The Company has also stated: "Our principal executive offices are currently located at 15 Joys Lane, Kingston, New York 12401. Our insurance underwriting business is located principally at 15 Joys Lane, Kingston, New York 12401." This is a small office building where frequent interaction between Kingstone's management and underwriters is unavoidable. Kingstone also stated in its annual reports for 2017 and 2018 that the Company's "future success" depended in part on defendants Goldstein, Thatcher, and Walden and that losing them "could prevent [Kingstone] from fully implementing [its] business strategies and could materially and adversely affect [Kingstone's] business, financial condition and results of operations."

103. ***Fourth***, prior to the Class Period, Kingstone had recently received an A.M. Best upgraded financial strength rating. As stated by the Company in its SEC filings:

> Financial strength ratings are important factors in establishing the competitive position of insurance companies and generally have an effect on an insurance company's business. Many insurance buyers, agents, brokers and secured lenders use the ratings assigned by A.M. Best and other agencies to assist them in assessing the financial strength and overall quality of the companies with which they do business or from which they are considering purchasing insurance or in determining the financial strength of the company that provides insurance with respect to the collateral they hold. ***A.M. Best ratings are derived from an in-depth evaluation of an insurance company's balance sheet strengths, operating performances and business profiles. A.M. Best evaluates, among other factors,*** the company's capitalization, underwriting leverage, financial leverage, asset leverage, capital structure, quality and appropriateness of reinsurance, ***adequacy of reserves, quality and diversification of assets***, liquidity, profitability, spread of risk, revenue composition, market position, management, market risk and event risk. ***On an ongoing basis, rating agencies such as A.M. Best review the financial performance and condition of insurers and can downgrade or change the outlook on an insurer's ratings*** due to, for example, a change in an insurer's statutory capital, a reduced confidence in management or a host of other considerations that may or may not be under the insurer's control. All ratings are subject to continuous review; therefore, the retention of these ratings cannot be assured. ***A downgrade in our financial strength rating from A.M. Best could have a material adverse***

> ***effect on our competitiveness, the marketability of our product offerings and our ability to grow in the marketplace.***

104. Defendants touted this rating, stressing its import, throughout the Class Period, stating, for example, that:

- In Q2, we achieved our long sought A.M. Best rating of "A- Excellent." (Defendant Goldstein, March 14, 2018 Press Release).
- An accelerating growth trend in personal lines continues as a result of the A.M. Best upgrade. (Defendant Walden, March 14, 2018 Press Release).
- We are very optimistic about the outlook for 2018 and to expanding our agency relationships as a premier Northwest regional "A" rated carrier. (Defendant Walden, March 15, 2018 Earnings Call).
- Growth is driven by the continued acceleration of our personal lines business from the A.M. Best upgrade to A- last April. (Defendant Brodsky, May 11, 2018 Earnings Call).
- This is taking us closer to becoming the planned for A-rated Northeast regional carrier focusing on small to midsized agencies. (Defendant Goldstein, May 11, 2018 Earnings Call).
- When you combine that with an A minus rating from A.M. Best, we've been able to parlay that into growth in excess of 20% . . . . (Defendant Thatcher, August 9, 2018 Earnings Call).

Thus, Defendants were motivated to conceal underwriting weaknesses, increase the premiums written, and under-reserve for losses.

105. ***Fifth***, the sudden "resignation" of defendant Thatcher raises an additional inference of scienter. Thatcher replaced defendant Goldstein as President and CEO of Kingstone ***just seven months prior to his suspicious "resignation"*** and after signing a three-year employment agreement. In fact, according to CW3 defendant Thatcher was fired.

106. ***Sixth***, the Individual Defendants received exorbitant compensation for a Company with revenues of $92.8 million to $113.8 million and received bonuses tied to the Company's income which was directly impacted by loss reserves as explained below. Thus, the Individual

Defendants were motivated to report low loss reserves in order to protect and enhance their substantial compensation.

107. Under Goldstein's employment agreement dated October 16, 2018, he was entitled to an annual base salary of $636,500 for 2019 and $500,000 for each of 2020 and 2021, among other things. In addition, Goldstein was eligible to receive an annual performance bonus equal to 3% of the Company's consolidated income from operations before taxes, exclusive of the Company's consolidated net investment income (loss) and net realized gains (losses) on investments. Goldstein was also entitled to a long-term compensation payment of between $945,000 and $2,835,000 in the event the Company's adjusted book value per share increased by at least an average of 8% per annum as of December 31, 2019, compared to December 31, 2016, (a continuation of his 2017 agreement described immediately below).

108. Under Goldstein's employment agreement dated January 20, 2017, originally expiring on December 31, 2019, Goldstein was entitled to an annual base salary of $630,000 and an annual bonus equal to 6% of the Company's consolidated income from operations before taxes, exclusive of the Company's consolidated net investment income (loss) and net realized gains (losses) on investments. In addition, Goldstein was entitled to the long-term compensation payment described above.

109. Defendant Goldstein received the following compensation for 2017 and 2018:

| Year | Salary | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|
| 2018 | $630,000 | $21,887* | $43,784*** | **$695,671** |
| 2017 | $630,000 | $1,670,111** | $24,152 | **$2,324,263** |

*Represents amounts earned pursuant to KICO employee profit sharing plans.
**Represents bonus compensation of $660,446 accrued pursuant to 2017 employment agreement and paid in 2018, $945,000 of long-term bonus compensation accrued pursuant to employment agreement and payable in 2020 if

incentive goals are maintained through December 31, 2019, and $64,655 accrued pursuant KICO employee profit sharing plan and paid in 2018. As of the date of the 2018 Form 10-K, the referenced long-term bonus compensation accrued and payable in 2020, if incentive goals were maintained through December 31, 2019, had been reduced by $247,311.
***Employer matching contributions under deferred compensation plan of $15,018, employer matching contributions under defined compensation plan of $10,266, care allowance of $12,000, and KICO director fees.

