K77QfitO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
DONALD FITZHERBERT, PHILLIP
WOOLGAR, Individually and on
Behalf of All Others Similarly
Situated,

                Plaintiff,

        v.                          19 Civ. 05500 (RA)
                                    REMOTE ORAL ARGUMENT
JASON & JENNIFER HAYMAN TRUST,

                Movant,

            v.

KINGSTONE COMPANIES, INC.,
BARRY GOLDSTEIN, DALE A. THATCHER,
VICTOR J. BRODSKY and BENJAMIN WALDEN,

                Defendants.

------------------------------x
                                    New York, N.Y.
                                    July 7, 2020
                                    3:00 p.m.

Before:

                    HON. RONNIE ABRAMS,

                                    District Judge

                        APPEARANCES

BRAGER EAGEL & SQUIRE PC
     Attorneys for Plaintiffs
BY:  WILLIAM SCOTT HOLLEMAN
     LAWRENCE P. EAGEL

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
     Attorney for Defendants
BY:  SCOTT D. MUSOFF

K77QfitO

(The Court and all parties appearing telephonically)

THE COURT:  Are we waiting for anyone else?

MR. MUSOFF:  Not for defendants, your Honor.

MR. HOLLEMAN:  Not for plaintiffs either.

THE COURT:  Then why don't we get started.  First of all, I will just say that I hope all of you and your families are safe and healthy.  I also want to remind everyone that this is a public proceeding.  Members of the public and the press are able to access the proceeding through the public call-in number.  All participants are reminded, however, that any recording or re-broadcasting of any portion of this proceeding is strictly prohibited.

As you all know, we're here for oral argument on defendant's motion to dismiss.  I have, of course, reviewed your papers.   Why don't I hear first from defense counsel.

MR. MUSOFF:  Thank you, Judge Abrams.  Scott Musoff from Scadden Arps for defendants.

Plaintiffs' claims here challenge solely on the basis of hindsight the accuracy of Kingstone, a property and casualty insurance company's insurance loss reserves between March 14, 2018 and April 29, 2019.  Insurance loss reserves, as with all reserving, are an inherently subjective and uncertain expense that is covered by the legal standards articulated in *Fait* and *Omnicare*, as your Honor recognized in the *Adient* case and *Philip Morris*, and as Judge Liman recently recognized in the

K77QfitO

*Mueller* case.  So, I won't go into all of the standards for which the Court is fully familiar, but plaintiffs must meet these stringent standards to show not only that the loss reserves were incorrectly made but were subjectively false.  In other words, did senior management and those responsible for those insurance loss reserves believe them to be false when they were made.

Here, we submit, your Honor, that plaintiffs relied primarily on the fact that they voluntarily did a review and increased the insurance loss reserves, and also on -- which I will go into in a little more detail -- in-firm reliance on vague allegations from several confidential witnesses.

In terms of the review that was done, while plaintiffs in their opposition brief in a sort of hyperbolic way accused the company of a culture of secrecy and abuse and otherwise, they have no explanation for that very same management team conducting a voluntary review in increasing the reserves on their own.  In other words, just like in *Slayton v. Am. Express* where the Second Circuit held that ordering an investigation, ordering a review, is a prudent course of action that weakens rather than strengthens an inference of scienter, plaintiffs have no answer for that.  They cite the resignation of Mr. Thatcher months later with no explanation as to why that raises the specter of any knowing, intentional misstatements made during the class period, but they certainly have no

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

K77QfitO

explanation for the fact that it's the same management team that conducted this prudent course of action that the Second Circuit held weakens rather than strengthens an inference of scienter.

In terms of the confidential witnesses, as your Honor stated in the *Adient* case, they provide no specific contrary information that the individual defendants would have had knowledge of that would have rendered their statements false and misleading.

THE COURT:  So, let's get a little bit more into the specifics about what CW2 and CW6 say in particular.  So, according to the complaint, CW2 submitted monthly reports to all management via email, including defendants Goldstein and Thatcher that discussed the "undervaluations of the properties" and "further discussed these reports and meetings attended by at least defendants Goldstein and Walden.  And CW2 also recalled discussing the book being undervalued multiple times by defendants Goldstein Thatcher and Walden.  CW-2 asserts that defendant Goldstein's response to the undervaluation concerns was that CW2 was making something of nothing, calling it a red herring and eventually trying to avoid having conversations with CW2 altogether."

