USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 8/10/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PHILLIP WOOLGAR, *individually and on behalf of all others similarly situated*,

Plaintiff,

v.

KINGSTONE COMPANIES, INC., BARRY GOLDSTEIN, DALE A. THATCHER, VICTOR J. BRODSKY, AND BENJAMIN WALDEN,

Defendants.

---

No. 19-CV-5500 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Lead Plaintiff Donald Fitzherbert brings this federal securities class action against Kingstone Companies, Inc. ("Kingstone" or the "Company"), as well as Kingstone's Chief Executive Officer Barry Goldstein, former Chief Executive Officer Dale Thatcher, Chief Financial Officer Victor Brodsky, and Chief Actuary Benjamin Walden (collectively, "Defendants"[1]), alleging that, from March 14, 2018 to April 29, 2019, Defendants committed securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5. Specifically, Plaintiff alleges that Defendants made materially false and misleading statements with respect to the Company's loss reserve estimates, the effectiveness of its internal controls, and its underwriting, risk management, and reserving practices. Before the Court is Defendants' motion to dismiss the Amended Class Action Complaint. For the reasons that follow, Defendants' motion is granted.

---

[1] Goldstein, Thatcher, Brodsky, and Walden are collectively referred to as the "Individual Defendants."

## BACKGROUND

### I.     Factual Background

The following facts are drawn from Plaintiff's Amended Class Action Complaint (the "CAC" or "Complaint"), Dkt. 36, and are assumed to be true for the purpose of this motion. *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

#### A.     The Parties

Defendant Kingstone is the parent and holding company of Kingstone Insurance Company ("KICO"), its wholly owned subsidiary. CAC ¶¶ 2, 22. KICO is a "property and casualty insurance company" that provides "insurance products for individuals and small to mid-size businesses in the northeast," and "distributes its insurance products through an independent agent and broker network." *Id.* ¶ 2. Kingstone is incorporated under the laws of the state of Delaware. *Id.* ¶ 22. Both Kingstone and KICO are headquartered in New York. *Id.* ¶ 2. Kingstone trades on the NASDAQ under the ticker symbol "KINS." *Id.* ¶ 22.

Defendant Barry Goldstein is Kingstone's current CEO and President, and has been since July 19, 2019. *Id.* ¶ 23. Goldstein also served as Kingstone's CEO and President from March 2001 to December 31, 2018. *See id.* In addition, Goldstein is the Executive Chairman of Kingstone's Board, as well as the CEO, President, and Chief Investment Officer of KICO, Chairman of KICO's Board, and Chairman of KICO's Executive Committee. *Id.* ¶¶ 23-24. Previously, Goldstein was the Chairman of Kingstone's Board from March 2001 to December 31, 2018, Kingstone's CFO from March 2001 to November 2007, Kingstone's Treasurer from May 2001 to August 2013, KICO's CEO from January 2012 to December 31, 2018, KICO's President from January 2012 to March 2018, and KICO's Treasurer from March 2010 to September 2010. *Id.*

Defendant Dale Thatcher is the former President and CEO of Kingstone and KICO. *Id.* ¶ 25. He served as Kingstone's President and CEO and as KICO's CEO from January 1, 2019—and as

KICO's President from March 2018—until his "abrupt resignation" on July 19, 2019.  *Id.*  Thatcher also served as Kingstone's Chief Operating Officer and as a board member until his July 2019 resignation.  *Id.*

Defendant Victor Brodsky is Kingstone's CFO and Treasurer, as well as KICO's CFO, Executive Vice President, and a director of its Board.  *Id.* ¶ 26.  Previously, Brodsky was Kingstone's Chief Accounting Officer from August 2007 to July 2009, its Principal Financial Officer "for SEC reporting purposes" from November 2007 to July 2009, and its Secretary from December 2008 to August 2013.  *Id.*  Brodsky was also previously KICO's Senior Vice President from January 2012 to February 2017 and KICO's Treasurer from September 2010 to December 2011.  *Id.*

Defendant Benjamin Walden is Kingstone's and KICO's Chief Actuary and KICO's Executive Vice President.  *Id.* ¶ 27.  He previously served as KICO's Senior Vice President from January 2015 to February 2017, and as KICO's Vice President from December 2013 to January 2015. *Id.*

Lead Plaintiff Donald Fitzherbert ("Plaintiff") acquired Kingstone securities during the Class Period, and allegedly did so "at artificially inflated prices" and thus suffered damages as a result of Defendants' alleged securities violations.  *Id.* ¶ 21.  Plaintiff brings this federal securities class action on behalf of both himself and a class of "all persons who purchased or otherwise acquired Kingstone securities" between March 14, 2018 and April 29, 2019 (the "Class Period").  *Id.* ¶ 164.[2]

**B.  Overview of Kingstone and KICO's Business**

Kingstone "offers property and casualty insurance products" through KICO, its wholly owned subsidiary.  *Id.* ¶ 30.  Its "primary source of revenue" comes from the "premiums paid to KICO" for

---

[2] Plaintiff's class definition excludes "Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which any excluded person or entity has or had a controlling interest."  *Id.* ¶ 164.

these insurance policies. *Id.* ¶ 35. KICO's property insurance policies generally cover "accidental losses to home and personal property, or a business's building, inventory, and equipment," while KICO's casualty insurance policies, or "liability insurance," generally cover "legal liability relating to negligent acts or omissions." *Id.* Plaintiff asserts that all of KICO's insurance policies are "twelve-month policies," and that property claims are generally "settled in a short time period," while casualty claims "can take years to settle." *Id.*

During the Class Period, KICO's product lines included "personal, commercial liability, [and] livery physical damages" lines. *Id.* ¶ 36. KICO's personal line is the company's largest, and consists of "homeowners and dwelling fire multi-peril, cooperative/condominiums, renters, and personal umbrella policies." *Id.* KICO's commercial liability line consists primarily of "small business retail, service, and office risks with limited residential exposure," as well as "liability policies for small independent contractors" and "special multi-peril policies for larger and more specialized risks," and "umbrella policies for each of these." *Id.* ¶ 37. Its livery physical damage line covers "vehicle physical damage for car service vehicles and taxicabs." *Id.* ¶ 38. Its other policies include "canine legal liability policies and participation in the mandatory state joint underwriting associations." *Id.*

### C. Kingstone's A.M. Best Rating

Plaintiff maintains that, for at least four years prior to the start of the Class Period, Kingstone "saw ever increasing net premiums, revenues, and net income." *Id.* ¶ 39. Prior to the Class Period, Kingstone also apparently "received an A.M. Best upgraded financial strength rating." *See id.* ¶ 103. In particular, Kingstone was upgraded to an A- rating. *See id.* ¶ 104; *see also* ¶ 32 (alleging that in April 2017, KICO "achieved its long-standing goal of becoming an A-rated carrier" when its rating was upgraded from "B++" to "A-"). According to the Company's SEC filings, "rating agencies such as A.M. Best review the financial performance and condition of insurers" on an "ongoing basis," and a "downgrade" in the Company's "financial strength rating from A.M. Best could have a material

adverse effect on [its] competitiveness, the marketability of [its] product offerings and [its] ability to grow in the marketplace." *See id.* ¶ 103.  Plaintiff alleges that, throughout the Class Period, Defendants "touted" their recently improved A.M. Best rating.  *See id.* ¶ 104.  Specifically, Plaintiff asserts, Defendant Goldstein "repeatedly boasted the import of the 'A-' rating on investor conference calls throughout the Class Period."  *Id.* ¶ 32.

### D.  Kingstone's Loss Reserves

According to the Complaint, "[i]nsurance companies like Kingstone" are required to maintain and record loss reserves in order to "ensure adequate liquidity to pay policy claims."  *Id.* ¶¶ 3, 40. The "loss reserve" is "an estimate of the value of claims not yet paid," which "directly impacts" a company's net income as it is "recorded as a balance sheet liability."  *Id.* ¶ 3; *see also id.* ¶ 40 ("Loss reserves are balance sheet liabilities[.]").  Plaintiff alleges that Kingstone's "loss reserves directly impact income and are the largest expense on the Company's income statement."  *Id.* ¶ 44.

Loss reserves are intended to "reflect the estimated cost of future amounts the company will be required to pay on claims for policies written at or before the balance sheet date," and are for "both known and unknown losses which have been incurred as of the financial reporting date on all previously written policies, both current and expired."  *Id.* ¶ 40.  Loss reserves fall into two categories. First, "case reserves" are reserves for "known but unpaid claims," including "reserves for the claims and [loss adjustment expenses ('LAE')], expenses for settling or adjusting the claims."  *Id.* ¶¶ 3, 41. Plaintiff asserts that when Kingstone receives an insurance claim, the "case reserve," or "estimated amount of its ultimate settlement and its estimated loss expenses," is established based on the "then-known facts about the claim," and that each reported claim may subsequently be increased or decreased based on "developing additional facts."  *Id.* ¶ 41.  According to Plaintiff, "a company's case reserves must accurately reflect the cost of known but unpaid claims."  *Id.* ¶ 3.  Second, "'incurred but not reported' loss reserves," or "IBNR reserves," are reserves that consist of "the IBNR

losses, loss and LAE amounts incurred but not reported and expected future development on known claims," i.e., "unknown policy claims." *Id.* ¶¶ 3, 42. Plaintiff avers that "a company's IBNR reserves must reflect, as reasonably as possible based on established procedures, the estimated costs of unknown claims." *Id.* ¶ 3. Plaintiff contends that Kingstone's IBNR reserves are calculated "in bulk as an estimate of ultimate losses and LAE less reported losses and LAE," and that the "determination of appropriate IBNR levels are projected by using generally accepted actuarial techniques." *Id.* ¶ 42.

The basis of most of Plaintiff's allegations is that Defendants materially understated the Company's loss reserve estimates. According to the Complaint, Kingstone's "under reporting" of its loss reserves ultimately "came to light" at the end of the Class Period, when Defendants were "forced to take a reserve charge in the amount of $5 million." *See id.* ¶ 5. Specifically, on April 29, 2019, Kingstone "shocked the market" by "announcing a $5 million loss reserve charge," comprised of $2.5 million to case reserves and $2.5 million to IBNR reserves. *Id.* ¶ 8; *see also id.* ¶ 84. In the press release announcing the $5 million reserve charge, the Company also stated that it had "engaged a consultant to do a comprehensive review of [its] claims operations," and that "[that] report conclude[ed] that Kingstone should adopt and implement 'a number of industry best [] practices including the need to acquire more skilled and experienced staff.'" *Id.* ¶ 8. As a result of this news, Kingstone's stock price dropped $2.02 per share. *See id.* ¶¶ 9, 85.

Since the end of the Class Period, Kingstone has taken additional reserve charges, for a total charge of over $11 million. *See id.* ¶¶ 5, 16. In particular, Kingstone took a $1.6 million reserve charge on August 8, 2019, *see id* ¶ 92, as well as a $5.1 million reserve charge—$4.4 million of which was "related to the commercial lines"—on November 11, 2019, *see id.* ¶¶ 14, 94. When the Company took the November 2019 reserve charge, it also announced that it expected to report "a material weakness in internal control," which related to "the establishment of case reserve levels." *See id.* ¶ 95. Plaintiff maintains that the Company's need to "take loss reserve charges totaling over $11

million [since] April 2019" was a "result of the failure to follow best practices and the credit risk." *See id.* ¶ 74.  Plaintiff further asserts that the total loss reserve charges "represent an understatement of the loss reserves reported for 2018 by approximately 20%."  *See id.* (emphasis omitted).

### E.  The CWs' Allegations

According to six confidential witnesses ("CWs"), "a culture of failing to accurately underwrite policies and set adequate loss reserves prevailed at [Kingstone] and was well-known, if not encouraged, by the Individual Defendants."  *Id.* ¶ 55.  Plaintiff maintains in particular that Defendants "permitted [such] risky underwriting of policies and insufficient claims reserving for those poorly underwritten policies" in order to increase the Company's business.  *See id.*  The CWs, all of whom are former employees of the Company, describe various issues that purportedly existed at Kingstone during the Class Period.[3]

First, the CWs reported issues in the Company's underwriting department.  CW1 described a "risky underwriting culture" at the Company, in which "management continually overrode underwriters and granted unwarranted exceptions leading to the undervaluation of properties."  *Id.* ¶ 60.  CW1 maintained that all "certain agents" had to do "was complain to management, especially [D]efendant Goldstein, when an underwriter would decline business and the decision [would be] overridden."  *Id.*  With respect to underwriting, CW1 also asserted: "If you didn't do what they wanted, you were going to get fired.  They were very controlling.  The bottom line is that the top are going to have the final say in it.  They will override you every step of the way."  *Id.* ¶ 61.  CW1

---

[3] CW1 is a former employee who worked as a Personal Lines Underwriter from March 2014 to March 2019.  *Id.* ¶ 56. CW1 reported to the Company's Personal Lines Manager, Jim White, who in turn reported to Defendant Walden.  *Id.* CW2 is a former employee who worked as the Director of Sales for High Value Homes from September 2017 to October 2018.  *Id.* ¶ 59.  CW3 is a former employee who worked as a Personal Lines Underwriter from an unspecified time until some point in 2016, i.e., entirely prior to the Class Period.  *See id.* ¶ 67.  CW4 is a former Underwriting Assistant, who worked in that capacity "for thirty years until July 2019."  *Id.* ¶ 68.  CW5 is also a former Underwriting Assistant, who worked at the Company for "approximately six years until July 2019."  *Id.* ¶ 69.  Finally, CW6 "worked in the claims department during the Class Period," and had the job of calculating "what the reserves should be."  *Id.* ¶ 73.  It is not entirely clear when CW6 worked at Kingstone, but it appears that CW6 is a former, not current, employee.

described issues with the Company's "ever-changing underwriting guidelines" as well, which apparently "changed so often that there was no way to enforce anything." *Id.* ¶ 62.  CW1 also referred to Kingstone's underwriting as "an errors-and-omission nightmare just waiting to happen" in light of the fact that "documents were missing, policies were not properly reviewed, and inspections were not completed," all of which allegedly resulted in Kingstone "getting 'stuck for a lot of money on certain policies.'" *Id.* ¶ 63.  According to the Complaint, CW2 "confirmed CW1's accounts of underwriting at Kingstone." *Id.* ¶ 64.