110. Defendant Thatcher's employment agreement, entered into on March 14, 2018, for his service as COO entitled him to a base salary of $500,000 per annum and minimum bonus equal to 15% of his base salary, along with a grant of 35,715 shares of restricted common stock under the Company's 2014 Equity Plan. Thatcher's October 16, 2018 employment agreement for his service as CEO entitled him to an annual base salary of $500,000 for 2019, and $630,000 for 2020 and 2021 with an annual performance bonus equal to 3% of the Company's consolidated income from operations before taxes, exclusive of the Company's consolidated net investment income (loss) and net realized gains (losses) on investments, among other things.

111. As a director for part of the year for 2017 and as an officer for 2018, defendant Thatcher received the following compensation:

| **Year** | **Salary** | **Stock Awards** | **Non-Equity Incentive Plan Compensation** | **All Other Compensation** | **Total** |
|---|---|---|---|---|---|
| 2018 | $398,630 | $750,000 | $59,795* | $79,157** | **$1,287,582** |
| 2017 | $19,464 | $12,124 | | | **$31,587** |

*Represents amounts earned pursuant to KICO employee profit sharing plans.
**Compensation as non-employee director during 2018 consisting of cash retainer of $11,458 and restricted shares of common stock with a grant date fair value of $41,300, matching contributions under defined compensation plan of $10,615, care allowance of $9,567, and KICO director fees.

112. Defendant Brodsky received the following compensation for 2017 and 2018:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2018 | $350,000 | $140,009 | $17,573* | $27,759** | **$535,341** |
| 2017 | $320,000 | $149,500 | $49,832* | $24,500 | **$573,832*** ** |

*Represents amounts earned pursuant to KICO employee profit sharing plans.
**Employer matching contributions under defined contribution plan of $10,847, car allowance of $7,200, and KICO director fees.
***Includes bonus of $30,000.

113. Defendant Walden received the following compensation for 2017 (2018 information was not provided in the Company's SEC filings):

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2017 | $270,000 | $89,700 | $41,981* | $14,215 | **$451,896** ** |

*Represents amounts accrued pursuant to KICO employee profit sharing plans.
**Includes bonus of $18,000.

114. In addition to the exorbitant pay packages for such a small company, the Individual Defendants' profit-sharing plans were tied directly to the GAAP combined ratio:

> The Company maintains a discretionary employee profit sharing plan (the "Profit Sharing Plan") available to full-time employees who are employed as of December 31. For the years ended December 31, 2017 and 2016, the Profit Sharing Plan called for a bonus to be paid based on a formula that is tied to the annual GAAP combined ratio ("Combined Ratio"). The maximum the bonus can be is 25% of eligible wages at a Combined Ratio of 70%. The bonus decreases by 1% for each percentage point increase in the Combined Ratio. There is a minimum bonus of 5% at a Combined Ratio of 90% and above. The bonus is allocated 35% to the employees' 401(k) account and 65% as cash through payroll. The Company incurred approximately $989,000 and $897,000 of expense for the years ended December 31, 2017 and 2016, respectively, related to the Profit Sharing Plan.

115. ***Seventh***, while in possession of material, nonpublic information regarding the gross understatement of Kingstone's loss reserves and loss ratio (and consequent overstatement of net income) and risky underwriting practices, defendant Goldstein sold 79,286 shares of Kingstone

stock during the Class Period reaping net proceeds of over $1.3 million. Goldstein had only sold shares of Kingstone stock ***once*** prior in the preceding ten years. Thus, Goldstein was highly motivated to engage in the alleged fraudulent scheme and issue materially false and misleading statements and/or omit material facts in order to inflate Kingstone's securities price and maximize individual profits.

| Date | No. Shares Sold[4] | Price Per Share | Proceeds |
|---|---|---|---|
| 01/02/2019 | 9,752 | $17.7881 | $173,469.55 |
| 01/03/2019 | 3,100 | $17.2409 | $53,446.79 |
| 01/04/2019 | 6,054 | $17.3551 | $105,067.78 |
| 01/07/2019 | 5,157 | $17.2639 | $89,029.93 |
| 01/08/2019 | 6,200 | $17.1626 | $106,408.12 |
| 01/09/2019 | 4,420 | $17.1701 | $75,891.84 |
| 01/10/2019 | 6,517 | $16.7435 | $109,117.39 |
| 01/11/2019 | 2,200 | $16.4143 | $36,111.46 |
| 01/14/2019 | 3,156 | $16.2505 | $51,286.58 |
| 01/15/2019 | 2,905 | $16.0878 | $46,735.06 |
| 01/16/2019 | 1,454 | $16.0082 | $23,275.92 |
| 01/17/2019 | 317 | $16.0074 | $5,074.35 |
| 01/18/2019 | 24 | $16.00 | $384.00 |
| 01/25/2019 | 28,030 | $16.326 | $457,617.78 |
| **TOTAL** | **79,286** | | **$1,332,916.55** |

## VII. MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

116. During the Class Period, Defendants mislead the market and investors with repeated materially false and misleading statements regarding Kingstone's loss reserves, purported loss reserve practices, adequate internal controls, and effective management of underwriting and risk. In reality, throughout the Class Period, Defendants materially misstated Kingstone's financial results—specifically, its loss reserves, net income, loss ratio, and combined ratio—and the effectiveness of its internal controls. The cumulative impact of these material misstatements

[4] While the shares sold were pursuant to a 10b5-1 plan, the plan was entered into during the Class Period on November 14, 2018.

resulted in loss reserves charges of over $11 million, which when compared to the loss reserves for the year ended December 31, 2018, represents an increase by approximately 20%.

**A. Defendants Materially Misstated Kingstone's Financial Results**

117. Kingstone reported its quarterly and annual financial results in press releases and SEC filings throughout the Class Period, including the Company's loss reserves, net loss ratio, net combined ratio, and net income. Defendants certified the accuracy of these financial results, including that the financial results were presented in accordance with GAAP, pursuant to their obligations under the Sarbanes-Oxley Act of 2002 ("SOX"). However, the financial results during the Class Period were neither accurate nor in compliance with GAAP and did not accurately reflect information known to Defendants at the time, leading to the material understatement of claims reserves requiring a charge of over $11 million.