Then as to CW6, the complaint alleges that it was CW6's job to calculate what the reserve should be, but that CW6's recommendations were ignored by upper management at least

50 percent of the time on larger accounts and that CW6 requested reserve increases.

So, tell me why those assertions specifically the Goldstein responded to the undervaluation concern by allegedly stating that CW2 is making something of nothing, calling it a red herring and allegedly trying to avoid having conversations with CW2 altogether, why aren't those sufficient?

MR. MUSOFF:  Yes, your Honor.  CW2 makes allegations about reports regarding houses, personal houses, and argues on the underwriting side -- and I will just take a step back for a moment to describe two sides of an insurance company.  One side is the underwriting, how you're going to charge premiums, and that's the person you deal with for getting the insurance.

The claims side, once somebody submits a claim for damages, totally different side of the business where they then measure and have to try and estimate somebody made a claim, how much are we going to have to pay out.  On the underwriting side, which is not the claims side, first of all, that's where CW2 is positioned.  So, no allegations that he or she would have had access to the claims writing side.

Second, he was involved or she is involved in the personal lines of the underwriting, meaning that there is a commercial business that handled business claims, business insurance, and personal, which was residential houses.  CW2 is talking about undervaluing on the underwriting side personal

K77QfitO

houses.

There's no allegation, nor could there be, that the increased insurance loss reserves were taken on that side of the business.  The increased insurance loss reserves were taken on the commercial side of the business, and plaintiffs do not and cannot allege otherwise.  And the public statements to which they cite for the increased insurance reserves make that clear as well.  And there is nothing in addition about those reports that says anything about claims reserving, and certainly nothing that is contrary to the public statements made about reserving.  And it's not that different than the CWs in *Adient* which may have offered their thoughts and opinions as to various operational issues, but they don't establish what specific contradictory information the makers of the statements had when somebody is working on the personal side, the underwriting side, and nothing in the reports about claims reserving.

CW6, on the other hand, does allege to be on the claims side, the only CW that we believe worked allegedly on the claims side.  CW6 refers to upper management.  Doesn't talk about any of the individual defendants specifically, and even then CW6 says 50 percent -- although plaintiffs in their brief say it's 50 percent of all claims, but that's not what CW6 says -- CW6 says 50 percent of the time on certain of CW6's accounts, his or her opinion on reserving was not taken into

K77QfitO

account.

First of all, that is, you know, what do you make of that?  That does not say that all of the reserving that led to the increased reserves was understated, but, more importantly, the difference of opinion between people as to reserving doesn't mean that any of the makers of the statements did not subjectively believe that they were right and that they had disagreements with CW6, and it doesn't make CW6's views correct.  But even if they were correct at the time, it certainly doesn't make the makers of the original reserving, which was reviewed by actuary, independent actuary and auditors, subjectively false when made.  And he talks about one case in particular is the example where he says in paragraph -- in the amended complaint 73, he recalled -- this is the only time he talks about commercial claims.  Everything else appears to be, again, about houses, about the personal lines.

There's one allegation where CW6 recalled commercial claims being under-reserved as well mentioning one case where an excess verdict was obtained and the amount awarded was in excess of the policy.  So, he knows one claim where the company believed that they were so right that they took it to litigation and lost a verdict about insurance coverage apparently, and somehow that means that their subjective beliefs about reserving over a one-year period were false and misleading when made.  These allegations come nowhere close.

They're far below those in your Honor's *Phillip Morris* case, in the *Adient* case, and we would say in the *Mueller Water Products* case that we recently submitted as well.

And the remaining CWs do no better.  Most of them are on the personal lines and have no interaction even allegedly with the individual defendants.  As your Honor pointed out, it's CW2 and CW6, which plaintiffs appear to be saying had connections to the individual defendants even though CW6 refers more generically to upper management.

THE COURT:  You cited some of my prior and somewhat recent opinions, but how do you distinguish cases cited by plaintiffs such as *In re Signet Jewelers Ltd. Securities Litigation* and *In re SLM Corp. Securities Litiation*?

MR. MUSOFF:  Your Honor, in *Signet*, there were -- first of all, here where the reserving was off by about 3 points annually, 3 percent, in *Signet* there was a far greater disparity.  But in *Signet* the plaintiffs had specific allegations of multiple periods of time in which they either were made aware or should have been made aware that the loss reserves they had were inadequate, as opposed to here, a voluntary review at the end of the class period where there was some relatively small changes made to it.  Let me just pull it up.  I apologize, your Honor.  Bear with me.