CW3 similarly maintained that the Company's policies "defied good underwriting guidelines and should not have been written." *Id.* ¶ 67.  CW5 asserted that "something was definitely 'off' with regards to underwriting" at the Company, and that "a lot of business was written for both personal and commercial properties that should not have been." *Id.* ¶ 69.  As an example of how Kingstone "took whatever they could get," CW5 recalled a "specific instance" of a "high value home" that was "left unattended for the winter where the pipes burst causing millions of dollars of damage." *Id.*  In that case, Kingstone allegedly "had not properly reserved for the claim, or possibly had no reserve for it, and had to pay out millions." *Id.* (emphasis omitted).  Additionally, some of the CWs suggested that the Company became more concerned with "volume," as opposed to quality.  *See, e.g.*, *id.* ¶ 68 (CW4 asserted that "the focus" of the Company "became volume as opposed to quality").  CW3 asserted further that "concessions were made to certain insurance agencies depending upon the volume of business they brought to the Company." *Id.* ¶ 67.

The CWs also described a culture of secrecy and a general lack of transparency at the Company.  CW2, for instance, maintained that everything at Kingstone was "secretive," and that there was "no sharing of information" and "no transparency." *Id.* ¶ 59.  CW1 and CW2 reported that there was a "lack of communication" between departments at Kingstone, which, among other things, had an "adverse effect on the underwriting process" at the Company.  *See id.* ¶¶ 58-59.  According to

CW1, issues arose within the Company "due to the disconnect between the underwriting department and other departments," including because the "underwriters' files and documentation were not accessible to other departments," such as the claims department, and because the underwriters likewise "did not have access to the claims department files." *Id.* ¶ 57.

CW1 also reported that, in addition to the Company's underwriting department, "Kingstone's claims department [] had concerns." *Id.* ¶ 70. To exemplify these issues, CW1 pointed to the fact that there were "at least five different claims managers during CW1's five-year tenure," and maintained that "[i]f you didn't play the game, they got rid of you." *Id.*; *see also id.* ¶ 57 (CW1 described issues with employee retention in the Company's claims department). CW1 asserted further that Walden, Kingstone's Chief Actuary, had "no business being an actuary at an insurance company" because he did not "understand insurance" and "was constantly giving exceptions." *See id.* ¶ 71.

CW2 raised concerns about under-valuations at Kingstone. Specifically, CW2 claimed that Kingstone was "definitely undervaluing all their homes," and did not have "proper reserves." *Id.* ¶ 64; *see also id.* ¶ 72 (CW2 asserted that Kingstone "did not have proper reserves set and it was very hush-hush when there was a big loss"). From CW2's perspective, the under-valuations were "significant," and CW2 thus "brought up" concerns about "undervaluing Kingstone's books and putting the Company at risk" "over and over." *See id.* ¶ 65 (alterations omitted). CW2 recalled discussing under-valuations with some of the Individual Defendants. For instance, CW2 apparently "discuss[ed] the book being undervalued" "multiple times" with Goldstein, Thatcher, and Walden. *Id.* ¶ 66. CW2 asserted that Goldstein's response to "the undervaluation concerns" was that CW2 was "making something of nothing, calling it a red herring, and eventually trying to avoid having conversations with CW2 altogether." *Id.* CW2's "topic of conversation" was nonetheless "the undervaluation of the books, and how it would impact [the Company] if there was a catastrophic

event" because they "would be completely underinsured." *Id.* CW2 explained that, as a result of Kingstone "undervaluing properties," the Company was "not collecting the proper premium for the risk," which "becomes problematic when you are insuring homes for their full replacement value." *Id.* ¶ 65; *see also id.* ¶ 66 (CW2 asserted that Kingstone was not "collecting the proper premium for the business that [it] had on the books"). Additionally, CW2 submitted monthly reports that discussed the "under-valuations of the properties." *Id.* ¶ 66. CW2's monthly reports were submitted "to all management via e-mail," including Goldstein and Thatcher, and "further discussed in meetings" attended by at least Goldstein, Walden, and "others" at Kingstone's Valley Stream office. *See id.*

Lastly, CW6 set forth concerns about the Company's loss reserves. In particular, CW6 contended that "a lot of [Kingstone's] files were under reserved, particularly the larger accounts." *Id.* ¶ 73. According to the Complaint, "[i]t was CW6's job to calculate what the reserves should be, but CW6's recommendations were ignored by upper management at least 50% of the time on the larger accounts." *Id.* The Complaint also alleges that when "CW6 requested reserve increases, [those] requests were declined." *See id.* Additionally, CW6 recalled that commercial claims were "under-reserved as well," including "one case where an excess verdict was obtained and the amount awarded was in excess of the policy." *See id.*

## F. Goldstein's Stock Sales

Plaintiff alleges that during the Class Period, Goldstein sold 79,286 shares of Kingstone stock, "reaping net proceeds of over $1.3 million." *See id.* ¶ 115. Goldstein sold these shares pursuant to a 10b5-1 plan, which was apparently entered into on November 14, 2018. *See id.* ¶ 115 n.4. Goldstein allegedly made these sales between January 2, 2019 and January 25, 2019. *See id.* ¶ 115. According to Plaintiff, Goldstein "had only sold shares of Kingstone stock once prior in the preceding ten years." *See id* (emphasis omitted).

### G. Thatcher's Resignation

On July 19, 2019, almost three months after the end of the Class Period, Kingstone announced that Thatcher had resigned his positions as CEO and President of Kingstone and KICO, and as a director on the Boards of both companies.  *See id.* ¶ 90.  Goldstein "resumed the positions as President and CEO of Kingstone and KICO" as a result of Thatcher's resignation.  *See id.*  Plaintiff contends that Thatcher's "resignation" was "sudden" and "suspicious" because, at the time he left the Company, Thatcher was only seven months into his three-year employment contract.  *See id.* ¶ 105.  Moreover, according to CW3, Thatcher was actually fired.  *See id.*

## II.    Procedural Background

On June 12, 2019, Plaintiff Phillip Woolgar filed this putative securities class action against Defendants Kingstone, Goldstein, Thatcher, and Brodsky.  Dkt. 1.  On October 3, 2019, the Court appointed Donald Fitzherbert as Lead Plaintiff, approved his selection of counsel, and authorized the filing of an amended complaint.  Dkts. 25, 26.  Plaintiff filed the amended class action complaint— the operative complaint—on December 17, 2019, adding Defendant Walden as a named defendant. Dkt. 36.  On February 18, 2020, Defendants moved to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).  Dkt. 45.  Plaintiff filed an opposition on April 20, 2020, Dkt. 52, and Defendants replied on May 20, 2020.  The Court held oral argument on July 7, 2020.  *See* Dkt. 59 ("Tr.").

## III.   Materially False and Misleading Statements Alleged in the Complaint

Plaintiff alleges that Defendants made materially false and misleading statements and omissions during the Class Period regarding Kingstone's loss reserves and "loss reserve practices," the effectiveness of Kingstone's internal controls, and Kingstone's underwriting and risk practices, including by "materially misstat[ing] Kingstone's financial results" such as its "loss reserves, net income, loss ratio, and combined ratio."  *See id.* ¶ 116.  By making such false and misleading

statements, Plaintiff contends, Defendants concealed "Kingstone's true loss reserves, risky underwriting practices, lack of adherence to industry best practices, and ineffectiveness of the Company's internal control." *Id.* ¶ 152. According to the Complaint, Defendants' false and misleading statements were made in the Company's financial statements, as well as in press releases and during investor conference calls held in connection with those financial reports. As to the Company's financial reports, the challenged statements were allegedly made in Kingstone's annual reports on Form 10-K filed with the SEC for the quarter and year ended December 31, 2017 ("2017 10-K") and the quarter and year ended December 31, 2018 ("2018 10-K"), as well as Kingstone's quarterly reports on Form 10-Q filed with the SEC for the first quarter 2018 ("1Q18 10-Q"), second quarter 2018 ("2Q18 10-Q"), and third quarter 2018 ("3Q18 10-Q").

### A. Kingstone's Loss Reserves

First, Plaintiff alleges that, throughout the Class Period, Defendants falsely represented that Kingstone's loss reserves were "adequate," "strong," and/or "solid." *See, e.g.*, *id.* ¶ 7. For instance, the March 14, 2018 press release announcing the Company's quarter and year ended December 31, 2017 financial results stated that "[t]he Company's reserve position remains strong," and that Kingstone had "built a dedicated and highly capable claims team that is clearly having a positive impact on financial results." *Id.* ¶ 132. During the investor conference call held the next day, Walden echoed this sentiment, stating that the Company's "year-end internal and external actuarial reviews confirmed the strength of [its] reserve position," and that its "financial results for the quarter and the year are not materially affected by changes in the adequacy of [Kingstone's] reserves." *Id.* ¶ 133; *see also id.* (the Company's "reserving philosophy lends stability to [its] results, even in times of short term volatility"); *id.* ¶ 134 ("Apart from the winter catastrophe events, underlying results remained solid."); *id.* ¶ 135 (the Company's "reserves remained solid"); *id.* ¶ 136 (the Company's "reserve levels remained strong with a small amount of favorable development recorded during the quarter").

Plaintiff contends that, contrary to these statements, "Kingstone's loss reserves were not 'strong' or 'solid,'" and that "Defendants were being far from 'transparent.'"  *See id.* ¶ 145.  Plaintiff maintains that Kingstone's loss reserves during the Class Period were in fact "inadequate," in part due to "the culture created by the Individual Defendants who disallowed communications between the underwriting and claims departments and enabled increased underwriting risk to appease agents and brokers."  *See id.* ¶ 6.

Defendants also allegedly "manipulated Kingstone's loss reserves" throughout the Class Period, causing the reserves to be "materially lower than they should have been."  *See id.* ¶¶ 4, 54. Plaintiff asserts that Defendants did this by intentionally and/or recklessly undervaluing properties at the underwriting and claims phases, and by "failing to follow industry best practices in [the Company's] claims department."  *See id.* ¶ 54.  Plaintiff alleges further that Defendants "intentionally under-reserved" and understated Kingstone's loss reserves in order to "inflate the Company's net income and overall financial strength, especially in light of the Company's recent A.M. Best rating upgrade which was bringing in more business."  *See id.* ¶¶ 4-5.  Plaintiff thus contends that Kingstone "should have increased its loss reserves" during the Class Period, but that it did not adequately do so. *See id.* ¶¶ 5-6.  By "materially understat[ing]" its loss reserve estimates on its income statement, Plaintiff alleges, Kingstone overstated its net income during the Class Period, thereby violating generally accepted accounting principles ("GAAP").  *See id.* ¶ 75.[4]

More broadly, Plaintiff alleges that Defendants falsely reported Kingstone's financial results during the Class Period because they "represented that the financial information [contained in the reports] was a fair statement of the Company's financial results and that the results were prepared in

---

[4] In addition to the Company's loss reserves, Plaintiff also alleges that Defendants falsely represented other "related key financial metrics," such as its loss ratio and net combined ratio.  *See id.* ¶ 7; *see also, e.g.*, *id.* ¶¶ 135-36, 138-44.  Plaintiff avers that Kingstone's reported loss ratios and combined ratios were "substantially understated as a result of the loss reserve being understated as confirmed by CWs."  *See id.* ¶ 146.

accordance with GAAP." *See id.* ¶ 76.  According to Plaintiff, however, the financial information contained in these reports "was not prepared in accordance with GAAP because Kingstone failed to establish sufficient loss reserves." *See id.*; *see also id.* ¶ 117 (alleging that Kingstone's "financial results during the Class Period were neither accurate nor in compliance with GAAP and did not accurately reflect information known to Defendants at the time," which led to "the material understatement of claims reserves requiring a charge of over $11 million").  Plaintiff also asserts that the financial statements were not prepared in accordance with GAAP because "Defendants were not following industry best practices and had turned a blind eye to, if not induced, risky underwriting practices and claims practices." *See id.* ¶ 76.