118. On March 14, 2018, the Company issued a press release announcing its quarter ended and year ended December 31, 2017 financial results. On March 15, 2018, Kingstone filed its annual report on Form 10-K with the SEC, signed by defendants Goldstein, Brodsky, and Thatcher, and reiterating the Company's financial and operating results for the quarter and year ended December 31, 2017 (the "2017 10-K"). The statements in the March 14, 2018 press release and 2017 10-K were materially false and misleading. As admitted by the Company, in claims handling, Kingstone was not following industry best practices, *inter alia*, which resulted in three reserve charges in 2019 of more than $11 million. As a result, instead of the reported loss reserves of $48.8 million, a net loss ratio of 44.2%, a net combined ratio of 80.6%, and net income of $10 million for 2017, Kingstone should have reported materially higher reserves and ratios and lower net income.

119. Kingstone filed quarterly reports on Form 10-Q with the SEC for its first, second, and third quarters of 2018 on May 10, 2018, August 9, 2018, and November 8, 2018, respectively,

with financial results press releases preceding the filings. The statements in each of the press releases and Forms 10-Q were materially false and misleading, reporting the following loss reserves, net loss ratio, net combined ratio, and net income.

| **Quarterly Report on Form 10-Q** | **Loss Reserves** | **Net Loss Ratio (Quarter/YTD)** | **Net Combined Ratio (Quarter/YTD)** | **Net Income (Loss) (Quarter/YTD)** |
|---|---|---|---|---|
| For the quarter ended March 31, 2018 (“1Q18 10-Q”) | $56.3 million | 75.6% | 114.3% | ($2.7 million) |
| For the quarter ended June 30, 2018 (“2Q18 10-Q”) | $49.3 million | 46.4%/60.6% | 84.2%/98.8% | $2.8 million/$39,000 |
| For the quarter ended September 30, 2018 (“3Q18 10-Q”) | $53.9 million | 48.3%/56.0% | 86.0%/94.1% | $3.9 million/$3.9 million |

120. Kingstone issued a press release announcing its financial results for the fourth quarter and year end December 31, 2018 on March 13, 2019. The Company filed its annual report on Form 10-K for the year ended December 31, 2018 (“2018 10-K”) with the SEC on March 18, 2019. The 2018 10-K was signed by defendants Thatcher, Brodsky, and Goldstein with SOX certifications signed by Thatcher and Brodsky. The statements in the March 13, 2019 press release and 2018 10-K were materially false and misleading. As admitted by the Company, in claims handling, Kingstone was not following industry best practices, *inter alia*, which resulted in three reserve charges in 2019 of more than $11 million. As a result, instead of the reported loss reserves of $58.3 million, a net loss ratio of 56.4%, a net combined ratio of 94.8%, and net income of $3.1 million for 2018, Kingstone should have reported materially higher reserves and ratios and lower net income.

## B. Misstatements Regarding Kingstone's Underwriting, Risk Management, and Reserves Practices

121. The Company filed its 2017 10-K with the SEC on March 15, 2018, signed by defendants Goldstein, Brodsky, and Thatcher with SOX certifications signed by Goldstein and Brodsky. The 2017 10-K described the Company's underwriting and risk management practices as follows:

> We believe that we have a significant underwriting advantage due to our local market presence and expertise. ***Our underwriting process evaluates and screens out certain risks based on property reports, individual insurance scoring, information collected from physical property inspections, and driving records. We maintain certain policy exclusions that reduce our exposure to risks that can create severe losses. We target a more preferred risk profile in order to reduce adverse selection from risks seeking the lowest premiums and minimal coverage levels.***
>
> * * *
>
> ***Our underwriting philosophy is to target niche risk segments for which we have detailed expertise and can take advantage of market conditions. We monitor results on a regular basis and all of our selected producers are reviewed by management on at least a quarterly basis.***
>
> We believe that our rates are competitive with other carriers' rates in our markets. We believe that rate consistency and the reliable availability of our insurance products is important to our producers. We do not seek to grow by competing based solely upon price. We seek to develop long-term relationships with our selected producers who understand and appreciate the consistent path we have chosen. ***We carefully underwrite our business utilizing the Comprehensive Loss Underwriting Exchange industry claims database, insurance scoring reports, physical inspection of risks and other individual risk underwriting tools.*** In the event that a material misrepresentation is discovered in the underwriting application, the policy is voided. If a material misrepresentation is discovered after a claim is presented, we deny the claim. We write homeowners and dwelling fire business in coastal markets and are cognizant of our exposure to hurricanes. We have mitigated this risk through appropriate catastrophe reinsurance and application of mandatory hurricane deductibles. ***Our claims and underwriting expertise in these markets enables us to profitably write personal lines business in all the territories in which we write.***

122. In the 2017 10-K, the Company described its loss and LAE reserves policies and procedures, stating in relevant part:

***Loss and Loss Adjustment Expense Reserves***

We are required to establish reserves for incurred losses that are unpaid, including reserves for claims and loss adjustment expenses ("LAE"), which represent the expenses of settling and adjusting those claims. These reserves are balance sheet liabilities representing estimates of future amounts required to pay losses and loss expenses for claims that have occurred at or before the balance sheet date, whether already known to us or not yet reported. ***We establish these reserves after considering all information known to us as of the date they are recorded.***

Loss reserves fall into two categories: case reserves for reported losses and LAE associated with specific reported claims, and reserves for losses and LAE that are incurred but not reported ("IBNR"). We establish these two categories of loss reserves as follows:

*Reserves for reported losses* – When a claim is received, we establish a case reserve for the estimated amount of its ultimate settlement and its estimated loss expenses. ***We establish case reserves based upon the known facts about each claim at the time the claim is reported and we may subsequently increase or reduce the case reserves as additional facts and information about each claim develops.***