THE COURT:  Take your time.

MR. MUSOFF:  Working from home is a little different

K77QfitO

than standing at the podium.  I apologize.

THE COURT:  I'm aware.

MR. MUSOFF:  And in *SLM Corp.*, the motive that was cited by plaintiffs there in that an imminent merger would have gone down that would have cost the company $2 billion and the individual defense $225 million is far more specific than the generic allegations of motive here, which are based primarily on either the corporate decisions, the fact that Mr. Goldstein sold some stock, although that was pursuant to a 10b5-1 plan, which as the court in *FootLocker* held negates a strong inference of scienter, there they were able to allege far more specific facts relating to scienter.

THE COURT:  All right.  You may proceed.

MR. MUSOFF:  And then just again to briefly go over scienter, which, again, plaintiffs must allege that management -- the individual defendants subjectively believed that their reserving was false and misleading when made, as mentioned earlier, not only did plaintiffs fail to cite to any specific contrary information that's actually different than that that was publicly stated, but here there was an independent auditor, there was an independent actuary, only one executive, Mr. Goldstein, is alleged to have sold any stock, plaintiffs don't provide a percentage that shows that it's unusual in scope or timing.  It was made months before the alleged corrected disclosure and not at a peak stock price, and

K77QfitO

it was pursuant to a 10b5-1 plan.  So I believe for those reasons, your Honor, plaintiffs have failed to sufficiently meet the stringent standards in challenging insurance loss reserves.

And unless your Honor has any other questions we'll rest on the papers for the remaining arguments.

THE COURT:  Thank you.

Who would like to be heard on behalf of plaintiff?

MR. HOLLEMAN:  Your Honor, this is Scott Holleman.

THE COURT:  All right.  You may proceed.

MR. HOLLEMAN:  Our view of this case is obviously quite different than the defendant's view, and we think that this is an issue where we have numerous post class trade statements where the company essentially admitted to under-reserving and having previously having inadequate financial controls.

THE COURT:  But that's after the fact, right?  That's in hindsight.  That's essentially mismanagement.  I mean, why is this fraud?

MR. HOLLEMAN:  I think the biggest thing goes to the confidential witness statements that we have.  We have confidential witness statements CW1, 2, 3, 4, 5 and 6, all of them except for one individual was actively involved in either side of the insurance business.  As Mr. Musoff described insurance companies, essentially there's two components of it:

K77QfitO

There's the underwriting where the money comes in, and the claims processing where the money comes out.  And all of them were involved in either of those sides of the business except for one during the class period.  And we have CW statements with respect to matters about underwriting processes and risks and loss reserves with specific information being conveyed to the individual defendant during the relevant period.

THE COURT:  So, walk me through your best statements.  I mean, obviously Rule 90 requires plaintiffs alleging securities fraud to specify the statements that plaintiffs contend were fraudulent and explain why the statements were fraudulent.  And the section of the complaint that details the alleged false and misleading statements here, which I think are paragraphs 116 to 150, is largely comprised of long block quotes with portions emphasized in bold and italics followed by two nearly identical paragraphs explaining why the statements were false and misleading.  But walk me through the specific statements and why they're sufficient here.

MR. HOLLEMAN:  OK.  So, in paragraph 121, that begins the discussion of underwriting, risk management, and reserves practices.  And as distinguishing between statements of opinion and statements of fact, what practices Kingstone undertook, what it did to ensure that it was doing the right thing to make sure that there was an adequate underwriting procedures in place and adequate loss reserve procedures in place.  That's

K77QfitO

what the statements that we have in these paragraphs beginning, as you said, on 121 discuss.

So, paragraph 121, we cite portions of the 2017 10-K that was filed on March 15, 2018, and that was the day after the beginning of the class period. And it discusses, as your Honor mentioned, there's long block quote, and it says:

"Our underwriting process evaluates and screens out certain risks based on property reports, individual insurance scoring, information collected, and physical property inspections and driving records. We maintain certain policy exclusions that reduce our exposure to risks that can create severe losses. We target a more preferred risk profile in order to reduce adverse selection from risks, seeking the lowest premiums and minimal coverage levels."