### B.  Kingstone's Internal Controls

Next, Plaintiff alleges that each of Kingstone's quarterly and annual financial reports filed during the Class Period "contained materially false and misleading [statements] regarding the Company's internal controls." *See id.* ¶ 147.  Specifically, these reports contained statements indicating that  "[t]here was no change in [the Company's] internal control over financial reporting during [its] most recently completed fiscal quarter that ha[d] materially affected, or [was] reasonably likely to materially affect, [its] internal control over financial reporting." *See id.* (2017 10-K and 2018 10-K); *id.* ¶ 148 (1Q18 10-Q, 2Q18 10-Q, and 3Q18 10-Q).  Defendants allegedly misrepresented that Kingstone "maintained effective internal controls that enabled the Company to accurately account for loss reserves, among other things." *See id.* ¶ 52.  Moreover, Goldstein, Thatcher, and Brodsky "certified the effectiveness of Kingstone's internal controls such that the Company's financial statements were accurate, prepared in compliance with [GAAP] and fairly represented the Company's financial condition in each of the financial reports issued" during the Class Period.  *See id.*; *see also id.* ¶ 149 (alleging that Goldstein or Thatcher and Brodsky "certified to the effectiveness of the Company's internal controls in each of Kingstone's annual and quarterly filings

14

during the Class Period"). According to Plaintiff, however, Kingstone's internal controls during the Class Period suffered from a material weakness. *See id.* ¶ 150. Kingstone allegedly admitted that a "material weakness in internal control existed as of September 30, 2019 relating 'to the establishment of case reserve levels.'" *See id.* Plaintiff maintains that this "same material weakness" existed during "the entire Class Period, if not before, as the case reserve level amounts related to polices [sic] from 2014, 2016, and 2017." *See id.*

## C. Kingstone's Underwriting, Risk Management, and Reserving Practices

Finally, Plaintiff alleges that Defendants made false and misleading statements regarding the Company's underwriting, risk management, and claims reserving practices. In describing the Company's "underwriting and risk management practices" in its 2017 10-K, for instance, Kingstone stated that its "underwriting process evaluates and screens out certain risks based on property reports, individual insurance scoring, information collected from physical property inspections, and driving records," that it "maintain[s] certain policy exclusions that reduce [its] exposure to risks that can create severe losses," that it "target[s] a more preferred risk profile in order to reduce adverse selection from risks seeking the lowest premiums and minimal coverage levels," that its "underwriting philosophy is to target niche risk segments for which [it has] detailed expertise and can take advantage of market conditions," and that it "monitor[s] results on a regular basis," including by reviewing "selected producers" on "at least a quarterly basis." *See id.* ¶ 121. The 2017 10-K also provided that Kingstone "carefully underwrite[s] [its] business" using certain "risk underwriting tools," and that the Company's "claims and underwriting expertise" enables it to "profitably write personal lines business in all the territories in which [it] writes[s]." *See id.* Plaintiff asserts that Kingstone's 2018 10-K "included the same, or substantially identical, false and misleading statements relating to the Company's underwriting and risk management practices and loss reserve practices and procedures as the 2017 10-K." *Id.* ¶ 130.

As to the Company's reserving practices, Plaintiff asserts that Defendants misrepresented that Kingstone "considered all relevant information in setting and continually updating the [loss] reserves." *See id.* ¶ 7.   Defendants also reported that Kingstone's claims reserving process was "designed to set reserves that, in the aggregate, are adequate to pay all claims at their ultimate settlement value," *id.* ¶ 122, and stated that the Company sought "to establish all reserves at the most likely ultimate liability based on [its] historical claims experience," *id.* ¶ 123.   In particular, the 2017 10-K reported that the Company "establish[ed] [its] reserves after considering all information known to [the Company] as of the date [the reserves] are recorded," *id.* ¶ 122, that "[r]ecorded claim reserves for [Kingstone's] business [were] based on [the Company's] best estimates of losses after considering known facts and interpretations of circumstances," including both "[i]nternal and external factors," *id.* ¶ 124, and that the "reserving process for loss and LAE reserves" was "based on facts and circumstances then known including losses that have occurred but that have not yet been reported," *id.* ¶ 125.   The 2017 10-K provided further that the Company was "not aware of any claims trends that have emerged or that would cause future adverse development that have not already been considered in existing case reserves and in its current loss development factors."  *See id.*; *see also id.* ¶ 126.[5]

The Company also allegedly made false and misleading statements regarding its process of regularly reviewing and updating its reserves estimates.  Plaintiff alleges that Kingstone's SEC filings during the Class Period falsely stated, for instance, that the Company's loss reserve process "used 'standard actuarial reserving methodologies,' considering 'all information known to [the Company]

---

[5] As to the Company's quarterly financial statements filed in 2018 and its 2018 10-K, Plaintiff alleges that those reports "reiterate[ed] the Company's reserving process as discussed in ¶¶ 125-126 in the same or substantially same manner" and thus "included the same, or substantially the same, false and misleading statements as discussed in ¶¶ 125-126," including that "[t]he Company is not aware of any claims trends that have emerged or that would cause future adverse development that have not already been considered in existing case reserves and in its current loss development factors."  *See id.* ¶ 127 (1Q18 10-Q); *id.* ¶ 128 (2Q18 10-Q); *id.* ¶ 129 (3Q18 10-Q); *id.* ¶ 130 (2018 10-K).

as of the date recorded,'" that "the loss reserves were 'closely monitored,'" and that the loss reserves were "recomputed periodically using the most recent information on reported claims and a variety of statistical techniques." *Id.* ¶ 47; *see also, e.g.*, *id.* ¶ 125 ("estimates are regularly reviewed and updated and any resulting adjustments are included in the current year's results"); *id.* ("On at least a quarterly basis, the Company reviews by line of business existing reserves, new claims, changes to existing case reserves and paid losses with respect to the current and prior years."); *id.* ¶ 140 ("As part of our proactive philosophy, we also constantly monitor individual claims and make adjustments to reserve levels whenever needed."); *id.* ¶ 143 ("Our product team continues to monitor claim trends closely, and we are taking actions to ensure our pricing remains adequate and that we stay disciplined in order to continue our profitable growth."). Contrary to these statements, Plaintiff maintains, "Defendants were not adequately 'monitor[ing] individual claims and mak[ing] adjustments to reserve levels when needed'" because "the claims department was not following industry best practices, as disclosed on April 29, 2019, along with the need for the initial $5 million reserve charge." *See id.* ¶ 145.

### D.  Reasons Why Statements Were Allegedly False and/or Misleading

According to Plaintiff, the statements in the Company's annual and quarterly financial statements were "materially false and/or misleading and/or failed to disclose" that (1) "properties were significantly under-valued creating greater credit risk and a greater chance that the loss reserves were not adequate," (2) "Defendants fostered a culture which prevented communications between underwriters and other departments, including the claims department, requiring underwriters to underwrite inaccurately or be fired, and acquiescing to the demands of agents and brokers," (3) "the claims department was not following industry best practices," (4) "as a result, loss reserving procedures were insufficient or not being performed correctly," and (5) "as a result the Company's loss reserves, net loss ratio, and net combined ratio were materially understated and net income

overstated during the Class Period." *See id.* ¶ 131 (referring generally to "[t]he statements made by Defendants in ¶¶ 121-130").  The statements made in the press releases and during the investor conference calls—issued and held in connection with the Company's financial reports—were likewise allegedly "materially false and/or misleading" for the same reasons, "and/or failed to disclose" the very same things.  *See id.* ¶ 146 (referring generally to "[t]he statements made by Defendants in ¶¶ 132-144").

Plaintiff also contends that the statements in the 2017 10-K and the corresponding March 14, 2018 press release were materially false and misleading because the Company allegedly admitted that "Kingstone was not following industry best practices" and because "Kingstone should have reported materially higher reserves and ratios and lower net income" for this period.  *See id.* ¶ 118.  Similarly, Plaintiff alleges that the statements in the 2018 10-K and corresponding March 13, 2019 press release were materially false and misleading for the same reason—the Company was allegedly not following industry best practices—and because, again, "Kingstone should have reported materially higher reserves and ratios and lower net income."  *See id.* ¶ 120; *see also id.* ¶¶ 119 (alleging that the statements in "each of the press releases and Forms 10-Q were also materially false and misleading" in light of the numbers reported for the Company's loss reserves, net loss ratio, combined ratio, and net income).

Additionally, as to the challenged statements about Kingstone's internal controls in particular, *see, e.g.*, *id.* ¶¶ 147-48, Plaintiff asserts that those statements were "false and misleading when made because throughout the Class Period, Kingstone's internal controls suffered from a material weakness."  *See id.* ¶ 150.

## LEGAL STANDARDS

### I.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint

18

must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  On a Rule 12(b)(6) motion, the question is "not whether [the plaintiff] will ultimately prevail," but "whether [the] complaint [is] sufficient to cross the federal court's threshold."  *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011) (citation omitted).  In answering this question, the Court must "accept[] all factual allegations as true, but 'giv[e] no effect to legal conclusions couched as factual allegations.'"  *Stadnick*, 861 F.3d at 35 (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)).  Moreover, on a motion to dismiss, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## II.     Motions to Dismiss Under Federal Rule of Civil Procedure 9(b) and the PSLRA

In addition to the requisite Rule 12(b)(6) pleading standards, the CAC is also subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b).  *See ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. J.P. Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).  Under Rule 9(b), a plaintiff alleging fraud "must state with particularity the circumstances constituting" the alleged fraud.  Fed. R. Civ. P. 9(b).  To do so successfully, "the plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4)

explain why the statements were fraudulent." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98,

108 (2d Cir. 2012) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).

The PSLRA expands on Rule 9(b) and requires "that securities fraud complaints specify each

misleading statement; that they set forth the facts on which a belief that a statement is misleading was

formed; and that they state with particularity facts giving rise to a strong inference that the defendant

acted with the required state of mind." *Id.* (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345

(2005)) (internal quotation marks omitted).   Nevertheless, "even with the heightened pleading

standards of Rule 9(b) and the PSLRA, the Court '[does] not require the pleading of detailed

evidentiary matter[s] in securities litigation.'" *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d

282, 302 (S.D.N.Y. 2018) (quoting *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10,

15 (2d Cir. 2011)).

**DISCUSSION**

**I.      Whether Plaintiff Adequately Alleges a Section 10(b) Claim**

To state a claim under Section 10(b) and Rule 10b-5, a plaintiff "must prove (1) a material

misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the

misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the

misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pac Inv. Mgmt. Co. v.*

*Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (quoting *Stoneridge Inv. Partners, LLC v.*

*Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).   Because Defendants only challenge the first and

second factors in their motion, the Court addresses only those two factors in this Opinion.

Under Rule 10b-5, it is unlawful to (1) "make any untrue statement of a material fact," or (2)

"omit to state a material fact necessary in order to make the statements made . . . not misleading."  17

C.F.R. § 240.10b-5(b).   To support a finding of liability under Rule 10b-5, there must be "an actual

*statement* [] [made] that is either untrue outright or misleading by virtue of what it omits to state."  *In*

*re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) (internal quotation marks omitted).  As

such, the "starting point for any 10b-5 case is the existence of material misstatements or omissions of

fact."  *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 578 (S.D.N.Y. 2010).

For a statement to be actionable under Section 10(b), "the statement must be false, and the

statement must be material.  Neither immaterial false statements nor material true statements are

actionable."  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd,* 604 F.

App'x 62 (2d Cir. 2015) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  As to falsity, a

claim for securities fraud premised on a misstatement "cannot occur unless an alleged material

misstatement was false *at the time it was made*."  *Id.*  Thus, "[a] statement believed to be true when

made, but later shown to be false, is insufficient."  *Id.*  Moreover, the Second Circuit has explained

that plaintiffs must do more than simply assert that a particular statement is false or misleading; rather,

"they must demonstrate with specificity why and how that is so."  *Rombach*, 355 F.3d at 174.

As to materiality, "there must be a substantial likelihood that a reasonable person would

consider the fact misstated or omitted important in connection with a contemplated securities

transaction."  *In re Lululemon*, 14 F. Supp. 3d at 572; *see also Freudenberg v. E*Trade Fin. Corp.*,

712 F. Supp. 2d 171, 181 (S.D.N.Y. 2010) ("A misrepresentation or omission is material when a

reasonable investor would attach importance to it in making an investment decision.").  However,

"whether a reasonable investor would find a particular misrepresentation or omission 'material' to an

investment decision is usually a matter reserved for the trier of fact."  *In re Inv. Tech. Grp., Inc. Sec.

Litig.*, 251 F. Supp. 3d 596, 610 (S.D.N.Y. 2017) (citation omitted).  Therefore, "a complaint may not

properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material

unless they are so obviously unimportant to a reasonable investor that reasonable minds could not

differ on the question of their importance."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir.

2000) (citation omitted).

### A.  The CWs' Allegations

To demonstrate the purported falsity of the challenged statements—as well as Defendants' fraudulent intent, which is discussed below—Plaintiff relies heavily on the reports from the six CWs. Where a plaintiff relies on allegations from confidential witnesses, as here, those sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).  "It is well-established, however, that generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard of [the PSLRA]." *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 140 (D. Conn. 2007), *aff'd*, 312 F. App'x 400 (2d Cir. 2009) (alterations, internal quotation marks, and citation omitted). Here, the CWs' allegations are insufficient for several reasons.

First, the majority of the CWs are alleged to have worked within the underwriting side of the business, and their allegations relate largely to the Company's property liability lines, not its commercial liability lines. *See, e.g.*, CAC ¶ 56 (CW1 was a Personal Lines Underwriter from March 2014 to March 2019); *id.* ¶ 67 (CW3 was a Personal Lines Underwriter until some point in 2016)[6]; *id.* ¶¶ 68-69 (CW4 and CW5 were both Underwriting Assistants until approximately July 2019), *id.* ¶¶ 59, 64 (CW2 was the "Director of Sales for High Value Homes" from September 2017 to October 2018, and primarily asserted issues regarding the undervaluing of homes).  Only CW6 is alleged to have knowledge of Kingstone's reserving practices.  *See* Tr. at 6; *cf.* CAC ¶¶ 56, 59, 67-69.  Indeed, aside from CW6—who is described in the Complaint without reference to any specific job title or dates of employment, but rather simply as someone who "worked in the claims department during the Class Period" and had the job of calculating "what the reserves should be," CAC ¶ 73—none of the

---

[6] Accordingly, CW3 was not even employed at Kingstone during the Class Period.

CWs are alleged to have specific experience with or knowledge of the Company's claims reserving practices or its loss reserve estimates. *See, e.g.*, *Malin*, 499 F. Supp. 2d at 141 ("Also problematic is the fact that none of the CWs are alleged to have been involved in or to have any familiarity with the process of setting or estimating loss reserves.").