*IBNR reserves* – We also estimate and establish reserves for loss and LAE amounts incurred but not yet reported ("IBNR"). IBNR reserves are calculated in bulk as an estimate of ultimate losses and LAE less reported losses and LAE. There are two types of IBNR; the first is a provision for claims that have occurred but are not yet reported or known. We refer to this as 'Pure' IBNR, and due to the fact that we write primarily quickly reported property lines of business, this type of IBNR does not make up a large portion of KICO's total IBNR. The second type of IBNR is a provision for expected future development on known claims, from the evaluation date until the time claims are settled and closed. We refer to this as 'Case Development' IBNR and it makes up the majority of the IBNR that KICO records. ***Ultimate losses driving the determination of appropriate IBNR levels are projected by using generally accepted actuarial techniques.***

The liability for loss and LAE represents our best estimate of the ultimate cost of all reported and unreported losses that are unpaid as of the balance sheet evaluation date. ***The liability for loss and LAE is estimated on an undiscounted basis, using individual case-basis valuations, statistical analyses and various actuarial procedures. The projection of future claim payment and reporting is based on an analysis of our historical experience, supplemented by analyses of industry loss data. We believe that the reserves for loss and LAE are adequate to cover the ultimate cost of losses and claims to date.*** However, because of the uncertainty from various sources, including changes in claims settlement patterns and handling procedures, litigation trends, judicial decisions, and economic conditions, actual loss experience may not conform to the assumptions used in determining the estimated amounts for such liabilities at the balance sheet date. As

adjustments to these estimates become necessary, such adjustments are reflected in the period in which the estimates are changed. Because of the nature of the business historically written, we believe that we have limited exposure to asbestos and environmental claim liabilities.

* * *

***Our claims reserving practices are designed to set reserves that, in the aggregate, are adequate to pay all claims at their ultimate settlement value.***

123. In describing the Company's loss and LAE, the 2017 10-K states, in relevant part:

Loss and LAE incurred represent our largest expense item, and for any given reporting period include estimates of future claim payments, changes in those estimates from prior reporting periods and costs associated with investigating, defending and servicing claims. These expenses fluctuate based on the amount and types of risks we insure. ***We record loss and LAE related to estimates of future claim payments based on case-by-case valuations, statistical analyses and actuarial procedures. We seek to establish all reserves at the most likely ultimate liability based on our historical claims experience.*** It is typical for certain claims to take several years to settle and we revise our estimates as we receive additional information on such claims. Our ability to estimate loss and LAE accurately at the time of pricing our insurance policies is a critical factor affecting our profitability.

124. The 2017 10-K also stated the following under the "Risks Related to Our Business":

Recorded claim reserves for our business are based on our best estimates of losses ***after considering known facts and interpretations of circumstances. Internal and external factors are considered. Internal factors include, but are not limited to, actual claims paid, pending levels of unpaid claims, product mix and contractual terms.*** External factors include, but are not limited to, changes in the law, court decisions, changes in regulatory requirements and economic conditions.

125. The notes to the Company's consolidated financial statements included the following with regards to loss and LAE reserves:

<u>Loss and LAE reserves</u>

The reserving process for loss and LAE reserves provides for the Company's best estimate at a particular point in time of the ultimate unpaid cost of all losses and LAE incurred, including settlement and administration of losses, ***and is based on facts and circumstances then known*** including losses that have occurred but that have not yet been reported. The process relies on standard actuarial reserving methodologies, judgments relative to estimates of ultimate claims severity and frequency, the length of time before losses will develop to their ultimate level ('tail'

factors), and the likelihood of changes in the law or other external factors that are beyond the Company's control. Several actuarial reserving methodologies are used to estimate required loss reserves. The process produces carried reserves set by management based upon the actuaries' best estimate and is the cumulative combination of the best estimates made by line of business, accident year, and loss and LAE. ***The amount of loss and LAE reserves for individual reported claims (the "case reserve") is determined by the claims department and changes over time as new information is gathered. Such information includes a review of coverage applicability, comparative liability on the part of the insured, injury severity, property damage, replacement cost estimates, and any other information considered pertinent to estimating the exposure presented by the claim. The amounts of loss and LAE reserves for unreported claims and development on known claims (IBNR reserves) are determined using historical information aggregated by line of insurance as adjusted to current conditions.*** Since this process produces loss reserves set by management based upon the actuaries' best estimate, there is no explicit or implicit provision for uncertainty in the carried loss reserves.

Due to the inherent uncertainty associated with the reserving process, the ultimate liability may differ, perhaps substantially, from the original estimate. ***Such estimates are regularly reviewed and updated and any resulting adjustments are included in the current year's results. Reserves are closely monitored and are recomputed periodically using the most recent information on reported claims and a variety of statistical techniques. On at least a quarterly basis, the Company reviews by line of business existing reserves, new claims, changes to existing case reserves and paid losses with respect to the current and prior years.*** Several methods are used, varying by line of business and accident year, in order to select the estimated year-end loss reserves.

* * *

***The Company is not aware of any claims trends that have emerged or that would cause future adverse development that have not already been considered in existing case reserves and in its current loss development factors.***

126. The 2017 10-K claimed that in preparing the consolidated financial statements:

***[O]ur management has utilized information including our past history,*** industry standards, and the current economic environment, among other factors, in forming its estimates and judgments of certain amounts included in the consolidated financial statements, ***giving due consideration to materiality.***

* * *

***We believe that the most critical accounting policies relate to the reporting of reserves for loss and LAE, including losses that have occurred but have not been reported prior to the reporting date,*** amounts recoverable from third party

reinsurers, deferred ceding commission revenue, deferred policy acquisition costs, deferred income taxes, the impairment of investment securities, intangible assets and the valuation of stock-based compensation.

127. Kingstone filed its 1Q18 10-Q with the SEC on May 10, 2018, signed by defendants Goldstein and Brodsky, and reiterating the Company's reserving process as discussed in ¶¶ 125-126 in the same or substantially same manner, and affirming that "[t]he Company is not aware of any claims trends that have emerged or that would cause future adverse development that have not already been considered in existing case reserves and in its current loss development factors."