Now, that one or those multiple statements covers a lot of different issues, but in our view what is being said there is that there is an objective, there is a methodical way that Kingstone went about underwriting insurance to make sure that they were not taking any undue risk, whereas the statements from the various CWs indicate that anything but was actually happening; that they were @silent in different departments not letting the claims department interact with the underwriting department; that CW2 recalled discussing the book being undervalued multiple times with the high-level executives. CW3 stated that the policy defied good

K77QfitO

underwriting guidelines and should not have been written; and that the CW4, he said that the business shifted from quality to quantity over the class period and management wanted him to wear blinders.

THE COURT:  But articulate for me why that's fraud as opposed to mismanagement or a difference of opinion.

MR. HOLLEMAN:  I think it could certainly also have been mismanagement, but we're not here asserting breach of fiduciary duty.  We're asserting that the public persona of Kingstone was that of a company that had rigorous underwriting procedures, rigorous ways of establishing loss reserves, that those loss reserves were adequate, and the statements that we got from the CWs, they indicate that that wasn't happening.

THE COURT:  Would you stop of the loss reserves.  I mean, aren't statements about loss reserves statements of opinion?

MR. HOLLEMAN:  I think that the statements of loss reserves, if it were, as we discussed, in order to get the protections of *Omnicare*, and that doesn't even preclude an actionable statement, but in order to do that, it has to be -- it does have to be full and it has to be complete.  It can't be a partial truth.  The statement that we -- that these are our loss reserves, whatever they might have when for a given period, those statements, they cannot be read separately from all the statements that Kingstone made about what it did to

K77QfitO

arrive at those loss reserves and what it did even prior to having a policy -- the underwriting process and the risk assessment of methodologies undertaken in connection with writing the insurance policies.

So, yes, while implicit in Kingstone representing what its loss reserves were for a given period, we believe that this is an accurate level of loss reserves, we don't think that you can divorce that representation from all of the statements contained in the rest of the same filings and in other filings and in other public statements about the adequacy of what Kingstone did.

THE COURT:  Sorry, just to be clear -- I will, of course, give you time to be heard out -- are there any factual allegations in the complaint alleging that Kingstone was not actually calculating or monitoring loss reserves in the manner described in the public statements?

MR. HOLLEMAN:  I am not aware that Kingstone was not undertaking some methodology to calculate loss reserves.

THE COURT:  Go ahead.  I didn't mean to cut you off.

MR. HOLLEMAN:  But the thrust is that they weren't doing all that they said they were doing otherwise there would not have been -- and the CW6 statement, it wasn't -- he gave as an example that one issue that there were problems related to the one verdict, but it wasn't limited to that.  The CW statements about having inadequate reserves for the claims, I

K77QfitO

think that that flows from having an inadequate policy in there.

THE COURT:  But CW6's allegation, among others, is that basically the recommendations CW6 made were ignored by upper management, right, at least 50 percent of the time on larger accounts, and that when CW6 requested reserve increases, those requests were declined.  But why does that establish fraud as opposed to, again, a disagreement of opinion about what the proper course of action should be?  Why does that show fraud?

MR. HOLLEMAN:  I think that one of the things that we should be care -- that we would urge the Court to be careful of, and which the defendants in our view are trying to do, is to make this solely about the exact number it might have been. At the end of the day, there were additional loss reserves recorded, and that was largely responsible for the swing from profit to loss.  But those statements are not made in isolation and nobody obligated Kingstone to make certain representations about what it did to ensure careful underwriting and careful loss reserving, and we think that the CW statements convey a theme of, we don't really want -- that upper management didn't care about what the individuals on the ground thought.  They didn't care about whether the right procedures were being followed.  It didn't care about advice from people who are underwriting that this is a risky policy.  And, instead, the CW

K77QfitO

allegations support a situation where -- that there was a situation where the executives caved to the desire for more revenue and writing certain policies and favoring certain agencies and agents.  I think there was the one CW statement where it's almost like the agents owned the company and not the shareholders.

So, I think that if we focus too much solely on the specific numerical loss reserve and not on what Kingstone has supplied around that about all the steps that it's taken to evaluate risk on an objective basis and the underwriting process and continually assessing the loss reserves when CW6 is saying, we don't have adequate reserves, I think that that shows that there was contemporaneous misstatement if the company is saying throughout the class period everything is fine, and then internally the individuals with the real knowledge are being siloed, and even those who are conveying it up the line, like CW2, who is having discussions with Goldstein and Walden, and those are being constantly disregarded and rebuffed in the name of generating more and more revenue.