Furthermore, despite Plaintiff's assertion that "in a Company of only 101 employees, an underwriter could surely have knowledge of unwarranted exceptions in both personal lines and commercial lines," *see* Opp'n at 11, the Complaint does not actually allege that the CWs were in positions in which they had particular knowledge about the Company's commercial liability lines—i.e., the lines from which the increased reserves were ultimately taken, *see* Tr. at 6; *see also* Reply at 2 (explaining that the "vast majority of the Company's loss reserve adjustments applied to commercial liability claims"). In fact, the CWs mention "commercial liability claims" only twice, and neither reference demonstrates that any Defendant was aware of specific information that contradicted their public statements. *See* CAC ¶ 69 (CW5 reported that "a lot of business was written for both personal and commercial properties that should not have been"); *id.* ¶ 73 ("CW6 recalled commercial claims being under-reserved as well, mentioning one case where an excess verdict was obtained and the amount awarded was in excess of the policy.").[7]

Second, the CWs' allegations fail to plausibly allege that any of the Individual Defendants received specific, contradictory information demonstrating that their public statements were false or misleading at the time they were made. The majority of the CWs are not alleged to have had any direct contact with the Individual Defendants at all, let alone know what information they possessed. In fact, only CW2 is alleged to have had personal contact and/or conversations with the Individual

---

[7] As Defendants point out, the fact that the Complaint alleges that CW6 recalls "commercial claims being under-reserved *as well*," CAC ¶ 73 (emphasis added), supports the inference that the majority of assertions attributed to CW6 in the rest of the paragraph concern the Company's *personal* liability lines. *See* Mot. at 16 n.5.

Defendants. *See* CAC ¶ 66. Even assuming that the other CWs' references to "management," "upper management," "the Company," or "they," *see id.* ¶¶ 60, 64, 67, 69, 73, refers to the Individual Defendants specifically, those allegations nonetheless do not establish that any of the Individual Defendants knew or honestly believed their statements to be false.

Moreover, although Plaintiff asserts that Defendants received "reports detailing significant undervaluation found on the books" and/or attended "meetings about the reports," *see* Opp'n at 15, "a complaint must allege more than the mere existence of contradictory information to support a securities fraud claim; it must allege particularized facts that suggest that the defendants knew of and disregarded such information." *Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 497-98 (S.D.N.Y. 2013). The Complaint here is thus different from that in *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171 (S.D.N.Y. 2010), for instance, where the plaintiffs had "pled with particularity the knowledgeable positions occupied by each of the CWs, . . . many of whom had first-hand interactions with the Defendants concerning the matters alleged in the Complaint." *See id.* at 196. In *Freudenberg*, "the Complaint ma[de] reference to sixteen CWs, who provide[d] accounts of what they told Defendants, what Defendants knew, and/or what was discussed internally that is alleged to be contrary to Class Period statements." *Id.* at 198. No such allegations are present here.[8]

Even CW2's allegations are insufficient in this regard. The Complaint alleges that CW2 submitted "monthly reports" to "all management," including Goldstein and Thatcher, and that these reports were discussed in meetings with "at least" Goldstein and Walden. *See* CAC ¶ 66. CW2 also allegedly discussed, in particular, "the book being undervalued multiple times" with Goldstein,

---

[8] Nor is this case similar to *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367 (S.D.N.Y. 2012), where the plaintiff "described in detail the positions that CW 13 and CW 15 held, as well as the dates when they worked for GE," leading the court to conclude that, as "[b]oth worked as managers within the real estate group," it was "probable that a person in such a position would have information regarding GE's practices with regards to troubled loans." *Id.* at 389.

Walden, and Thatcher, and reported that Goldstein's response to "the undervaluation concerns" was "that CW2 was making something of nothing, calling it a red herring, and eventually trying to avoid having conversations with CW2 altogether." *See id.* As to the reports and meetings that CW2 described, "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309. The Complaint fails to identify the specific information contained in CW2's monthly reports, or that which was discussed at the meetings, nor how such information contradicted Defendants' public statements. *See, e.g.*, *In re Adient plc Sec. Litig.*, No. 18-CV-9116 (RA), 2020 WL 1644018, at *28 (S.D.N.Y. Apr. 2, 2020) (rejecting CWs' statements where they "do[] not allege what information was contained in those reports or how that information contradicted Defendants' public statements"). As to CW2's purported conversations with Goldstein, Walden, and Thatcher, the Complaint does not sufficiently allege when those conversations took place, or how those Defendants' knowledge of "the book being undervalued" demonstrates that any of their public statements were false at the time they were made.[9]

Third, and related to the above discussion, Plaintiff does not establish how any of the CWs' allegations are inconsistent with the challenged statements. Even assuming, for instance, that there were communication issues among and within Kingstone's underwriting and claims departments, *see* CAC ¶¶ 57-59, that the underwriting department suffered from missing paperwork, *see id.* ¶ 63, that the underwriting guidelines changed every few months, *see id.* ¶ 62, and/or that the Company had issues with "employee retention," *see id.* ¶ 56-57, none of these allegations demonstrate that the

---

[9] Similarly, neither CW5's assertion that, at some point during CW5's six-year tenure at the Company, there was a "specific property that was significantly undervalued and had a very small or possibly non-existent reserve, which ultimately required Kingstone to pay out millions," *see* Opp'n at 11-12 (citing CAC ¶ 69), nor CW6's statement that at some unspecified point during CW6's employment, "an amount [was] awarded in excess of [a] policy," such that the "claims should have 'had reserves of $650,000' but instead 'were only at $150,000 or $200,000,'" *see id.* at 12 (citing CAC ¶ 73), demonstrates the falsity of any challenged statement. And even if it is true that all six CWs "corroborated that the properties were being undervalued and the reserves were inadequate," Opp'n at 12, this too does not sufficiently demonstrate any fraud on Defendants' part, as opposed to apparent mismanagement.

statements about evaluating and screening out risk, carefully underwriting Kingstone's business, tightening its underwriting criteria, or maintaining a conservative level of risk-taking were false or misleading.  Nor do the CWs' allegations establish that Kingstone was not actually calculating or monitoring loss reserves in the manner that was publicly described, that the Company failed to monitor claims or claim trends, or that any of the Defendants were aware of claims trends that would cause future adverse developments.

Fourth, despite Plaintiff's contention that the CWs were "employed during the Class Period, which is all that is required to show the timing of the knowledge," Opp'n at 12, such vague references as to timing do not establish that the CWs have "provide[d] an adequate basis for believing that the defendants' statements were false."  *See Novak*, 216 F.3d at 314.  While many of the CWs were employed at Kingstone during the Class Period, they were also employed before and after it, making it unclear whether the purported issues they discuss actually existed during the Class Period.  And one CW—CW3—was not even employed during the Class Period.  *See* CAC ¶ 67.  In any event, the critical deficiency is that the CWs' *allegations* are largely undated, not their dates of employment.  Without approximate dates as to when the CWs had—or raised—certain concerns, their allegations do not plead contemporaneous falsity.  The one case that Plaintiff cites for the proposition that "all that is required to show the timing of the knowledge" is that the CWs were employed during the Class Period, *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, No. 18-CV-10320 (AJN), 2020 WL 1529371 (S.D.N.Y. Mar. 30, 2020), specifically noted that "courts must pay particular attention to the timing of anonymous allegations and the CWs' bases for making such allegations." *See id.* at *15.  The Complaint here contains no indication as to when any of the issues

detailed by the CWs arose.[10]   The CWs' allegations thus do little to demonstrate that any of the challenged statements were false or misleading *at the time they were made*.

Finally, Plaintiff asserts that the CWs describe "an environment of fear of firing if management's desires were not followed," *see* Opp'n at 12, as well as a "corporate culture . . . indicative of knowledge that the underwriting and claims practices at the Company were risky at best," *see id.* at 16.   Plaintiff points to Kingstone's "small size," the "restrictive rules" in place at the Company, and the fact that "there were five claims managers within five years," as support for the contention that "when employees refuse to play along with Defendants' demands, they are fired." *See* Opp'n at 16-17.   These assertions, however, are plainly insufficient to demonstrate the falsity of Defendants' public statements.   Nor does Plaintiff provide particularized allegations from which it could be inferred that such a culture was anything more than the CWs' own individual, subjective opinions, or that the Individual Defendants were aware of any of these general concerns.   For instance, while CW1 stated that "[i]f you didn't do what they wanted, you were going to get fired," CAC ¶ 61, and that "[i]f you didn't play the game, they got rid of you," *id.* ¶ 70, none of the CWs actually allege instances of someone being terminated because they disagreed with the Company's management or "didn't play the game."

### B.  Kingstone's Loss Reserves

Turning now to the categories of challenged statements, Plaintiff first asserts that Kingstone materially understated its loss reserve estimates, which caused it to overstate its net income in violation of GAAP.   *See* Opp'n at 14.   Plaintiff also alleges that Defendants made material misstatements about the Company's reserves by falsely representing that they were "adequate,"

---

[10] Moreover, in *Evoqua*, the court addressed whether the CWs were "present for some or all of the change[s] in policy, and were in a position to comment on its potential risks."  *See id.* at *15.  That case does not stand for the proposition that alleging only the dates of a CW's employment is sufficient.

"strong," and "solid."   *See, e.g.*, CAC ¶¶ 132-36.   Moreover, Plaintiff maintains generally that "Kingstone should have reported materially higher loss reserves and related ratios, and materially lower net income."  *See* Opp'n at 13.

As an initial matter, loss reserves are statements of opinion.  *See, e.g.*, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011) (holding that "statements regarding the adequacy of loan loss reserves" are statements of opinion); *Chapman v. Mueller Water Prods., Inc.*, No. 19-cv-3260 (LJL), 2020 WL 3100243, at *10 (S.D.N.Y. June 11, 2020) ("Under *Fait*, accounting estimates that depend on management's determination or assumptions are 'subjective' opinions and 'not matters of objective fact'") (quoting *Fait*, 655 F.3d at 110-11); *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 395 (S.D.N.Y. 2019) ("There is no dispute that, because there is no 'objective standard for setting [] reserves,' . . . such statements are to be analyzed as opinions.") (citations omitted); *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM), 2018 WL 6167889, at *13 (S.D.N.Y. Nov. 26, 2018) ("Loan loss reserves are statements of opinion, as they reflect management's belief about the number of uncollectible loans in a company's portfolio."); *In re CRM Holdings, Ltd. Sec. Litig.*, No. 10 Civ. 975 (RPP), 2012 WL 1646888, at *28 (S.D.N.Y. May 10, 2012) (concluding that "[r]eserves are opinions" and explaining that "[i]nsurance reserves are, by their nature, extremely conjectural, and may need adjustment as time passes and their accuracy can be tested in retrospect.") (internal quotation marks and citations omitted).   In *Fait*, for instance, the Second Circuit explained that "determining the adequacy of loan loss reserves is not a matter of objective fact," but rather, "reflect[s] management's opinion or judgment about what, if any, portion of amounts due on the loans ultimately might not be collectible."  *See id.* at 113.  The "determination is inherently subjective," and such estimates "will vary depending on a variety of predictable and unpredictable circumstances."  *Id.*; *see also In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 294 (S.D.N.Y. 2009) ("[T]he word

'estimate' connotes uncertainty.").[11]

Statements of opinion may give rise to liability under Section 10(b) in two ways. First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief [he] professed' or 'the supporting fact[s] [he] supplied were untrue.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund.*, 575 U.S. 175, 185-86 (2015)). However, "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless [of] whether an investor can ultimately prove the belief wrong." *Omnicare*, 575 U.S. at 186. As the Second Circuit "has firmly rejected [the] 'fraud by hindsight' approach" it is "not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 24 (S.D.N.Y. 2016) (citations omitted).

Second, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Sanofi*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 194). A reasonable investor "expects not just that the [speaker] believes the opinion (however irrationally), but that it fairly aligns with the information in the [speaker's] possession at the time." *Omnicare*, 575 U.S. at 188-89. To sufficiently allege that a statement of opinion was false or misleading through the omission of material information, a plaintiff "must identify particular (and material) facts going to the basis for the [speaker's] opinion—facts about the inquiry the [speaker] did or did not conduct or

---

[11] Despite Plaintiff's assertion that Defendants' reliance on *Fait* is misplaced, *Fait* remains good law and is particularly relevant here. Courts in this Circuit have recognized that *Omnicare*, discussed herein, "did not reject the *Fait* . . . standard in the Second Circuit," but rather, "expanded it" as "*Fait* requires alleging both falsity and disbelief, whereas *Omnicare* requires allegations of either." *Lehmann v. Ohr Pharm. Inc.*, No. 18 Civ. 1284 (LAP), 2019 WL 4572765, at *4 (S.D.N.Y. Sept. 20, 2019) (citation omitted). Courts have thus continued to rely on *Fait* to analyze alleged misstatements and omissions under analogous circumstances. *See, e.g.*, *Chapman*, 2020 WL 3100243, at *10 (evaluating allegations that the company "materially understated" its "accounting for its warranty reserve," as well as its corresponding "statements of expenses and liabilities," based on the "operative principles" from both *Omnicare* and *Fait*).

the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Sanofi*, 816 F.3d at 209 (quoting *Omnicare*, 575 U.S. at 194).  The "core inquiry" is "whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'"  *Id*. at 210 (quoting *Omnicare*, 575 U.S. at 189).   The Supreme Court, however, has "cautioned against an overly expansive reading of this standard, noting that '[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts,' and adding that '[a] reasonable investor does not expect that *every* fact known to [a speaker] supports its opinion statement.'"  *Id*. (quoting *Omnicare*, 575 U.S. at 189-90).   Therefore, "a statement of opinion 'is not necessarily misleading when [a speaker] knows, but fails to disclose, some fact cutting the other way.'"  *Id*. (quoting *Omnicare*, 575 U.S. at 189).  "Moreover, whether an omission makes an expression of opinion misleading always depends on context. . . . So an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame."  *Omnicare*, 575 U.S. at 190.