128. The Company filed its 2Q18 10-Q with the SEC on August 9, 2018, signed by defendants Goldstein and Brodsky. The 2Q18 10-Q included the same, or substantially the same, false and misleading statements as discussed in ¶¶ 125-126 above and again stated that "[t]he Company is not aware of any claims trends that have emerged or that would cause future adverse development that have not already been considered in existing case reserves and in its current loss development factors."

129. Kingstone filed its 3Q18 10-Q on November 8, 2018, which was amended on the same day to add Exhibits 101. The 3Q18 10-Q was signed by defendants Goldstein and Brodsky and included the same, or substantially the same, false and misleading statements as discussed in ¶¶ 125-126 above and again stated that "[t]he Company is not aware of any claims trends that have emerged or that would cause future adverse development that have not already been considered in existing case reserves and in its current loss development factors."

130. Kingstone's 2018 10-K, filed with the SEC on March 18, 2019, and signed by defendants Goldstein, Brodsky, and Thatcher with SOX certifications signed by defendants Thatcher and Brodsky, included the same, or substantially identical, false and misleading statements relating to the Company's underwriting and risk management practices and loss reserve practices and procedures as the 2017 10-K. *See* ¶¶ 121-126.

131. The statements made by Defendants in ¶¶ 121-130 were materially false and/or misleading and/or failed to disclose that: (a) properties were significantly under-valued creating greater credit risk and a greater chance that the loss reserves were not adequate; (b) Defendants fostered a culture which prevented communications between underwriters and other departments, including the claims department, requiring underwriters to underwrite inaccurately or be fired, and acquiescing to the demands of agents and brokers; (c) the claims department was not following industry best practices; (d) as a result, loss reserving procedures were insufficient or not being performed correctly; and (e) as a result the Company's loss reserves, net loss ratio, and net combined ratio were materially understated and net income overstated during the Class Period.

**C. Additional Misstatements During the Class Period**

132. On March 14, 2018, the first day of the Class Period, Kingstone issued a press release, attached as Exhibit 99.1 to a Form 8-K filed with the SEC the following day, titled "Kingstone Announces 2017 Fourth Quarter and Year-End Financial Results; Dale Thatcher elected as Chief Operating Officer of Kingstone Companies, Inc. and President of Kingstone Insurance Company," announcing the Company's financial results for the quarter and year ended December 31, 2017. The press release states in relevant part:

> Kingstone's EVP and Chief Actuary, Ben Walden, provided details on the underwriting results for the quarter.
>
> Mr. Walden stated, "Underwriting results for the quarter were dampened by the impact of large claims and by an early onset of severe cold weather. Two large claims, one in personal lines and one in commercial lines, reached the per risk reinsurance retentions during the quarter, and these had a 5.8 point impact on the loss ratio. An unusual spell of very cold weather during the last week of December resulted in pipe freeze claims that affected the quarterly loss ratio by another 2.7 points. Combined, the two large claims and those from late December had a 2.5 point impact on the full year loss ratio. Fire claim activity this quarter was more in line with long term averages than was observed in Q4 2016, which had an unusually low impact from such claims. ***Despite the impacts noted above, the quarterly combined ratio again came in under 90% and the full year ended with a combined ratio just over 80%.***

* * *

> ***The Company's reserve position remains strong***, as confirmed by an independent external actuarial review performed each year. 2017 marked the third straight year of favorable prior year loss development, and the external actuarial review supports our confidence in the adequacy of reserves. ***We have built a dedicated and highly capable claims team that is clearly having a positive impact on financial results.***"

133. On March 15, 2018, Kingstone held an investor conference call regarding the Company's fourth quarter and year ended December 31, 2017 financial results. During the call, defendant Walden stated:

> Our Q4, 2017 loss ratio was higher than last year, primarily because the result for Q4, 2016 was much better than we normally see in the fourth quarter. This quarter's result was impacted by two large claims, one in personal lines, and one in commercial lines, which reached our maximum per risk retentions.
>
> * * *
>
> ***Our year-end internal and external actuarial reviews confirmed the strength of our reserve position***, although we recorded a small amount of prior year developments in the fourth quarter, we ended 2017 with a third straight year of favorable loss development.
>
> ***Our financial results for the quarter and the year are not materially affected by changes in the adequacy of our reserves.*** Before concluding, I'd like to provide some guidance on expected results for the first quarter 2018.
>
> * * *
>
> Our strong reinsurance program ***and reserving philosophy lends stability to our results, even in times of short term volatility***.

134. On May 9, 2018, Kingstone issued a press release, attached as Exhibit 99.1 to its Form 8-K filed with the SEC the following day (and re-filed on May 11, 2018, correcting the headline), titled "Kingstone Announces 2018 First Quarter Financial Results and 2018 Guidance," announcing the Company's financial results for the quarter ended March 31, 2018. The press release states, in relevant part:

> Barry Goldstein, Kingstone's Chairman and CEO, commented "Running the risk of being the master of the obvious, that was one long cold winter, far worse than any of the other twelve I've experienced as Kingstone's Chairman. But, while the

> losses were elevated, mostly due to the early January deep freeze, ***our core business remains highly profitable and growing***.
>
> * * *
>
> Dale Thatcher, Kingstone's Chief Operating Officer, continued, "This series of winter storms, though more severe than average, were in line with what you have to expect in this business. It's a reminder why people need our product. As Barry indicated, this was probably the worst winter weather losses we've suffered in the last ten years, but in spite of that we still expect to achieve a combined ratio, excluding cat losses, of between a 79% and 85% for the full year and cat losses of between 5 points and 7.5 points on the combined ratio for the full year."
>
> Ben Walden, Kingstone's EVP and Chief Actuary, commented, "Beginning this year, Kingstone has changed its definition of a catastrophe event to more closely align with the definition used by other major carriers. Going forward, Kingstone will define catastrophe losses as those associated with an event that is assigned a catastrophe number by the Property Claim Services (PCS) unit of ISO (Insurance Services Office). Kingstone experienced three such events in the first quarter that were first disclosed in mid-March.
>
> * * *
>
> ***Apart from the winter catastrophe events, underlying results remained solid. Kingstone continued to observe favorable prior year claim emergence with 0.4 points of favorable loss development recorded during the quarter.***"