THE COURT:  Can you point me to factual allegations in the complaint demonstrating that defendants did not believe their opinions regarding the strength or adequacy of their company's reserves at the time the statements were made; not after the fact, but at the time the statements were made.

MR. HOLLEMAN:  I think the CW statements are those

statements that they could not have believed that given the information that was given --

THE COURT:  Because CW6 disagreed, that means that the defendants could not have believed them, the statements?

MR. HOLLEMAN:  It's not just CW6.  I think it's also CW2 who was conveying that they didn't have the proper reserves; that monthly reports were being made regarding the undervaluation of properties which would have translated into erroneous reserve calculations.  So, I think that those -- the CW statements that we have are more than sufficient to identify specific problems, general cultural problems and knowledge on the part of the defendants that things were not all right even to Kingstone.

THE COURT:  All right.  Can you point me to allegations in the complaint demonstrating that the individual defendants were aware of a material weakness in the company's internal controls during the class period.

MR. HOLLEMAN:  I think that the post class period admission that there were weaknesses in internal controls is telling, certainly --

THE COURT:  How does that demonstrate that the defendants were aware of those or any material weaknesses during the class period?

MR. HOLLEMAN:  I will get to that in a moment.  I was going to -- with respect to the post class period admission, in

K77QfitO

our view that is consistent with the allegations that the internal controls -- that they knew the internal controls during the class period were weak, but with respect to what was known at the time, the defendants, they're not just random employees of the company.  They are long-time chairman and then for a period of time executive chairman and then subsequently again chairman -- sorry about that.  Goldstein was executive chairman, then chairman, then executive chairman again when Thatcher resigned.  Thatcher was the CEO.  These are high-level executives of a small one hundred person company that's situated essentially on a third of an acre in Upstate New York, and these individuals designed the reporting structure and the structure regarding how Kingstone operated, and they were aware that -- in fact, it was -- I'm trying to remember which CW it is, I can find it -- but the individual people working in the underwriting department were specifically instructed not to speak to anybody else; not to speak to auditors; not to consult with anybody in the claims period.  And if you're an executive and you set up your company to operate in such an opaque way where the left hand can't speak to the right hand and vice versa and information is intentionally suppressed, then you have to be aware that if you're the one who designed that system, you have to be aware that the internal controls are not going to be functioning in the way that they ought to be.  But certainly the Kingstone employees -- Kingstone and the

K77QfitO

executives that we named as defendants were aware that they weren't undertaking the appropriate methodologies for underwriting and loss reserve assessing.

Your Honor, if I may move on to the scienter element. I am not going to belabor what was said in our brief. We've already said that. We would largely stand on our papers, but I would add that the defendant's argument that the fact there was an internal review conducted in our view makes no sense from a public policy perspective. If you committed fraud, committing the fact that prior to the class period or prior ultimate revelation, well, you can just conduct an internal review or commence an internal review, that would turn in our view the state laws on its head, and it wouldn't be a get-out-of-jail card based on a decision to come clean at the end of the day.

I think that the stock sales made by Goldstein, even though they are pursuant to a 10b-5 1 trading plan, that plan came about during the class period. The executives were motivated to under-reserve and over underwrite based on their compensation structure, which was specifically tied to income. The CWs specifically advised the various defendants about the issues with underwriting and with making sure that there were adequate loss reserves. I think that -- I'd be happy to go through some of the cases. In fact, I would in particular like to talk about the case that the defendants introduced just on Thursday or Friday of last week in supplemental authority. I

K77QfitO

think that actually provides a nice contrast to this current case.

THE COURT:  Judge Liman's case?

MR. HOLLEMAN:  That's correct, the *Chapman v. Mueller Water Products* case.  In that case, the CWs had only generic knowledge that was in my read not inconsistent with what the company was doing internally and conveying externally.  I think that one of the CW statements was that there were lots of metering issues, but the company already knew that because it had already reserves for certain warranty losses.  Also, the CWs that were cited in the *Mueller Water Products* case did not report directly to any of the defendants.  So, therefore, the defendants in that case didn't have any direct knowledge of a potential misconduct or potential failings within the company, unlike the defendants here who had direct contact with some of the CWs.