Accordingly, "[s]tatements of opinion are not actionable unless subjectively false – the speaker does not believe what [he] says – or objectively false – the speaker misrepresents or omits existing material facts in support of [his] belief."  *In re Signet Jewelers*, 2018 WL 6167889, at *13; *see also In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 690 (S.D.N.Y. 2004) ("[S]tatements about defendants' belief in the adequacy of loan loss reserves could be actionable if it is alleged that defendants did not actually believe that loan loss reserves were adequate, or if defendants had no reasonable factual basis for their belief.").  The plaintiff "bears the burden of pleading particularized facts going to the basis of the speaker's opinion."  *In re Signet Jewelers*, 2018 WL 6167889, at *13. Here, Plaintiff fails to sufficiently allege that the loss reserve estimates were false at the time they were made, or that Defendants did not honestly believe those estimates to be true and accurate.  Nor

30

has Plaintiff adequately identified "particular (and material) facts . . . whose omission makes [any of Defendants' statements] misleading to a reasonable person reading the statement fairly and in context." *Sanofi*, 816 F.3d at 209 (quoting *Omnicare*, 575 U.S. at 194); *see also Chapman*, 2020 WL 3100243, at *15 ("Plaintiffs have failed to show 'any serious conflict' between the facts they allege and Defendants' opinion regarding the adequacy of the [] reserves.").

The Complaint is devoid of allegations demonstrating—or even plausibly suggesting—that Defendants did not honestly believe their opinions regarding the strength or adequacy of the Company's loss reserves, or that they believed those estimates to be false. Courts in this Circuit have rejected claims based on similar allegations regarding a company's reserves. *See, e.g.*, *Chapman*, 2020 WL 3100243, at *10 (rejecting claims that defendants materially understated the company's warranty reserves because plaintiffs failed to allege "facts plausibly showing that Defendants held anything other than an 'honest belief' that the warranty reserves were adequately stated," "that [the company] 'was experiencing or internally predicting losses exceeding their set reserves,'" "that Defendants 'knew that the . . . evidence on which they relied' required them to take a larger reserve," or "that the Company's officers 'understood that the publicly reported numbers were at odds with [their] internal analyses'") (citations omitted); *Student Loan*, 951 F. Supp. 2d at 497 (finding that plaintiffs failed to allege any "basis for concluding that [the company's] loan loss reserves reflected anything other than management's opinion—based on a variety of subjective determinations—as to the likelihood and magnitude of future losses," nor any facts "to support their argument that defendants did not honestly believe their loan loss reserves were adequate when made"); *Malin*, 499 F. Supp. 2d at 165 (explaining that while "statements regarding the adequacy of the loss reserves may be actionable under the theory that defendants did not actually believe them to be true or had no reasonable basis for such a conclusion, . . . they would not be actionable under the securities laws if they simply represented a failure on the part of defendants to correctly gauge the adequacy of the loan

31

loss reserves") (internal quotation marks and citation omitted); *In re CIT Grp.*, 349 F. Supp. 2d at 689 ("[P]laintiffs' claim that loan loss reserves were inadequate is nothing more than an assertion that CIT was incorrect or unskillful in determining exactly what amount of reserves would be adequate.").[12]

As another court in this Circuit has aptly explained, "Plaintiff[] must do more than allege that Defendants could not have actually believed that [] loss reserves were adequate because they later increased reserves." *Malin*, 499 F. Supp. 2d at 148.  Rather, Plaintiff must plausibly allege "other indicator[s] that the results reported by Defendants were inaccurate at the time reported, or that Defendants had knowledge of any inaccuracy." *Id.*  Indeed, similar to *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685 (S.D.N.Y. 2004), where "plaintiffs argue[d] that defendants could not have actually believed that [] loss reserves were adequate, . . . because defendants decided to increase loan loss reserves just three weeks after the IPO," Plaintiff here "provide[s] no additional facts from which to infer that defendants did not believe that reserves were adequate or had no reasonable basis for such a belief." *See id.* at 690.  Furthermore, "[t]hat defendants later decided to revise the amount of [] loss reserves that it deemed adequate provides absolutely no reasonable basis for concluding that defendants did not think reserves were adequate at the time [of the challenged statements]." *See id.* at 690-91.[13]

---

[12] The cases cited by Plaintiff do not compel a different conclusion.  In *Signet*, for instance, the court noted that "[n]umerous facts support[ed] [the] inference" that "Defendants knew that its reserves did not account for losses that it was likely to incur and that its reserve figures provided a misleading picture of [the company's] credit portfolio and [its] underwriting practices."  *See* 2018 WL 6167889, at *13.  No such facts are present here.

[13] *See also, e.g.*, *Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, No. 14-CV-3876 (LTS), 2016 WL 1261135, at *11 (S.D.N.Y. Mar. 30, 2016) (concluding that plaintiffs had "failed to plead facts demonstrating that [the company's] earlier loss reserve provisions were not the product of sincere opinions regarding appropriate loss reserves, notwithstanding the subsequent substantial increase in those provisions following the change of management"); *Student Loan*, 951 F. Supp. 2d at 495-96 ("The [complaint] contains no allegations whatsoever contradicting the reasonableness of the estimated quarterly loss reserves at the time they were made.  Rather, it merely speculates that those reserves could not have been adequate when made, given that loan loss allowances decreased as a percentage of total loan assets over the course of the class period."); *Malin*, 499 F. Supp. 2d at 146 (concluding that "the fact that [the company] was required to increase loss reserves during the Class Period" does not "establish the falsity" of the challenged statements, particularly since "the process of estimating loss reserves is a difficult one, and even following these accounting policies might not result in adequate loss reserves," and because "Plaintiffs must provide evidence of fraud, aside from the mere fact of the loss reserve increases, to prevail on their claims").

In fact, Plaintiff's assertions about the Company's loss reserves "mimic[] the typical type of 'fraud by hindsight' theory that courts have been unwilling to entertain." *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478 (NRB), 2003 WL 22801416, at *10 (S.D.N.Y. Nov. 25, 2003), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004) (citation omitted). A plaintiff "may not sustain causes of action based on 'fraud by hindsight,'" i.e., by "relying on 'allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did.'" *Waterford*, 2016 WL 1261135, at *9 (quoting *Novak*, 216 F.3d at 309); *see also Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (noting that plaintiff failed to allege contemporaneous facts as to the falsity of defendants' statements and instead "simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones"); *Student Loan*, 951 F. Supp. 2d at 498 (concluding that, "at best, plaintiffs' theory is one of underestimation in hindsight" because it "relies on conclusory allegations to mask the legally insufficient contention at its core, which is that defendants could not possibly have believed their own estimates, since plaintiffs interpret those estimates to have proven inadequate"); *NECA-IBEW Pension Tr. Fund v. Bank of Am. Corp.*, No. 10 Civ. 440 (LAK) (HBP), 2012 WL 3191860, at *10 (S.D.N.Y. Feb. 9, 2012) ("[T]he mere fact that [defendant's] predicted loss reserves turned out to be insufficient some time after they were made does not render those figures false at the time they were publicly filed with the SEC.").

Here, Plaintiff places substantial weight on the fact that on April 29, 2019—at the very end of the Class Period—Kingstone announced a $5 million loss reserve charge, and that it subsequently announced additional reserve charges in the ensuing months, totaling over $11 million. *See, e.g.*, CAC ¶¶ 5, 8, 11, 16, 74, 84, 116-18, 120, 145, 154. Plaintiff seems to argue that, because the Company increased its loss reserves in 2019, its prior reserve estimates must have been fraudulent when originally made. The Court disagrees. The Complaint contains no factual allegations "support[ing] an inference that Defendants thought the reserves were inadequate prior to when these charges were

made," or that the Company was "aware of the need to make those increases to the reserves before [it] actually took the charges and made those increases." *Chapman*, 2020 WL 3100243, at *14. Indeed, it is well established in this Circuit that plaintiffs must do more than simply assert that a particular statement is false or misleading; rather, "they must demonstrate with specificity why and how that is so." *Rombach*, 355 F.3d at 174; *see also In re Lululemon*, 14 F. Supp. 3d at 571. Plaintiff has failed to do so here. He does not explain, for instance, why the Company's statement on April 29, 2019—that it would be "adopting and implementing a number of industry best practices including the need to acquire more skilled and experienced staff," *see* CAC ¶ 84—demonstrates that its prior loss reserves were false or inaccurate when made, that Defendants did not honestly believe them, or that Defendants omitted specific, material facts as to those estimates. Plaintiff's conclusory allegations that "Kingstone should have reported materially higher reserves and ratios and lower net income" during the Class Period, *see id.* ¶¶ 118, 120, are similarly unsupported by any particularized allegations demonstrating the falsity of those figures.

Nor do the CWs' statements support Plaintiff's allegations regarding Kingstone's loss reserves. When asked at oral argument to identify factual allegations in the Complaint demonstrating that Defendants did not believe their opinions regarding the strength or adequacy of the Company's reserves at the time of their public statements, Plaintiff's counsel pointed primarily to the CWs' statements. *See* Tr. at 16-17. In his opposition, Plaintiff similarly contends that Defendants "did not honestly believe the loss reserves were adequate" because they were "directly made aware of the insufficiency of the loss reserves" through the "receipt of reports detailing significant undervaluation found on the books," as well as their "attendance at meetings about the reports," and because the Individual Defendants themselves "were the primary actors in making the decisions to under reserve." *See* Opp'n at 15. As discussed above, however, the CWs generally consist of former employees who worked within Kingstone's underwriting business, many of whom worked on the Company's personal

liability lines, and most of whom are not alleged to have any particular insights into the Company's reserving practices.  The CWs' allegations do not establish, for example, "that the accounting for [Kingstone's loss] reserves, at the time [Kingstone] estimated the reserves, did not represent a fair estimate."  *Chapman*, 2020 WL 3100243, at *13.  As in *Chapman*, the CWs' allegations also "do not demonstrate that Defendants were aware, at the time that [Kingstone] released its financial statements, that they knew or believed that the [loss] reserves already taken in those statements were inaccurate," that "at that time, [Kingstone's] stated [loss] reserves were in fact inaccurate," or that Defendants "thought the [loss] reserves were false."  *Chapman*, 2020 WL 3100243, at *11.[14]  The CWs' statements thus do not support Plaintiff's contention that it was "inconceivable" that the Individual Defendants would believe that they could "ignore the recommended necessary loss reserves" in a "pervasive manner" and "still maintain adequate loss reserves for the Company as a whole."  *See* Opp'n at 16.

Even CW6's statements—that "[s]ome of the claims [CW6] handled should have had" higher reserves, that CW6's "recommendations were ignored by upper management at least 50% of the time on the larger accounts," and that CW6's requested reserve increases were denied, *see* CAC ¶ 73— appear only to demonstrate a disagreement between the CWs and Kingstone's "upper management" as to what the loss reserves should be, which is not uncommon in the context of reserves.  *See Fait*, 655 F.3d at 113.  At worst, such statements allege inactionable mismanagement.  *See Hinerfeld v. United Auto Grp.*, No. 97 Civ. 3533 (RPP), 1998 WL 397852, at *7 (S.D.N.Y. July 15, 1998) ("The

---

[14] At oral argument, Plaintiff's counsel attempted to distinguish *Chapman* on the ground that the CWs there "did not report directly to any of the defendants," and "therefore, the defendants in [*Chapman*] didn't have any direct knowledge of [the alleged misconduct], unlike the Defendants here who had direct contact with some of the CWs."  Tr. at 20.  Again, however, CW2 is the only CW alleged to have any specific interaction with any of the Individual Defendants, and none of the CWs are alleged to have "report[ed] directly" to them.  The closest allegation of a "direct[] report" to any Individual Defendant is that CW1 reported to the Company's Personal Lines Manager, Jim White, who in turn reported to Walden. *See* CAC ¶ 56.  But there is no allegation that CW1 ever reported, either formally or informally, directly to Walden or any other Defendant.

failure to anticipate the extent of necessary reserves, even if it amounts to mismanagement, is not actionable under federal securities laws."); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 (3d Cir. 1992) ("Mere failure to provide adequate reserves . . . does not implicate the concerns of the federal securities laws and is not normally actionable."). Similarly, CW6's statement regarding one instance of "commercial claims being under-reserved," where "an excess verdict was obtained and the amount awarded was in excess of the policy," CAC ¶ 73, does not show that any of the Company's reserves were intentionally or fraudulently understated, or that Defendants did not subjectively believe the estimates at the time.