135. On May 10, 2018, the Company held an investor conference call wherein defendant Goldstein claimed that the Company's "***reserves remained solid***." Defendant Thatcher reported:

> As we look beyond the cat losses, ***underlying results turned in a very solid 88.7% combined ratio, though I'm sure that even this number had some winter weather in it. We're very pleased with our ongoing ability to combine strong growth of 20.7% with a very profitable underlying combined ratio.***

136. Defendant Walden echoed defendant Goldstein, stating that Kingstone's "***reserve levels remained strong with a small amount of favorable development recorded during the quarter***" and that the "***actual loss emergence for the quarter was better than both our internal and external year-end actuarial analyses had indicated.***"

137. Defendant Goldstein added the following in touting the Company's history and growth: "We've ***made a sensible conservative level of risk, we've maintained a sensible conservative level of risk taking*** and expanded our reinsurance program."

138. On August 8, 2018, the Company issued a press release titled "Kingstone Announces 2018 Second Quarter Financial Results; Net Income Rises 10% on Premium Growth of 21%," also filed as Exhibit 99.1 to the Form 8-K filed with the SEC the next day. The press release included the following statement:

> Dale Thatcher, Kingstone's Chief Operating Officer, continued, "***I'm very pleased to see almost all measures moving in a positive direction. We are managing substantial growth while maintaining a mid-80's combined ratio*** and increasing our return on equity to 12.5% - a great reflection of how we are putting our new capital to work for our shareholders. ***We are currently leveraged at 1.1 to 1 premiums to surplus, and look to move that over time into the 1.5 to 1 range so that we can most efficiently generate returns.*** We still expect to achieve a combined ratio, excluding cat losses, of between a 79% and 85% for the full year and cat losses of between 5 points and 7.5 points on the combined ratio for the full year."

139. On August 9, 2018, the Company held an investor conference call for its second quarter 2018 earnings results. During the call, defendant Thatcher reported on the Company's combined ratio, stating, in relevant part:

> ***And for only the second time in my 35-year insurance career, my company came in with a combined ratio in the 80s at 84.2%.*** That's one of the really special things about Kingstone and one of the big reasons I decided to come out of retirement and join Kingstone as the exemplary history of outstanding profitability. We've carved out a unique niche for ourselves in serving the smaller agents that many of the larger carriers have left behind.
>
> By providing them with the love and attention of years gone by, they provide us with the best of their profitable business. ***When you combine that with an A minus rating from A.M. Best, we've been able to parlay that into growth in excess of 20%, while maintaining combined ratios in the 80s, a pretty compelling story.***

* * *

> ***We are currently writing a just under 1.1 to 1 premiums-to-surplus and fully expect to achieve a steady state of approximately 1.5 to 1, meaning that we have substantial capital currently to support our robust growth in excess of 20%.***

140. Defendant Walden added further information on the loss reserves, stating, in relevant part:

> ***As Barry noted, we strive to be transparent and proactive in all of our financial reporting. We reflect the ultimate impact from even large storms as soon as we know the scope of an event.***
>
> * * *
>
> ***As part of our proactive philosophy, we also constantly monitor individual claims and make adjustments to reserve levels whenever needed.*** Following along with that, during the quarter, we strengthened reserves on several liability claims resulting in prior year development of $341,000. Although this is still within our target range for reserve variability, it created an unfavorable variance of 2.6 points compared to 2Q 2017 when we recorded favorable prior year development. Such ongoing investments, up and down, ensure that our overall reserve levels always remain strong and accurately stated.
>
> ***Apart of these adjustments, our underlying loss ratio remains consistently profitable. The loss ratio excluding cats and prior year development decreased by 1 point to 44.2 from 45.2 for 2Q 2017.*** The improvement was primarily due to a decrease in personal lines claims frequency.

141. When asked about the Company's leverage and A.M. Best rating, defendant Thatcher stressed the Company's low reserve risk, responding:

> So as long barring any changes in how A.M. Best views the business, more broadly, we don't expect any kind of issues with that at all. One of the things to keep in mind as a homeowners' writer, ***there's a lot less volatility and a lot less reserve risk with a company like ours.*** And therefore, they are much more accepting of a higher leverage ratio. So even though the industry sits at a 1.1 to 1, they've got no problem with a 1.5 to 1. And we think it's a much more appropriate area of leverage to operate in. To be honest with you, I could theoretically from a finance perspective argue that a higher leverage ratio would be even more appropriate. But ***we're very cognizant of our rating agency obligations and the need to maintain a positive outlook from that process. So 1.5 to 1 is a good range for us to operate in***.

142. Kingstone issued a press release reporting its third quarter 2018 financial results on November 7, 2018, also filed as Exhibit 99.1 to a Form 8-K filed with the SEC on November 8, 2018. The press release included the following statements:

> Dale Thatcher, Kingstone's Chief Operating Officer, commented, "We continued to add significant new business volume in New Jersey, Rhode Island and Massachusetts while at the same time growing our highly profitable core New York business. Personal lines direct written premium again grew at over 20% year over year. Although the combined ratio is substantially higher for third quarter 2018, that is more a story of how low the combined ratio was last year at 69.8%. ***This year we recorded a more normal 86.0% combined ratio and an operating ROE for the quarter of 16%. Both metrics demonstrate our continued high performance.***

143. The next day, the Company held its third quarter 2018 earnings conference call where defendant Thatcher once again emphasized Kingstone's excellent combined ratio, as well as the increase in direct written premiums, stating, in relevant part:

> Personal lines as a whole saw direct written premium again grow at over 20% year-over-year, and we are seeing many new opportunities present themselves that will enhance our growth prospects in the near term. ***Keep in mind, that our plus 20% growth rate this quarter reflects the first quarter-over-quarter comparison that is not impacted by the A.M. Best rating upgrade, which occurred in 2Q 2017.***
>
> ***For the quarter, we recorded a combined ratio of 86%, an excellent combined ratio by anyone's standards, but it does look anemic when compared to last year's 69.8%. I remind you that in my 35-year insurance career, this is only the third time my company has recorded a combined ratio in the 80s, so I'm not going to apologize for it.*** Clearly a 69% combined ratio for a quarter is unusual, but I'd love to record a few more of those now and again. As we grow and diversify, we expect to see less volatility in our combined ratio, but we still have every expectation of continuing our history of profitability.
>
> ***For the quarter, that combined ratio translated into a 16% operating ROE. In my mind, a 16% ROE and an 86% combined ratio continue to be something to write home about and are, obviously, an envious position to be in.***
>
> * * *
>
> ***Our product team continues to monitor claim trends closely, and we are taking actions to ensure our pricing remains adequate and that we stay disciplined in order to continue our profitable growth.*** Based on our continued excellent results, for the full year, we expect to achieve a combined ratio, excluding cat losses, of

> between an 84% and 86% and cat losses of approximately 6 points on the combined ratio.