The other thing that is important to remember here is this is an insurance company.  As we discussed earlier, it does two things:  It collects money for policies, and then it pays out money for claims.  So, the loss reserve and the underwriting risk approach is crucial.  It's central to how the company operates.  In *Mueller Water Products*, they create water meters and they sell them to private parties, and they sold them to governmental entities all across the country.  And a defective product, there may be a warranty for it and there may

K77QfitO

be certain liabilities associated with that, but that's not central to that company's business, no more than Apple or IBM, that their warranty department is central to that company's business.  Apple sells products in music, and it's not a warranty company.  It's an electronics company.

Here, it's an insurance company.  So, making sure there's adequate loss reserves, making sure there's adequate underwriting processes is central to the company's very existence.  And we know, as we allege in our complaint, getting the AM Best A minus rating was something that was also central to the company being able to grow and grow.  It tried to grow premiums, I think we said by several times in the years leading up to the class period, and it continued to try to grow premiums, and in order do that, you just -- that's fine if you want to grow, but you have to undertake the appropriate steps to make sure you're not growing too fast.  And, moreover, if you're a publicly traded company, and you're relying on the public markets for capital, you have to be honest.  And nobody was telling Kingstone to tout how good its underwriting policies were.  Nobody compelled Kingstone to tout how good and accurate its loss reserves policies were.

THE COURT:  But, again, aren't those statements of opinion?

MR. HOLLEMAN:  I don't believe that they are.  And in the *eTrade* case that we cite, in the *GE Securities* case that we

K77QfitO

cite, those opinions of a similar nature were not analyzed under -- the statements were not analyzed as opinion statements.  They were analyzed as statements of fact.  I think if Kingstone is saying we undertake -- I'm summarizing here, but if they're saying we undertake a thorough objective process for identifying underwriting risks and for minimizing risks and if that's not true, that's factually not true, then that's actionable, and that's what we allege happened here.

THE COURT:  Tell me why under *Omnicare* the statements are false and misleading.

MR. HOLLEMAN:  I think if you get to the fact that they are opinion statements -- and certain of statements may be opinion statements and others statements may not be, but in our brief we say that they're not, but, nevertheless, I think that if you were to evaluate it under *Omnicare* that -- I'm still trying to struggle how to do that, how to evaluate an assertion that we undertake objective ways and we take into account all of this information, how that could be an opinion. Nevertheless, if it were an opinion, it's not true, because the CW statements we include in our complaint suggest that the company -- it didn't always follow the right procedures, but it sometimes bowed to pressure from agents and it focused on quantity over quality, so much so that CW1 thought that the company was going to go belly-up.

So, I think that if you're saying that you're

K77QfitO

undertaking all the appropriate steps in underwriting policies, and the facts indicate that -- whether you -- whether that's an opinion or not, it's not true; that they weren't undertaking appropriate steps when they are bowing to the pressure of agents, when they're undervaluing houses; that they are disregarding recommendations from those in the claims department about loss reserves.

And then the fact that the CWs were providing monthly reports or having a direct communication line with any of the higher-ups, and in particular, the defendants, that they would have had knowledge that those statements are not true.  So, I think the facts indicate that they're objectively false, and that also the interaction with the CWs -- and also the executive's role and an executives.  They were the ones who created the architecture, the style of the architecture where there was complete opacity between the different departments. They would have had to have known that that's not true.

So, if one were to evaluate this under *Omnicare*, which, again, as we say in our brief, we don't think is the appropriate way to look at this, we think that we've satisfied both objective and subjective false promise.

THE COURT:  Anything else you'd like to say today?

MR. HOLLEMAN:  Nothing else, your Honor.

THE COURT:  OK.  Any rebuttal?

MR. MUSOFF:  Yes, your Honor, very briefly.  I think

K77QfitO

it's well settled within the Second Circuit that loss reserving, whether it's loan loss reserving, insurance loss reserving, are covered by *Omnicare* and *Fait* and those standards are the ones that have to apply.

I think what we heard was nothing inconsistent by any of the confidential witnesses with the public description of reserving; nothing that was inconsistent with the disclosure that it's a complex process using individual case basis valuations, statistical analysis, various actuarial procedures and analysis of historical experiences supplemented by industry loss data; nothing at all by any of the CWs or anything we heard today that was inconsistent with that.

What we did hear was there was one instance where CW6 thought a reserve was inadequate, and we heard my friend on the other side say that he thinks our reserving was inadequate. Well, by necessity, any time you increase your reserves, your prior reserves were inadequate, but that is such a far cry from securities fraud if it were intentional and subjective belief that you were reserving on purpose below where you thought it should actually be.