That management allegedly did not accept some of CW6's reserve recommendations—or some of the other CWs' opinions that certain homes were undervalued—does not demonstrate that Kingstone engaged in risky reserving practices, had insufficient reserves, intentionally understated its reserves, or failed to adjust reserves levels when it was necessary to do so. Although Plaintiff argues repeatedly that reserve recommendations were ignored by Defendants "at least 50% of the time," *see* Opp'n at 9, 15, 16, 20, 22, 25, it is nonetheless plain from the Complaint that that allegation applies only to one CW's recommendations—that of CW6—and appears only to relate to "the larger accounts." *See* CAC ¶ 73.[15]

---

[15] As to the other CWs, aside from one allegation referring specifically to Defendant Goldstein, *see* CAC ¶ 60 ("According to CW1, all certain agents had to do was complain to management, especially [D]efendant Goldstein, when an underwriter would decline business and the decision was overridden."), their allegations do not demonstrate that any of the Individual Defendants in particular, as opposed to "management" more generally, were "the primary actors in making the decisions to under reserve." *See* Opp'n at 15. But "[s]uch generalized allegations fail to specify what caused the Defendants to know that the [] loss reserves were insufficient." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 361 (S.D.N.Y. 2011). Moreover, the remainder of the CWs' allegations related to claims reserving and undervaluing consist merely of the CWs' own subjective opinions. *See, e.g.*, CAC ¶ 64 (asserting that Kingstone was "undervaluing all their homes" and "didn't have proper reserves"); *id.* ¶ 69 (recalling a "specific instance on a high value home" in which "Kingstone had not properly reserved for the claim, or possibly had no reserve for it, and had to pay out millions"); *id.* ¶ 71 (alleging that, with regard to the loss reserves, Walden had "no business being an actuary at an insurance company[] because he doesn't understand insurance"); *id.* ¶ 72 (asserting that Kingstone "did not have proper reserves set"); *id.* ¶ 73 (contending that "a lot of the [Company's] files were under reserved"). As detailed above, loss reserves are inherently subjective statements of opinions. Plaintiff has not established that any of the CWs' subjective opinions were accurate while Defendants' were —intentionally or recklessly—not. *See, e.g.*, *In re Adient*, 2020 WL 1644018, at *15 (finding plaintiffs' allegations about certain "issues," which were "primarily based on the CWs' subjective views of how the Company should have managed

Finally, the Court agrees with Defendants that Plaintiff's allegations regarding the Company's loss reserves are undermined by the fact that its independent auditor, as well as its independent actuary, reviewed their accuracy and concluded that, "in all material aspects, the Company's financial statements were accurate." *See* Mot. at 6. As reflected in Kingstone's 2017 10-K and 2018 10-K, the independent actuary reviewed the Company's loss reserve estimates, and found that the reserves "[fell] within the range of those determined as reasonable."[16]  *See* 2017 10-K, Musoff Decl. Ex. A, at 11; 2018 10-K, Musoff Decl. Ex. B, at 10. Similarly, the independent auditor reviewed Kingstone's financial statements and determined that they too were accurate. *See* 2017 10-K at 65; 2018 10-K at 63-64. Notably, review of Kingstone's financial statements by such independent parties did not result in any restatement, withdrawal, or qualification during the Class Period. *See* Tr. at 25-26; *see also, e.g.*, *Malin*, 499 F. Supp. 2d at 148 ("[A]lthough misreported financial data are clearly false statements of fact, . . . there is no allegation here [that] there has been any restatement of any financial statement or that any auditor or actuary has qualified or withdrawn its opinion.") (internal quotation marks and citations omitted).[17]

---

such challenges," were "not sufficient to demonstrate that any of the statements were inaccurate at the time they were made, or that any Defendant believed them to be so").

[16] The Court may take judicial notice of documents publicly filed with the SEC, *see Citadel Equity Fund Ltd. v. Aquila, Inc.*, 168 F. App'x 474, 476 (2d Cir. 2006), and may "consider any . . . legally required public disclosure document[] filed with the SEC" on a motion to dismiss, *see ATSI*, 493 F.3d at 98.

[17] While Plaintiff argues that "the law is clear" that "the fact that the financial statements . . . were not restated does not end [the] case.," *see* Opp'n at 19, the two cases he cites do not lend him support. In *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72 (1st Cir. 2002), the First Circuit disagreed with the company's assertion that "because it has never restated any of its financials or otherwise indicated any error in the 1998 financial statements, and because its financial statements were audited by an independent accounting firm, no inference of accounting error, and so no inference of scienter, can be drawn." *See id.* at 83. The First Circuit, however, was plainly addressing these arguments in the context of scienter, not in the context of whether the statements were false or misleading, as here. In any event, the First Circuit also noted that "the fact that the financial statements for the year in question were not restated [did] not end [the plaintiff's] case" because he had "otherwise met the pleading requirements of the PSLRA." *See id.* And *SEC v. Rio Tinto plc*, No. 17 Civ. 7994 (AT), 2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019), is inapposite. There, the court assessed the materiality of "the remaining statements for which the SEC ha[d] adequately pleaded falsity," and specifically, addressed defendants' argument that such statements were "presumptively immaterial" because a company Rio Tinto had acquired, RTCM, "related to less than five percent of Rio Tinto's balance sheet, which has about $120 billion in assets. *See id.* at *12. In that context, the court stated that this "'preliminary assumption' of immateriality" was "not dispositive," and that the court

For all of these reasons, the Court concludes that the challenged statements regarding the Company's loss reserves are inactionable.

### C. Kingstone's Internal Controls

Plaintiff also challenges Defendants' statements about the effectiveness of Kingstone's internal controls, including statements that management concluded that "internal control over financial reporting was effective" as of December 31, 2017 and December 31, 2018, CAC ¶ 147; statements in the Company's annual and quarterly reports that there was "no change" in its "internal control over financial reporting during [its] most recently completed fiscal quarter that has materially affected, or is reasonably likely to materially affect, [its] internal control over financial reporting," *id.* ¶¶ 147-48; and Goldstein, Thatcher, and Brodsky's certifications regarding the design and effectiveness of the Company's internal controls over financial reporting, *id.* ¶ 149.

Plaintiff's allegations with respect to Kingstone's internal controls seem to rest entirely on Kingstone's "post-Class Period admission" that there was a material weakness as of September 30, 2019. *See* Tr. at 17-18. In Kingstone's Form 10-Q for the quarter ended September 30, 2019—filed with the SEC on November 12, 2019—the Company disclosed that, based on an evaluation of the effectiveness of its "disclosure controls and procedures," it had identified a material weakness in its internal controls, which existed as of September 30, 2019. *See* CAC ¶ 97 ("Our management concluded that, as of September 30, 2019, our internal control over financial reporting was not effective. Management determined there was ineffective oversight over the process of setting

---

must "consider all relevant qualitative circumstances related to the alleged misstatements." *See id.* *Rio Tinto* thus does not support Plaintiff's suggestion that an independent auditor's review has no bearing on whether the company's statements were false or misleading. Finally, the Court is not persuaded by Plaintiff's contention that "such facts can hold no weight here where it is alleged that auditors were prevented from speaking with employees." *See* Opp'n at 19 (citing CAC ¶ 58) (emphasis omitted). The paragraph cited by Plaintiff—paragraph 58 of the Complaint—contains only a conclusory allegation—not attributed to any specific CW—that "the underwriters were not allowed to speak with any auditors." The Complaint does not, however, plead how the underwriters' inability to speak with the Company's auditors, even if true, establishes that the auditors' review or conclusions were inaccurate.

appropriate liability case reserves, which has been assessed as a material weakness."). The

Complaint, however, does not contain factual allegations supporting the inference that Defendants

knew about any material weakness in the Company's internal controls *prior* to this disclosure or, more

importantly, during the Class Period. Indeed, when asked at oral argument to point to allegations

demonstrating that the Individual Defendants were aware of a material weakness in internal controls

during the Class Period, Plaintiff's counsel referred only to the "post-Class Period admission," and

argued that "the post-Class Period admissions . . . is consistent with the allegations . . . that [the

Individual Defendants] knew the internal controls during the Class Period were weak" simply because

they were executives of a relatively small company. *See* Tr. at 17-18. Plaintiff has failed to allege

how Defendants' knowledge of a material weakness as of September 30, 2019—as disclosed in

November 2019—demonstrates that any Defendant was aware of a weakness during the Class Period.

*See, e.g.*, *Waterford*, 2016 WL 1261135, at *11 (holding that plaintiffs' "allegation regarding

misstatements relating to the sufficiency of internal controls" failed because there were "no facts

pleaded to support an inference that the Company knew, at time of the earlier disclosures . . . , that its

internal controls were insufficient").

Additionally, as with its reserve estimates, Kingstone's independent auditor reviewed the

effectiveness of its internal controls and concluded that the Company "maintained effective internal

control over financial reporting." *See* Mot. at 6. According to Defendants, Kingstone's independent

auditor also "issued unqualified opinions throughout the Class Period attesting to the effectiveness of

the Company's internal controls," and was "unable to identify a material weakness in the Company's

internal controls" during that period. *See* Mot. at 27-28. The Court agrees that these facts

"undermine[] any inference that Defendants must have been aware of such a weakness during the

same time period." *See id.* at 28.[18]  For these reasons, the Court concludes that the statements about the Company's internal controls are not actionable.

### D.  Kingstone's Underwriting, Risk Management, and Reserving Practices

Plaintiff next challenges Defendants' statements regarding the Company's underwriting, risk management, and reserving practices.  Plaintiff asserts in particular that Defendants knowingly and falsely claimed to have "conservative" and "strong" underwriting and risk management policies, as well as a "high quality insurance portfolio."  *See* Opp'n at 9.  Defendants also represented, for instance, that the Company's underwriting process "evaluate[d] and screen[ed] out certain risks based on property reports, individual insurance scoring, information collected from physical property inspections, and driving records," CAC ¶ 121, that the Company maintained "certain policy exclusions that reduce[d] [its] exposure to risks that can create severe losses," *id.*, that it "carefully underwr[ote] [its] business" and "tighten[ed] certain underwriting criteria," *id.* ¶¶ 121, 144, that it "target[ed] a more preferred risk profile in order to reduce adverse selection from risks seeking the lowest premiums and minimal coverage levels," *id.* ¶ 121, and that it "maintained a sensible conservative level of risk taking," *id.* ¶ 137.  As to the Company's claims reserving process, Defendants stated that Kingstone's practices were "designed to set reserves that, in the aggregate, are adequate to pay all claims at their ultimate settlement value," *id.* ¶ 122, that claims reserves were "closely monitored and [] recomputed periodically using the most recent information on reported claims and a variety of statistical techniques," *id.* ¶ 125, that the Company had a "highly capable claims team," *id.* ¶ 132, and that it "constantly monitor[ed] individual claims and ma[de] adjustments

---

[18] In the context of its scienter argument, Plaintiff contends that Defendants "knew, or were reckless in not knowing, that the underwriting exceptions and refusal to consider reserve increases . . . could cause inaccuracies in the financial statements," and that Kingstone was purportedly "forced to admit"—after the Class Period—"that the very issues the CWs allege Defendants had knowledge of," i.e., "ineffective oversight over the establishment of case reserve levels," "was a material weakness in internal controls."  *See* Opp'n at 22.  Nonetheless, Plaintiff points to no allegations demonstrating that Defendants had knowledge of any material weakness at the time they made any challenged statements regarding internal controls.

to reserve levels whenever needed," *id.* ¶ 140.  Defendants also allegedly "touted" both "Kingstone's risk management practices and [its] claims processes."  Opp'n at 7.

Relying heavily on the CWs' allegations, Plaintiff argues that such statements were false and misleading because, in reality, "Kingstone was engaged in risky underwriting practices with missing documentation, improper policy reviews, and a lack of inspections."  Opp'n at 8.[19]  In particular, Plaintiff asserts, based on the CWs' allegations, that Defendants "continually permitted underwriting exceptions for agents who brought in a large amount of business," resulting in undervaluing of properties and thus under-reserving, as well as "prevented" the "underwriters and claims departments . . . from communicating and sharing information," thereby "making an adequate review of claims and the 'monitoring' of claims impossible."  Opp'n at 8-9.

Statements about Kingstone's underwriting, risk management, and reserving practices fail for similar reasons as those above: the Complaint is devoid of particularized allegations demonstrating the falsity of these challenged statements.  For the reasons already explained, none of the CWs' allegations—all of which are assumed to be true—demonstrates the contemporaneous falsity of the challenged statements.  *See In re Lululemon*, 14 F. Supp. 3d at 571 (noting that, "without *contemporaneous* falsity, there can be no fraud").  The CWs do not set forth specific, contradictory information of which Defendants were aware.  Nor do they provide facts that make Defendants' public statements about the Company's underwriting, risk management, or reserving practices false,

---

[19] Citing paragraph 84 of the Complaint, Plaintiff also argues that "in sharp contrast" to Defendants' statements about the Company's underwriting, risk management, and reserving practices, Kingstone was "forced to acknowledge that it had not been employing industry best claims practices during the Class Period, admitting that following a comprehensive review of the claims department, the Company would adopt and implement a number of industry best practices."  *See* Opp'n at 8.  For the reasons discussed above, however, Plaintiff does not "demonstrate with specificity why and how" these statements were false and misleading, even in light of the Company's decision to "adopt and implement a number of industry best practices" at the end of the Class Period.  *See Rombach*, 355 F.3d at 174.  There is no allegation in the Complaint that Defendants stated that the Company had been employing industry best claims practices during the Class Period when it really was not.  That Defendants determined that there was "much room for improvement," for instance, does not evince a previous failure to employ industry best practices.

misleading, or inconsistent with the CWs' alleged concerns. *See, e.g.*, *Waterford*, 2016 WL 1261135, at *10 (concluding that plaintiffs failed to identify actionable misstatements or omissions premised on the company's "disclosures regarding its underwriting practices" because they failed to allege "facts demonstrating that [] management believed that the Company's underwriting practices were unsound or inappropriate for a program of that type," "knowingly failed to follow the underwriting practices that it actually disclosed," or "that the Company's representation that it was monitoring the underwriting was false"); *Malin*, 499 F. Supp. 2d at 145 (concluding that plaintiffs failed to allege with particularity why "statements regarding [the company's] accounting practices" were fraudulent as "Plaintiffs simply list the statements and assert that because large reserve increases were necessary, the accounting practices described must not have been followed").  "Notwithstanding the fact that certain [] issues may have existed within [the underwriting and/or claims departments], Plaintiff[] do[es] not show 'how and why' Defendants' statements" about Kingstone's practices within these departments were false or misleading at the time the statements were made.  *See In re Adient*, 2020 WL 1644018, at *13.  Accordingly, Defendants' statements about Kingstone's underwriting, risk management, and reserving practices are also not actionable under the securities laws.