144. On March 14, 2019, the Company held an earnings conference call to discuss the fourth quarter and year ended December 31, 2018 financial results. During the call, defendant Thatcher discussed the Company's ratios, claiming that Kingstone was tightening its underwriting standards:

> ***For 2018, the expansion states delivered a loss ratio of 49%, well ahead of where we thought they would perform at this point of their development, and dead even with the overall loss ratio for the company. Our combined ratio for the quarter was 96.4%, including 3.5 points of adverse development, and 0.4 points of cat losses. Overall, for the year, our combined ratio was a disappointing 94.8%. This included six points of catastrophe losses, and 1.1 points of adverse development related to unfavorable liability settlements from 2014 and '15.***
>
> The industry as a whole has seen some deterioration in property losses, and we're not immune from that trend. ***We've taken steps to tighten certain underwriting criteria, we've increased both exterior and interior inspections, we've filed rate increases, and we've tightened restrictions on seasonal and secondary homes.***
>
> * * *
>
> Before I close the call, I would like to provide guidance for 2019. ***Based on our results for this past year, trends we are seeing in the industry, and the changes we have made and continue to make to underwriting and claims practices***, we expect to end 2019 with a combined ratio excluding catastrophe losses of the 20% and 82% and an 84%, and catastrophe losses of 4 points. Keep in mind that historically most of our cat losses hit in the first quarter and we expect that again this year.

145. Contrary to the statements above, Kingstone's loss reserves were not "strong" or "solid" and the Defendants were being far from "transparent." Further, the Defendants were not adequately "monitor[ing] individual claims and mak[ing] adjustments to reserve levels when needed" because, *inter alia,* the claims department was not following industry best practices, as disclosed on April 29, 2019, along with the need for the initial $5 million reserve charge.

146. In fact, the reported loss ratios and combined ratios were substantially understated as a result of the loss reserve being understated as confirmed by CWs. The statements made by

Defendants in ¶¶ 132-144 were materially false and/or misleading and/or failed to disclose that: (a) properties were significantly under-valued creating greater credit risk and a greater chance that the loss reserves were not adequate; (b) Defendants fostered a culture which prevented communications between underwriters and other departments, including the claims department, requiring underwriters to underwrite inaccurately or be fired, and acquiescing to the demands of agents and brokers; (c) the claims department was not following industry best practices; (d) as a result, loss reserving procedures were insufficient or not being performed correctly; and (e) as a result the Company's loss reserves, net loss ratio, and net combined ratio were materially understated and net income overstated during the Class Period.

**D. False Statements Regarding Internal Controls**

147. Each of Kingstone's quarterly and annual financial reports filed during the Class Period contained materially false and misleading regarding the Company's internal controls. The 2017 10-K and 2018 10-K each stated in the same, or substantially the same manner, in relevant part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. Internal control over financial reporting is a process designed by, or under the supervision of, our Chief Executive Officer and Chief Financial Officer, and effected by the board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP including those policies and procedures that: (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP and that receipts and expenditures are being made only in accordance with authorizations of our management and directors, and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of our assets that could have a material effect on the financial statements.

* * *

> Management conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2018 based on the framework in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on the evaluation of the effectiveness of our internal control over financial reporting management concluded that our internal control over financial reporting was effective as of December 31, 2018. . . .
>
> There was no change in our internal control over financial reporting during our most recently completed fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

148. The quarterly financial reports filed during the Class Period each made the following substantially similar statements: "There was no change in our internal control over financial reporting during our most recently completed fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

149. Defendants Goldstein or Thatcher and defendant Brodsky certified to the effectiveness of the Company's internal controls in each of Kingstone's annual and quarterly filings during the Class Period, stating in substantially similar language that:

> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; . . . .

150. These statements were materially false and misleading when made because throughout the Class Period, Kingstone's internal controls suffered from a material weakness. As admitted by the Company, a material weakness in internal control existed as of September 30, 2019 relating "to the establishment of case reserve levels." This admission reflected the same material weakness for the entire Class Period, if not before, as the case reserve level amounts related to polices from 2014, 2016, and 2017. Further, Defendants have admitted that the Company's claims department was not following industry best practices and CWs have stated that Defendants knew, or were grossly reckless in not knowing, about the occurrence of significant under-reserving on claims and over-valuations in underwriting.

## VIII. LOSS CAUSATION

151. During the Class Period, as detailed herein, Defendants engaged in a fraudulent scheme to deceive the market that artificially inflated the price of Kingstone securities and operated as a fraud or deceit on Class Period purchasers of Kingstone securities.

152. Defendants' materially false and/or misleading statements and omissions concealed, *inter alia*, Kingstone's true loss reserves, risky underwriting practices, lack of adherence to industry best practices, and ineffectiveness of the Company's internal control. As detailed above, when the truth was revealed, the price of Kingstone securities declined significantly as the prior artificial inflation was removed from the Company's stock price.

153. As a result of their purchases of Kingstone securities during the Class Period, at artificially inflated prices, Lead Plaintiff and the Class suffered damages under the federal securities laws.