And the other thing here is, as the Second Circuit has said, what advantage here was there for a short respite from the inevitable day of reckoning?  And I think that's the Second Circuit's view of what is the basis for this fraud?  Where is the intent?  What did any of these individuals gain from

K77QfitO

deliberately under-reserving only to increase the reserves on their own shortly thereafter?  We heard nothing to explain that.

On internal controls, I think my colleague acknowledged that he was relying heavily on the post class period admissions that there was an internal control issue, which is classic fraud by hindsight; did not address the fact there was an independent auditor that did not find before the review that was initiated by the individual defendants themselves and the internal control issues.

And then just to pause briefly on *SLM*, the student loan case your Honor asked about, there was also in that case contemporaneous data from the department of education showing that there were actually higher default rates in the loans than the company itself was disclosing.

And in the *Signet* case, they sat around at these bad debt meetings, and senior management said, we don't want to increase the reserves for the bad debt because they'll go to the bottom line and instead used accounting treatments that masked the true delinquency of the trends there.  Nothing of the sort is remotely alleged here on that point.  And then again on --

THE COURT:  Can I just ask you one question?  Can I just confirm that there was never any restatement or withdrawal or qualification of the financial statements during the class

K77QfitO

period.  Is that right?

MR. MUSOFF:  That is correct, one hundred percent, there was no restatement.  In fact, despite the internal control issue, they found I think that all of the financial statements were still properly stated, and they disclosed it at the time.  Even though they found it a material weakness and were addressing that material weakness, it did not impact in any way any of the prior financial statements.  There was no restatement, no withdrawal, just a going-forward increase in the reserving.

THE COURT:  All right. OK.

MR. EAGEL:  Your Honor, this is Larry Eagel.

I just want to make sure that it's clear that one of the things I know Mr. Holleman made in his argument, but I guess I would like to say a little bit more about the importance of these disclosures because they're not generalized disclosures, as I think everybody on the call recognized that what these disclosures are intended to do is to provide assurance to the public that your investment is safe; that we do in fact make extra effort to adequately reserve.  We have all of these policies and procedures in place.  So, rest assured, investor, that we have done everything right, and they say that repeatedly and consistently, and yet, we have six confidential witnesses who have said just the opposite.

So, it is -- these are material misstatements set

K77QfitO

forth in the complaints.  They relate to their process of how they reserve.  Their assurances to the public made to induce members of the public to be comforted by the fact, this is how you keep the price of stock up, this is how you get the AM Best rating.  And so management we say in a very small company was directly specifically aware that these representations were false.  We say that through the confidential witnesses that Mr. Holleman discussed, and they nonetheless continued to make these representations, and why did they do it, because it kept the stock price up, and because ultimately the day of reckoning came when they had to take two or three reserves on consecutive quarters.  So, that's our theory of the case.

It's not about the fact that the reserves were inadequate, because it turns out, of course, they were, but what is misrepresented to the public is, we do it right, we do it well, we've got great profits, we've got great procedures, we say it time and again, and we say it to you so you know your investment is safe, and it wasn't.  And that's the theory of our case.

THE COURT:  All right.  Thank you all very much. Mr. Musoff?

MR. MUSOFF:  This is Mr. Musoff.  You know, all of what we just heard could be made, could be said about any company.  It's well settled that trying to preserve debt rating is not enough.  Here, it makes no sense because they invested

K77QfitO

and even lowered its rating after the reserving, but certainly not alleged that anything was done; that they needed the rating for any specific type of transaction or otherwise.  And far from assuring the general public that their reserves were a hundred percent guaranteed, as they disclosed on Exhibit A to the declaration we submitted in support of the motion to dismiss, the 2017 10-K makes clear that there are inherent uncertainties associated with the reserving process, and the ultimate viability may differ perhaps substantially from the original estimate, and goes on and on to warn about how reserving is done.  And there's simply nothing that was stated with specificity by these confidential witnesses to justify the slanderous assertions in the opposition brief that there was some kind of culture of secrecy and otherwise, compared to the *Signet* case or the *SLM* case or any of the others that plaintiff cited.  And with that, your Honor, I conclude.

THE COURT:  Thank you all.  I will take this under advisement.  Stay safe everyone and have a good day.

MR. HOLLEMAN:  Thank you, your Honor.

MR. EAGEL:  Thank you, your Honor.

MR. MUSOFF:  Thank you, your Honor.

(Adjourned)