## II.     Whether Plaintiff Adequately Alleges that Defendants Acted with Scienter

Not only does the Complaint fail to sufficiently plead that Defendants made any false or misleading statements, but also it fails to sufficiently plead that any Defendant acted with the requisite scienter.  "Scienter is the mental state embracing an intent to deceive, manipulate, or defraud by the maker of a statement." *In re Lululemon*, 14 F. Supp. 3d at 573 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 323 (2007)).  The "scienter requirement is met where the complaint alleges facts showing" either (1) a "motive and opportunity to commit the fraud," or (2) "strong circumstantial evidence of conscious misbehavior or recklessness." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (citation omitted); *see also Kalnit v.*

*Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).  To adequately plead that the statements were made with the requisite scienter, a plaintiff must plead facts that, "taken together[,] give rise to a strong inference that the makers of the statements . . . knew that their statements were false or misleading when made, or recklessly disregarded that possibility." *In re Lululemon*, 14 F. Supp. 3d at 581 (citing *Tellabs* 551 U.S. at 323-24 and *Novak*, 216 F. 3d at 308-09).  The question is thus "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323.

At the motion to dismiss stage, "[t]o determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323-24.  "In other words, it is not enough to set out facts from which, if true, a reasonable person *could* infer that the defendant acted with the required intent." *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015) (internal quotation marks and citation omitted).  Rather, the scienter requirement is met "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  The court must therefore ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *ECA*, 553 F.3d at 198 (quoting *Tellabs*, 551 U.S. at 326).  The PSLRA likewise requires that a plaintiff "state with particularity facts giving rise to a strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2)(A).

Plaintiff argues that the Complaint pleads a strong inference of scienter under both the "motive and opportunity" theory and the "conscious misbehavior or recklessness" theory.  *See* Opp'n at 20-24.  The Court again disagrees, and holds that under either theory, he has failed to sufficiently plead scienter.

### A. Motive and Opportunity

To allege scienter under the "motive and opportunity" theory, generally, a plaintiff must show that the defendant "benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307-08; *see also In re Lululemon*, 14 F. Supp. 3d at 573 ("Motive and opportunity require plausible allegations that the maker of a statement could, and had the likely prospect of, realizing concrete benefits by the misstatement."). It is undisputed that the Complaint adequately alleges that the Individual Defendants—former and current executives of the Company—had the "opportunity" to commit the alleged fraud by virtue of their executive positions at Kingstone. *See Nguyen v. New Links Genetics Corp.*, 297 F. Supp. 3d 472, 492 (S.D.N.Y. 2018). The Complaint fails to plead, however, sufficient facts to show that any Individual Defendant had a "motive" to do so.

"Motives that are generally possessed by most corporate directors and officers do not suffice" for purposes of scienter. *Kalnit*, 264 F.3d at 139 (citing *Novak*, 216 F.3d at 307-08). "[I]nstead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Id.* Plaintiff argues that Defendants had the "motive" to commit the fraud based on three theories: first, based on the Individual Defendants' "exorbitant compensation," as well as the fact that their bonuses were "tied to the Company's income and combined ratio," which was "directly impacted by loss reserves," *see* Opp'n at 23; second, based on the Individual Defendants' desire to maintain the Company's upgraded A.M. Best rating, *see id.* at 24; and third, based on Goldstein's "substantial sale of stock" during the Class Period, *see id.* The Court addresses each of these theories in turn.

As to the Individual Defendants' compensation and bonuses, it is well established that "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *ECA*, 553 F.3d at 198; *see also Kalnit*, 264 F.3d at 139. As to allegations of defendants inflating stock prices in order to increase their own compensation, the

Second Circuit has specifically noted that "[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Kalnit*, 264 F.3d at 140 (citation omitted); *see also Malin*, 499 F. Supp. 2d at 158-59 (explaining that because "[i]n today's corporate environment, . . . nearly all executives are compensated with stock options and incentive bonuses," the "receipt of incentive compensation, including performance-based bonuses, does not, by itself, establish motive"). The motive requirement is generally satisfied, however, "when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *ECA*, 553 F.3d at 198. Here, however, Plaintiff does not explain why the Individual Defendants' compensation or bonuses, even if "tied to the Company's income and combined ratio which was directly impacted by loss reserves," *see* Opp'n at 23, establishes a "concrete and personal benefit" to them. This motive theory thus fails.

As to Kingstone's A.M. Best rating, the Court agrees with Defendants that a desire to maintain a favorable rating from A.M. Best similarly does not establish motive. *See* Mot. at 21. Courts in this Circuit have held that "a motive to maintain a financial rating to protect the viability of the Company is not sufficient, under the law of this Circuit, to establish a motive to commit fraud." *Coronel v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 1405 (RPP), 2009 WL 174656, at *16 (S.D.N.Y. Jan. 26, 2009) (rejecting plaintiff's allegations of fraud "based on the Company's desire to maintain an 'excellent' rating from A.M. Best"); *see also, e.g.*, *Novak*, 216 F.3d at 307 ("Plaintiffs could not proceed based on motives possessed by virtually all corporate insiders, including . . . the desire to maintain a high corporate credit rating[.]"); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) (noting that a "company's desire to maintain a high bond or credit rating" does not qualify as a sufficient motive); *Malin*, 499 F. Supp. 2d at 157 ("A company's desire to maintain high credit and bond ratings, along with other similarly generalized motives, have been found to be insufficient, because such desires can be imputed to all companies.").

Plaintiff has provided no reasoning why the Court should disregard these principles, and it declines to do so.[20]

Lastly, Goldstein's stock sales do not establish motive to commit the fraud for several reasons. As an initial matter, even a significant stock sale by a corporate insider is generally insufficient, without more, to support an inference of fraudulent intent. *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004). Rather, only "unusual" stock trading by an executive, "under some circumstances[,] may give rise to an inference of [scienter]." *Id.* (citation omitted); *see also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). An insider's stock sales may thus support an inference of fraudulent intent where the trades are "unusual or suspicious in timing or amount." *See In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999). A plaintiff bears the burden of demonstrating that a defendant's stock sales are "unusual." *See Acito*, 47 F.3d at 54.

The Court cannot conclude that Goldstein's Class Period sale of 79,286 shares of Kingstone stock, "reaping net proceeds of over $1.3 million," CAC ¶ 115, was "unusual" or "suspicious," even if it is true that Goldstein had only sold shares of Kingstone stock once before in the preceding ten years, *see id.* As to the timing, Plaintiff merely asserts that Goldstein "sold his stocks almost immediately after being taken out of the position to control the disclosure timing." *See* Opp'n at 24 n.20. Nonetheless, according to the table included in the Complaint, Goldstein's stock sales all occurred between January 2 and January 25, 2019. *See* CAC ¶ 115. It is thus undisputed that

---

[20] Plaintiff cites one case, *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506 (S.D.N.Y. 2010), in support of his argument that "the Individual Defendants had a concrete [sic] and personal motive to maintain that upgraded rating." Opp'n at 24. In *Citiline*, however, the court found that plaintiffs had adequately pleaded scienter based on "facts constituting strong circumstantial evidence of misbehavior or recklessness" in light of allegations that, among other things, defendants "needed to conceal [the company's] deteriorating performance so that [it] would be able to secure financing and maintain an investment-grade credit rating." *Citiline*, 701 F. Supp. 2d at 516. Plaintiff's one conclusory allegation that Defendants sought to "conceal underwriting weaknesses" in order to maintain the Company's A.M. Best rating, CAC ¶ 104, does not suffice to establish motive for these purposes.

Goldstein stopped selling shares more than three months before the first disclosure, which occurred on April 29, 2019. *See* CAC ¶ 84. Courts in the Second Circuit have found that "stock sales are not indicative of scienter when they are 'more than two months before the announcement' in question." *See In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 345 (W.D.N.Y. 2008) (citing *Malin*, 499 F. Supp. 2d at 154 n.24 and *In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 385 (E.D.N.Y. 2003)). Trades that are "made a short time before a negative public announcement," on the other hand, may be "suspiciously timed." *In re Oxford Health*, 187 F.R.D. at 139; *see also, e.g.*, *Reilly v. U.S. Physical Therapy, Inc.*, No. 17 Civ. 2347 (NRB), 2018 WL 3559089, at *14 (S.D.N.Y. July 23, 2018) ("Indeed, courts in this Circuit are frequently skeptical that stock sales are indicative of scienter where no trades occur in the months immediately prior to a negative disclosure."); *In re Bausch & Lomb*, 592 F. Supp. 2d at 344-45 (noting that because the "stock sales at issue took place, for the most part, over two months prior to the release of the negative disclosure by [the company] relating to its accounting problems," such timing did not "suggest that the Individual Defendants meant to realize profits immediately prior to an expected and dramatic fall in the stock's price"); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 444-45 (S.D.N.Y. 2005) (explaining that timing is more suspicious where defendants' stock sales are "clustered at [the] end [of the Class Period], when insiders theoretically would have rushed to cash out before the fraud was revealed and stock prices plummeted").

As to the amount or other circumstances surrounding Goldstein's sales during the Class Period, Plaintiff has failed to sufficiently allege why such activity was "unusual." In this determination, courts typically consider factors such as "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *Evoqua*, 2020 WL 1529371, at *25 (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir. 2001)). Aside from alleging that Goldstein made "net proceeds" of approximately $1.3 million, CAC ¶ 115, the Complaint is silent with respect to "the portion of stockholdings sold,

the change in volume of insider sales, [or] the number of insiders selling." *See also Reilly*, 2018 WL 3559089, at \*15 (explaining that "without more, the amount of stock sold cannot be determinative" as "courts routinely find that raw sales numbers alone are insufficient to establish scienter"). Indeed, proceeds alone are insufficient to demonstrate unusual or suspicious trading activity. *See, e.g.*, *Chapman*, 2020 WL 3100243, at \*20 (rejecting allegations of motive based on two defendants' stock sales because the complaint did not "identify the profits realized by either Defendant for any of the sales," and "proceeds alone say nothing about a seller's motive") (citation omitted); *Malin*, 499 F. Supp. 2d at 153 (noting that "even large stock sales are not probative of scienter unless they are significant in comparison to the total number of shares an insider holds") (citation omitted); *In re BISYS*, 397 F. Supp. 2d at 445 ("The gross proceeds, standing alone, tell us very little. Far more significant is the extent to which sales ahead of disclosure of negative news or purchases ahead of the disclosure of positive news lead logically to the conclusion that the insiders were aware of the news at the times of the transactions."). Moreover, it is significant that none of the other three Individual Defendants are alleged to have made any sales during the Class Period. *See, e.g.*, *San Leandro*, 75 F.3d at 814 ("[T]he fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive."); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 558 (S.D.N.Y. 2010) (explaining that, as "[t]he number of corporate insiders who sold shares is [] relevant," courts have "held that an inference of motive and opportunity is undermined when only one of several individual defendants engaged in unusual trading activity").

Finally, it is uncontested that Goldstein's stock sales were made pursuant to a Rule 10b5-1 trading plan, which further undermines an inference of fraudulent intent as "it is well established that trades under 10b–5–1 plan[s] do not raise a strong inference of scienter." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) (quoting *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009)) (internal quotation marks omitted). Although Plaintiff argues that

Goldstein "knew of the fraud when he entered into the plan," and therefore that his sales pursuant to the plan still lead to an inference of scienter, *see* Opp'n at 24 n.20, the Complaint does not actually contain allegations demonstrating Goldstein's knowledge as to any fraud, as discussed above.  *See City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 226 (E.D.N.Y. 2019) ("While it is true that trading plans entered into during the class period may raise an inference of scienter, . . . the plaintiffs have not alleged any facts that suggest there was strategic trading and manipulative intent involved in the trading plan[.]").

In sum, the allegations regarding Goldstein's stock sales are insufficient to conclude that such sales were "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information."  *Malin*, 499 F. Supp. 2d at 150.  For all of these reasons, Plaintiff has failed to plausibly allege that any Defendant had a "motive" to commit the fraud.

**B.  Conscious Misbehavior or Recklessness**

Absent a showing of motive, a plaintiff may demonstrate scienter through allegations regarding conscious misbehavior or recklessness, but "the strength of the circumstantial allegations must be correspondingly greater."   *ECA*, 553 F.3d at 199 (quoting *Kalnit*, 264 F.3d at 142). "Conscious misbehavior," on one hand, "generally consists of deliberate, illegal behavior."   *In re Lululemon*, 14 F. Supp. 3d at 573 (citing *Novak*, 216 F.3d at 308).  Recklessness, on the other hand, can be adequately pleaded where the allegations show that defendants' conduct was "highly unreasonable" and constituted "an extreme departure from the standards of ordinary care to the extent that *the danger was either known to the defendant or so obvious that the defendant must have been aware of it.*'"  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)) (emphasis in *S. Cherry St.*).  In other words, the recklessness required to plead scienter is "conscious recklessness—i.e., a state of

mind *approximating actual intent*, and *not merely a heightened form of negligence*." *Id.* (quoting

*Novak*, 216 F.3d at 312) (emphasis in *S. Cherry St.*).