154. The artificial inflation created by Defendants' misrepresentations and omissions was removed when the Company announced on April 29, 2019 that it was taking a loss reserve charge of $5 million and that the Company's claims department was not following industry best practices. *See* ¶¶ 84-85. Following this disclosure, Kingstone's share price declined by $2.02 per share, or 15.2%, on heavier than usual trading volume of 209,900 shares, to close on April 30, 2019 at $11.30 per share.

155. The timing and magnitude of the price decline in Kingstone's stock on the date of the disclosure above negates any inference that the losses suffered by Lead Plaintiff and the Class were caused by changed market conditions, macroeconomic or industry facts, or Company-specific facts unrelated to Defendants' fraudulent conduct.

156. The damages suffered by Lead Plaintiff and the Class were the direct and proximate result of Defendants' materially false and misleading statements and omissions that artificially inflated the Company's stock price and the subsequent significant decline in the value of the Company's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct were revealed.

## IX. NO SAFE HARBOR

157. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false and/or misleading herein. The statements complained of herein were historical statements or statements of then-existing facts and conditions at the time the statements were made and/or were material omissions.

158. To the extent that statements alleged to be false and/or misleading could be construed as forward-looking, the statutory safe harbor does not apply to such statements because they were not sufficiently identified as "forward-looking statements" when made, there were no meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the forward-looking statements, and/or Defendants had actual knowledge that the forward-looking statements were materially false or misleading at the time each such statement was made.

## X. PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

159. The market for Kingstone securities was open, well-developed, and efficient at all relevant times. As a result of Defendants' materially false and/or misleading statements and material omissions, Kingstone stock traded at artificially inflated prices during the Class Period. Lead Plaintiff and the Class purchased or otherwise acquired the Company's stock relying on the integrity of the market price of such securities and on publicly available market information relating to Kingstone, and have been damaged thereby.

160. During the Class Period, the artificial inflation of the value of Kingstone's stock was caused by the material misrepresentations and omissions particularized in this Complaint, thereby causing the damages sustained by Lead Plaintiff and the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's stock to be artificially inflated at all relevant times. When the truth was disclosed, it drove down the value of the Company's stock, causing Lead Plaintiff and other Class members that had purchased the stock at artificially inflated prices to be damaged as a result.

161. Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Kingstone securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Lead Plaintiff and members of the Class purchased, acquired and/or sold Kingstone securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

162. Based upon the foregoing, Lead Plaintiff and the Class are entitled to a presumption of reliance upon the integrity of the market.

163. Alternatively, Lead Plaintiff and the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XI. CLASS ACTION ALLEGATIONS

164. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased or otherwise acquired Kingstone securities between March 14, 2018 and April 29, 2019, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which any excluded person or entity has or had a controlling interest.

165. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Kingstone securities were actively traded on the NASDAQ. As of March 12, 2019, Kingstone had approximately 10.7 million shares of common

stock issued and outstanding. While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members of the proposed Class. Record owners and other members of the Class can be identified from records maintained by Kingstone or its transfer agent and notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

166. Lead Plaintiff's claims are typical of the claims of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

167. Lead Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

168. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made (or omissions) by Defendants to the investing public during the Class Period misrepresented (or omitted) material facts about the business, operations, and management of Kingstone, in particular the Company's loss reserves and related metrics, its loss reserve policies and procedures, its underwriting and risk management practices, and the effectiveness of the Company's internal controls;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements (or omissions);
- whether the prices of Kingstone securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

169. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII. CAUSES OF ACTION

### COUNT I

**Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder (Against All Defendants)**

170. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

171. During the Class Period, Defendants carried out a plan, scheme, and course of conduct, which was intended to, and throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Kingstone securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire Kingstone securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

172. The Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon

the purchasers of the Company's securities during the Class Period in an effort to maintain artificially high market prices for Kingstone's securities in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

173. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal and misrepresent adverse material information about the Company's business, operations, and financial results, as specified herein.

174. Pursuant to the above plan, scheme, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Kingstone securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented Kingstone's true condition.

175. The Company and the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, the Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

176. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As directors and senior officers of Kingstone, the Individual Defendants had knowledge of the details of Kingstone's internal affairs.

177. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Kingstone. As directors and senior officers of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Kingstone's businesses, operations, financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Kingstone securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Kingstone's business and financial condition which were concealed by Defendants, Lead Plaintiff and the Class purchased or otherwise acquired Kingstone securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

178. During the Class Period, Kingstone securities were traded on an active and efficient market. Lead Plaintiff and the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Kingstone securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiff and the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time

of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true value of Kingstone securities was substantially lower than the prices paid by Lead Plaintiff and the Class. The market price of Kingstone securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and the Class.

179. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

180. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating material misrepresentations to the investing public.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

181. Lead Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

182. During the Class Period, the Individual Defendants participated in the operation and management of Kingstone, and conducted and participated, directly and indirectly, in the conduct of Kingstone's business affairs. Because of their senior positions, they knew the adverse non-public information about Kingstone's misstatements.

183. As directors and senior officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Kingstone's financial condition and results of operations, and to correct promptly any public statements issued by Kingstone which had become materially false or misleading.

184. Because of their positions of control and authority as directors and senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which Kingstone disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Kingstone to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Kingstone within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Kingstone securities.

185. Each of the Individual Defendants, therefore, acted as a controlling person of Kingstone. By reason of their senior management positions and/or being a director of Kingstone, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Kingstone to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Kingstone and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

186. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Kingstone.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff prays for judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

C. Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees with interest, expert fees, and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Lead Plaintiff hereby demands a trial by jury.

Dated: December 17, 2019

Respectfully submitted,

**BRAGAR EAGEL & SQUIRE, P.C.**

*/s/ Lawrence P. Eagel*
Lawrence P. Eagel
W. Scott Holleman
Melissa A. Fortunato
Marion C. Passmore (*pro hac vice* forthcoming)
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone: (212) 308-5888
Facsimile: (212) 504-3260
Email: eagel@bespc.com
holleman@bespc.com
fortunato@bespc.com
passmore@bespc.com

*Lead Counsel for Lead Plaintiff and the proposed Class*