Circumstantial evidence can support a strong inference of scienter, under the "conscious

misbehavior or recklessness" theory, where defendants: "(1) benefitted in a concrete and personal

way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had

access to information suggesting that their public statements were not accurate; or (4) failed to check

information they had a duty to monitor." *Blanford*, 794 F.3d at 306 (citation omitted).  Here, Plaintiff

points to several circumstances that purportedly lead to an inference that the Individual Defendants

engaged in "conscious misbehavior or recklessness."  The Court finds none of these to be persuasive.

First, Plaintiff argues that the Complaint sufficiently alleges that Defendants "knew facts or

had access to information" suggesting that "Kingstone's portrayal of its underwriting practices, risk

management practices, and loss reserving practices," as well as its "loss reserves and related financial

results," were "not accurate."  *See* Opp'n at 21.  Under this prong, recklessness may be sufficiently

pled where there are "[p]lausible allegations that a defendant had facts at his disposal contradicting

material public statements, but then ignor[ed] such facts or proceed[ed] despite them."  *In re

Lululemon*, 14 F. Supp. 3d at 574 (citing *Novak*, 216 F.3d at 308-09).  Plaintiff asserts this purported

knowledge based on the CWs' allegations, including "CW6's frequently rejected loss reserve

recommendations and refused reserve increase requests," as well as the monthly reports that CW2

submitted and the "numerous meetings and discussions surrounding those reports."  *See* Opp'n at 20.

Where plaintiffs allege that defendants knew about or had access to contrary facts, however, "they

must specifically identify the reports or statements containing this information."  *Novak*, 216 F.3d at

309.  "An allegation that a defendant merely ought to have known is not sufficient to allege

recklessness."  *In re Lululemon*, 14 F. Supp. 3d at 574 (citation omitted).  As such, "Second Circuit

cases uniformly rely on allegations that [1] *specific* contradictory information was available to the

defendants [2] *at the same time* they made their misleading statements." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 813 (S.D.N.Y. 2018) (quoting *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009)).

As noted above, Plaintiff has failed to adequately plead that Defendants were aware of any specific, contradictory information at the time they made the allegedly false and misleading statements regarding loss reserves or reserving practices, underwriting practices, or risk management practices. *See, e.g.*, *In re SLM*, 740 F. Supp. 2d at 559 (rejecting CWs' allegations where plaintiff did not "identify any contemporaneous internal document showing that the loan loss reserves were improperly calculated or that [a defendant] made a statement without foundation," and where "none of the CWs claim knowledge of how the loan loss reserves were calculated"); *Malin*, 499 F. Supp. 2d at 161 (rejecting CWs' allegations in part because the complaint "fail[ed] to reference any actual reports reviewed by any specific individuals, including the Individual Defendants, at [the company] on any specific date that indicated that [the] loss reserves were not sufficient"). In fact, aside from CW2, Plaintiff has "failed to allege any facts showing that the confidential sources . . . had any contact with the Individual Defendants or would have knowledge of what they knew or should have known during the Class Period." *In re Bausch & Lomb*, 592 F. Supp. 2d at 342; *see also Malin*, 499 F. Supp. 2d at 141-42 (holding that the "information collected from the CWs" was insufficient to support an inference of scienter because, among other things, "none of the CWs present[ed] any evidence that they communicated any of the alleged problems detailed above to any of the Individual Defendants or that the Individual Defendants otherwise knew about these issues"). And although CW2 references "monthly reports" and "meetings," the Complaint does not plausibly allege what information was actually included in those reports or discussed at those meetings. Put simply, Plaintiff fails to plead "specific contradictory information" that was available to any Defendant at the time they made any

challenged statement.[21]

Moreover, the fact that Kingstone's independent auditor and independent actuary were unable to identify any material inaccuracies or weaknesses undermines a finding of recklessness on Defendants' part.  *See, e.g.*, *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) ("[T]he fact that UBS's outside independent auditor . . . did not require a restatement of UBS's financials significantly undercuts Plaintiffs' allegations of recklessness[.]"); *In re Bausch & Lomb*, 592 F. Supp. 2d at 341 ("It is noteworthy that B & L's outside auditor[] did not question B & L's accounting practices."); *In re JP Morgan Chase Sec. Litig.*, No. 02 Civ. 1282 (SHS), 2007 WL 950132, at *13 (S.D.N.Y. 2007), *aff'd,* 553 F.3d 187 (2d Cir. 2009) (explaining that the fact that the auditor had not required a restatement demonstrates that "reasonable accountants could differ as to whether [a particular accounting rule] applied to the . . . transactions— an inference that defeats plaintiffs' claims of recklessness").

Second, Plaintiff asserts that the fact that the Individual Defendants made "detailed public statements" as to the adequacy of Kingstone's loss reserves, as well as the fact that some of the Individual Defendants signed the Company's SOX certifications thereby attesting to the Company's internal controls over its reserves, supports an inference of scienter.  *See* Opp'n at 21-22.  As a preliminary matter, this argument fails because Plaintiff has not sufficiently pleaded falsity as to any of the challenged statements for the reasons discussed above.  The Complaint does not contain

---

[21] Additionally, the mere fact that some of the Individual Defendants attended meetings where the CW2's reports were discussed is insufficient to demonstrate that they knew, reasonably believed, or were in reckless disregard of facts that rendered their statements inaccurate.  *See In re MBIA*, 700 F. Supp. 2d at 588 (holding that "generalized allegation[s] of [company's then-Chairman and CEO] and [CFO and VP's] membership on various corporate committees is insufficient to show that they were personally aware of the [alleged fraud]"); *Police & Fire Ret. Sys. of the City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 234 (S.D.N.Y. 2009) ("Courts may not infer scienter solely from the fact that, due to defendants board membership or executive managerial position, they had access to the company's internal documentation as well as any adverse information.") (internal quotation marks and citation omitted).

particularized allegations demonstrating that the Individual Defendants "knew, or were reckless in not knowing, that the underwriting exceptions and refusal to consider reserve increases . . . could cause inaccuracies in the financial statements." *See* Opp'n at 22.  The mere fact that Kingstone identified a material weakness in its internal controls in November 2019 does not lead to the inference that the Individual Defendants were aware of that weakness—or any similar weakness—during the Class Period.  Nor does the Complaint itself allege any facts that plausibly demonstrate that any Defendant had such awareness or knowledge.

Third, Plaintiff argues that Defendants' violation of GAAP supports an inference of scienter. *See* Opp'n at 22.  But the "mere fact" that Kingstone's financial reporting may have been inaccurate, even if true, does not establish scienter.  *See In re Bausch & Lomb*, 592 F. Supp. 2d at 341.  The Second Circuit has made clear that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. . . . Only where such allegations are *coupled with evidence of corresponding fraudulent intent* . . . might they be deemed sufficient." *Novak*, 216 F.3d at 309 (internal quotation marks and citations omitted) (emphasis added); *see also Evoqua*, 2020 WL 1529371, at *26 ("The Second Circuit has long applied this standard, repeatedly holding that violations of GAAP are by themselves insufficient to state scienter.") (collecting cases). Accordingly, there must be some showing that Defendants "intentionally and deliberately" refused to comply with GAAP to adequately plead scienter.  *See Novak*, 216 F.3d at 311 (finding that plaintiffs adequately pleaded scienter where they alleged that defendants "intentionally and deliberately" refused to follow internal accounting policies).  To succeed on this theory, Plaintiff must "put forward evidence of corresponding fraudulent intent, *separate and apart from* the accounting violations themselves." *Evoqua*, 2020 WL 1529371, at *26 (internal quotations and citation omitted).  Because Plaintiff has failed to plead facts demonstrating fraudulent intent, the alleged GAAP violations do not support an inference of scienter.

Fourth, Plaintiff's resort to the "core operations" doctrine is unpersuasive. "The core operations doctrine permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *Das*, 332 F. Supp. 3d at 816 (internal quotation marks and citation omitted). "Core operations 'include matters critical to the long term viability of the company and events affecting a significant source of income.'" *Id.* The core operations doctrine, however, "typically applies only where the operation in question constitute[s] nearly all of a company's business," and moreover, "does not independently establish scienter." *Id.* (quoting *Lipow v. Net1 UEPS Tech., Inc.*, 131 F. Supp. 3d 144, 163 (S.D.N.Y. 2015)). "[A]t most," the doctrine "constitutes 'supplemental support' for alleging scienter." *Id.* Here, Plaintiff asserts that the challenged statements "pertained to key accounting metrics and underwriting, the core of any insurance company," and that Defendants allegedly misstated "almost one-quarter of the Company's loss reserves." *See* Opp'n at 23 (emphasis omitted). Plaintiff does not, however, allege that any specific operation constitutes "nearly all" of Kingstone's business, and even if he did, such allegations are insufficient to plead scienter. *See, e.g.*, *In re Adient*, 2020 WL 1644018, at *29 (rejecting allegations about the "importance of Metals to the Company's business" because "Metals did not constitute 'nearly all' of [the company's] business"); *Lululemon*, 14 F. Supp. 3d at 582 (rejecting CWs' argument that "because black luon yoga pants were so important to revenue, when quality issues arose that impacted these products, defendants downplayed those quality issues in order to mislead the marketplace and maintain a higher stock price," and finding instead that those arguments were "unsupported by any allegations in the [complaint]," especially since "the CWs do not allege that any of the makers of the alleged false and misleading statement [sic] did not believe the truth of those statements"). Furthermore, "Plaintiff[] cannot rely on the magnitude of the reserve charges as evidence of Defendants' conscious misbehavior or recklessness." *Malin*, 499 F. Supp. 2d at 164; *see also In re BISYS*, 397 F. Supp. 2d at 447 ("[I]t is clear that 'the size of the fraud alone does not create

an inference of scienter.'") (citation omitted); *In re Wachovia*, 753 F. Supp. at 366 (noting that "the magnitude of the alleged fraud alone is not enough" to establish an inference of scienter).

Finally, Thatcher's "sudden resignation" in July 2019 does not support an inference of scienter. *See* Opp'n at 23. Terminations or resignations of corporate executives are insufficient alone to establish an inference of scienter. *See Das*, 332 F. Supp. 3d at 815. Indeed, "there are any number of reasons that an executive might resign, most of which are not related to fraud." *Id.* (citation omitted). "[A]bsent additional factual allegations linking [an executive's] resignation . . . to the alleged fraud, such allegations are insufficient to raise a strong inference of scienter." *In re UBS*, 2012 WL 4471265, at *18 (internal quotation marks and citations omitted). While Plaintiff contends that Thatcher's resignation was "highly suspicious" because he was "only seven months into his lucrative three-year employment agreement" at the time, *see* Opp'n at 23 (emphasis omitted); *see also* CAC ¶ 105, he cites no authority for the proposition that an executive's early resignation during a period otherwise covered by an employment agreement constitutes "highly suspicious" circumstances. That allegation alone is thus insufficient to establish an inference of scienter. *See, e.g.*, *In re DRDGold Ltd. Sec. Litig.*, 472 F. Supp. 2d 562, 575 (S.D.N.Y. 2007) (rejecting allegations as to a director's resignation "after being in the position just three weeks" because the complaint did not "state any facts to indicate that his departure was a result of any knowledge of alleged fraudulent activities at [the company]"); *In re BISYS*, 397 F. Supp. 2d at 447 ("[A]bsent any alleged facts linking the two resignations and the alleged fraud, the resignations of [two former executives] do not support an inference of conscious misbehavior or recklessness.").

The Court therefore concludes that Plaintiff has not pled facts giving rise to a strong inference of scienter. To the contrary, the more plausible inference—based on the facts alleged in the Complaint—is a "nonculpable" one: any inadequacy in Kingstone's loss reserves or the effectiveness of its internal controls were, at the most, a result of inactionable corporate mismanagement. And it

is well established that mismanagement is not actionable under the securities laws.  *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) ("Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.") (citation omitted); *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) ("Generally, poor business judgment is not actionable under section 10(b) and Rule 10b-5."); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 354-55 (S.D.N.Y. 2006) ("Allegations of corporate mismanagement generally fall outside the scope of § 10(b) because they fail to allege conduct that is considered 'manipulative or deceptive.'") (quoting *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 617 (S.D.N.Y. 2005)).

### III.    Whether Plaintiff Adequately Alleges a Section 20(a) Claim

Lastly, under Section 20(a) of the Securities Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under [the Exchange Act and its regulations] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable."  15 U.S.C. § 78t(a).  To state a claim under Section 20(a), a plaintiff must show (1) "a primary violation by the controlled person," (2) "control of the primary violator by the defendant," and (3) "that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI*, 493 F.3d at 108.

Control person liability under Section 20(a) requires an underlying primary violation of Section 10(b) of the Securities Exchange Act.  *See id.*  Since Plaintiff has failed to adequately plead a violation of Section 10(b), his claim for Section 20(a) control person liability by the Individual Defendants also fails.  *See, e.g.*, *Das*, 332 F. Supp. 3d at 817-18; *Lopez*, 173 F. Supp. 3d at 42; *In re Lululemon*, 14 F. Supp. 3d at 587.

**CONCLUSION**

For the reasons set forth above, Defendants' motion to dismiss the Amended Class Action Complaint is granted.  In light of his request, the Court will, however, permit Plaintiff to amend the complaint to cure the deficiencies identified in this Opinion, to the extent he has a good faith basis to do so.  Plaintiff's amended complaint, if any, shall be filed no later than September 11, 2020.  If he chooses to amend his complaint, Plaintiff shall also submit a redline demonstrating the changes between the current complaint and the new complaint, as well as a letter brief explaining why such changes should alter the Court's analysis.  The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 45.

SO ORDERED.

Dated:      August 10, 2020
            New York, New York

_____
Ronnie Abrams
United States District Judge